# 22-2987

## United States Court of Appeals for the Second Circuit

BRETT CHRISTIAN, FIREARMS POLICY COALITION, INC.,
SECOND AMENDMENT FOUNDATION, INC.,

*Plaintiffs-Appellees,*

v.

STEVEN A. NIGRELLI, in his official capacity as
Superintendent of the New York State Police,

*Defendant-Appellant,*

(*Caption continues inside front cover.*)

On Appeal from the United States District Court
for the Western District of New York

**BRIEF AND SPECIAL APPENDIX FOR APPELLANT**

BARBARA D. UNDERWOOD
*Solicitor General*
ESTER MURDUKHAYEVA
*Deputy Solicitor General*
ERIC DEL POZO
*Assistant Solicitor General*
*of Counsel*

LETITIA JAMES
*Attorney General*
*State of New York*
Attorney for Appellant
28 Liberty Street
New York, New York 10005
(212) 416-8019

Dated: January 23, 2023

*(Caption continues from front cover.)*

JOHN BROWN,

*Plaintiff,*

v.

JOHN J. FLYNN, in his official capacity as
District Attorney for the County of Erie, New York,

*Defendant-Appellee.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................iii

PRELIMINARY STATEMENT ............................................................. 1

JURISDICTIONAL STATEMENT ....................................................... 4

ISSUES PRESENTED ........................................................................... 5

STATEMENT OF THE CASE .............................................................. 5

    A.   Legal Background ..................................................................... 5

        1.   The U.S. Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen* ......................... 5

        2.   New York's default rule regarding possession of firearms on others' private property ................................ 7

    B.   Procedural History ................................................................... 8

    C.   The District Court's Preliminary-Injunction Ruling.............. 11

STANDARD OF REVIEW.................................................................... 13

SUMMARY OF ARGUMENT ............................................................. 15

ARGUMENT ........................................................................................ 17

POINT I

    CHRISTIAN LACKS ARTICLE III STANDING TO MAINTAIN THIS PREENFORCEMENT CHALLENGE...................................................... 17

POINT II

    PLAINTIFFS FAILED TO ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR SECOND AMENDMENT CHALLENGE TO THE PRIVATE-PROPERTY PROVISION ........................................................ 23

i

**Page**

    A.   The Second Amendment Does Not Bestow a Right to
         Carry Arms onto Others' Private Property Absent Consent. ... 24

    B.   The Private-Property Provision Is Consistent with the
         Historical Tradition of Firearms Regulation. ....................... 29

POINT III
    THE DISTRICT COURT ERRED IN APPLYING THE REMAINING
    PRELIMINARY-INJUNCTION FACTORS .................................................... 37

CONCLUSION ....................................................................... 42

# TABLE OF AUTHORITIES

**Cases**                                                 **Page(s)**

*Antonyuk v. Hochul*,
No. 22-cv-986, 2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022) .... 22, 32-34

*Bennett v. Spear*,
520 U.S. 154 (1997) ........................................................................ 19

*Burg v. Gosselin*,
591 F.3d 95 (2d Cir. 2010) ............................................................ 25

*Caswell v. Calderon*,
363 F.3d 832 (9th Cir. 2004) ........................................................ 25

*Cedar Point Nursery v. Hassid*,
141 S. Ct. 2063 (2021) .................................................................. 28

*Citibank, N.A. v. Citytrust*,
756 F.2d 273 (2d Cir. 1985) .......................................................... 38

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ...................................................................... 20

*Connecticut Citizens Def. League, Inc. v. Lamont*,
6 F.4th 439 (2d Cir. 2021) ............................................................ 17

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ................................................................ 7, 26

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
559 F.3d 110 (2d Cir. 2009) .......................................................... 39

*Fields v. City of Tulsa*,
753 F.3d 1000 (10th Cir. 2014) ..................................................... 25

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ................................................................ 18, 23

*GeorgiaCarry.Org, Inc. v. Georgia*,
687 F.3d 1244 (11th Cir. 2012) .................................................27-28

iii

## Cases                                                                    Page(s)

*Intel Corp. Inv. Pol'y Comm. v. Sulyma,*
140 S. Ct. 768 (2020) ............................................................ 21

*Kachalsky v. County of Westchester,*
701 F.3d 81 (2d Cir. 2012) ................................................... 41

*Kansas v. Hendricks,*
521 U.S. 346 (1997) .............................................................. 25

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) .............................................................. 18

*Manhattan Cmty. Access Corp. v. Halleck,*
139 S. Ct. 1921 (2019) ......................................................... 19

*Martin v. Franklin Cap. Corp.,*
546 U.S. 132 (2005) .............................................................. 40

*New York ex rel. Schneiderman v. Actavis PLC,*
787 F.3d 638 (2d Cir. 2015) ................................................. 14

*New York Progress & Prot. PAC v. Walsh,*
733 F.3d 483 (2d Cir. 2013) ................................................. 37

*New York State Rifle & Pistol Association v. Bruen,*
142 S. Ct. 2111 (2022) ................................................. passim

*Nken v. Holder,*
556 U.S. 418 (2009) .............................................................. 37

*OneWest Bank, N.A. v. Melina,*
827 F.3d 214 (2d Cir. 2016) ................................................. 14

*Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.,*
769 F.3d 105 (2d Cir. 2014) ................................................. 23

*Otokoyama Co. v. Wine of Japan Imp., Inc.,*
175 F.3d 266 (2d Cir. 1999) .......................................... 13, 26

| Cases | Page(s) |
|---|---|

*Planned Parenthood Minn., N.D., S.D. v. Rounds*,
  686 F.3d 889 (8th Cir. 2012) .............................................................. 25

*RiseandShine Corp. v. PepsiCo, Inc.*,
  41 F.4th 112 (2d Cir. 2022) ......................................................... 13, 26

*Salinger v. Colting*,
  607 F.3d 68 (2d Cir. 2010) ................................................................ 37

*Simon v. Eastern Ky. Welfare Rts. Org.*,
  426 U.S. 26 (1976) ............................................................................. 20

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ........................................................................... 17

*Sprint Commc'ns Co. v. APCC Servs., Inc.*,
  554 U.S. 269 (2008) ........................................................................... 18

*Sussman v. Crawford*,
  488 F.3d 136 (2d Cir. 2007) ......................................................... 14, 23

*Tough Traveler, Ltd. v. Outbound Prods.*,
  60 F.3d 964 (2d Cir. 1995) ................................................................ 38

*Turaani v. Wray*,
  988 F.3d 313 (6th Cir. 2021) ............................................................. 20

*United States v. Smythe*,
  363 F.3d 127 (2d Cir. 2004) .............................................................. 40

*Utah v. Evans*,
  536 U.S. 452 (2002) ........................................................................... 36

*We The Patriots USA, Inc. v. Hochul*,
  17 F.4th 266 (2d Cir. 2021) ....................................................... 14, 39-40

*Whole Woman's Health v. Jackson*,
  142 S. Ct. 522 (2021) ......................................................................... 20

**Laws & Rules**                                                      **Page(s)**

*Federal*

Fed. R. App. P. 43 ........................................................................ 8

*New York*

Ch. 371, 2022 N.Y. Laws (N.Y. Legis. Retrieval Serv.) ........................... 7

Penal Law
    § 265.01-d ............................................................. 1, 8, 21, 26
    § 265.03 ...................................................................... 5
    § 265.20 ...................................................................... 5
    § 400.00 ................................................................... 5-6

**Miscellaneous Authorities**

Ian Ayres & Spurthi Jonnalagadda, *Guests with Guns:*
    *Public Support for "No Carry" Defaults on Private Land,*
    48 J.L., Med. & Ethics 183 (2020) ........................................ 41

## PRELIMINARY STATEMENT

In July 2022, the New York Legislature enacted the Concealed Carry Improvement Act (CCIA) to update New York's firearm licensing and possession laws following the U.S. Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022). As relevant to this case, the CCIA prohibits a person from entering others' private property with a firearm when he knows or reasonably should know that the owner or lessee has not expressly consented to the presence of firearms on the property. *See* Penal Law § 265.01-d.

More than two months after the law was enacted and two weeks after it took effect, plaintiffs sued to challenge this private-property provision as unconstitutional under the Second and Fourteenth Amendments. The U.S. District Court for the Western District of New York (Sinatra, J.) preliminarily enjoined defendant Steven A. Nigrelli, in his official capacity as Acting Superintendent of the New York State Police,

from enforcing the provision on a statewide basis with respect to private property that is otherwise open to the public.[1] This Court should reverse.

First, plaintiffs—individual Brett Christian and two gun-advocacy organizations—lack Article III standing to maintain this preenforcement challenge. It is undisputed that an owner or lessee of private property—whether a private residence or a commercial business—has the unqualified right to exclude firearms from the premises. It is also undisputed that the private-property provision does not preclude a person from seeking and obtaining an owner's or lessee's express consent to carry a firearm into an establishment. Accordingly, plaintiffs' alleged injury—the purported inability to carry a firearm into various establishments—is ultimately attributable to decisions made by innumerable third parties about whether and how to convey consent to the carriage of firearms on their properties.

Second, even if plaintiffs had standing to sue, the district court erred in holding that plaintiffs' challenge is likely to succeed on the merits. As *Bruen* dictates, only when the Second Amendment's plain text

---

[1] The injunction also applies to defendant John J. Flynn, in his official capacity as District Attorney for Erie County, New York. Flynn has not appealed from the preliminary injunction.

covers a plaintiff's alleged conduct must the government then demonstrate that the challenged law is consistent with the Nation's history and tradition of gun regulation.

Here, plaintiffs made no showing that carrying firearms onto private property implicated the Second Amendment's textual scope, and the district court simply assumed that conclusion to be so. But the U.S. Supreme Court has never identified a Second Amendment right to carry a gun into someone else's private residence or business without that person's knowledge and consent. Indeed, the Second Amendment's reach, as originally understood, ends at the property line of others—at least when the proprietors wish to exclude weaponry from the premises. New York's law merely sets a default rule to vindicate the ability of owners or lessees of private property to make informed choices about whether anyone (or everyone) may enter or remain on the property armed, and in doing so does not implicate the Second Amendment.

In any event, there is a robust and unambiguous line of statutes, from the colonial era through Reconstruction and beyond, that have restricted carrying guns onto others' private premises without advance consent. The district court's decision to cast aside all of these sources

effectively imposes a hurdle so high as to preclude a historical defense of any modern gun regulation. This approach impermissibly makes the Second Amendment a regulatory straitjacket—contrary to *Bruen*'s admonition.

Finally, the district court erred in applying the remaining preliminary-injunction factors. Among other things, the court improperly speculated that plaintiffs would suffer irreparable harm absent an injunction and improperly based its public-interest finding on its policy disagreements with New York's elected leaders.

## JURISDICTIONAL STATEMENT

The district court had original subject-matter jurisdiction over this Second Amendment action under 28 U.S.C. §§ 1331 and 1343. This Court has appellate jurisdiction over the district court's preliminary-injunction decision under 28 U.S.C. § 1292(a)(1). The district court's decision was entered on November 22, 2022, and appellant filed a timely notice of appeal the following day. (*See* Joint Appendix (J.A.) 522.)

4

## ISSUES PRESENTED

1.      Do plaintiffs lack Article III standing to maintain a preenforcement challenge to the private-property provision?

2.      Did plaintiffs fail to show a likelihood of success on the claim that the private-property provision facially violates the Second Amendment?

3.      Did the district court err in its application of the remaining preliminary-injunction factors?

## STATEMENT OF THE CASE

**A.    Legal Background**

### 1.   The U.S. Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen*

Like dozens of States, New York requires a license to carry a concealed handgun in public. *See, e.g.*, Penal Law §§ 265.03 (criminalizing possession of loaded handgun), 265.20(a)(3) (exempting license holders). New York law has long set forth basic eligibility criteria for a license, including being at least twenty-one years old, not having a felony record, and otherwise having "good moral character." *Id.* § 400.00(1)(a)-(c). Until recently, New York also required demonstrating "proper cause" to obtain

5

a concealed-carry license. *Id.* § 400.00(2)(f) (effective through June 23, 2022).

In *Bruen*, the U.S. Supreme Court concluded that insofar as "proper cause" required articulating a "special need for self-defense," this condition violated the Second Amendment rights of law-abiding, responsible citizens to carry arms in public for self-defense. 142 S. Ct. at 2122, 2138. In so holding, *Bruen* rejected the framework previously used by nearly all federal appellate courts to evaluate Second Amendment challenges in favor of a restated standard: if "the Second Amendment's plain text covers an individual's conduct," then the government seeking to restrict that activity must demonstrate that its law "is consistent with this Nation's historical tradition of firearms regulation." *Id.* at 2126; *see also id.* at 2129.

*Bruen* declined to "undertake an exhaustive historical analysis of the full scope of the Second Amendment." 142 S. Ct. at 2134 (quotation marks and alterations omitted). Nor did the Court "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment." *Id.* at 2132. But the Court made clear that "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical

6

*twin*" or "dead ringer" for a modern regulation. *Id.* at 2133. The Court recognized that sometimes analogies will be "relatively simple to draw," but cautioned that in no case should the exercise come to resemble a "regulatory straightjacket." *Id.* at 2132-33; *see also id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) ("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations." (quoting *District of Columbia v. Heller*, 554 U.S. 570, 636 (2008))).

## 2. New York's default rule regarding possession of firearms on others' private property

On July 1, 2022, the New York Legislature passed the CCIA, which removed the proper-cause requirement that *Bruen* declared unconstitutional and made several other changes to New York's firearm licensing and possession laws. *See* Ch. 371, 2022 N.Y. Laws (N.Y. Legis. Retrieval Serv.).

As relevant here, the CCIA denominates private property within New York State to be a "restricted location," pursuant to a default rule that someone may not carry a firearm on the premises if the person knows or reasonably should know that the proprietor has not given express consent to such carriage, either through posted signage or some other

indication. *See* Penal Law § 265.01-d(1) (*reproduced at* Special Appendix
(S.A.) 28). The private-property provision does not apply to law-enforcement
officers, military personnel, armed security guards, and persons lawfully
engaged in hunting activity. *See id.* § 265.01-d(2).

## B.   Procedural History

On September 13, 2022, plaintiff Brett Christian and two
gun-advocacy organizations[2] filed this lawsuit under 42 U.S.C. § 1983 in
the Western District of New York against the then-Superintendent of the
New York State Police and the District Attorney of Erie County, in their
official capacities.[3] The complaint challenged the private-property provi-
sion as facially unconstitutional under the Second and Fourteenth Amend-
ments "with respect to places open to the public" (J.A. 38), and sought
declaratory and injunctive relief (J.A. 40). Two weeks later, plaintiffs

_____

[2] Original lead plaintiff John Boron withdrew his claims shortly
after the complaint's filing. *See* Notice of Voluntary Dismissal (Sept. 28,
2022), Dist. Ct. ECF No. 17. Citing this Court's precedent on organiza-
tional standing, the district court in its preliminary-injunction ruling
considered only the allegations raised by Christian. (S.A. 3.)

[3] Acting Superintendent Nigrelli was automatically substituted as
a defendant after the prior Superintendent left government service. *See*
Fed. R. App. P. 43(c)(2).

8

moved for a preliminary injunction against enforcement of the challenged provision.[4]

Christian has a New York State license to carry a handgun (J.A. 73), and currently owns eleven of them (J.A. 411). Christian avers that the private-property provision has "barred [him] from carrying a firearm for self-defense in places that [he] previously carried in and would intend to keep carrying in, but for the enactment and enforcement of" this law. (J.A. 73.) As relevant here, Christian "would typically bring" a concealed firearm onto "private property open to the public, including weekly visits to gas stations and monthly visits to hardware stores," but now allegedly cannot do so because these establishments "have failed to post conspicuous signage consenting to the carrying of firearms." (J.A. 74-75.)

---

[4] The complaint and preliminary-injunction motion also challenged the CCIA's separate sensitive-location restrictions on firearms in public parks and on public transportation. The district court reserved decision on the request for a preliminary injunction as to these provisions (S.A. 2) and stayed the resolution of these portions of the motion pending the appeal in *Antonyuk v. Hochul*, No. 22-2908 (2d Cir. docketed Nov. 9, 2022). (*See* J.A. 9-10 (Text Order, Dist. Ct. ECF No. 60).)

The State opposed the preliminary-injunction motion on numerous grounds, including that plaintiffs lacked standing and failed to show that the default rule embodied in the private-property provision implicates the Second Amendment.[5] In addition, the State argued that this statute is part of a significant and unambiguous tradition of laws forbidding carrying guns onto others' property without their permission; the State identified at least eight such provisions from seven different jurisdictions, spanning almost two hundred years from the colonial to the Reconstruction eras. The State also asserted that plaintiffs failed to show irreparable harm and that a preliminary injunction would not be in the public interest as, among other things, it would allow persons to carry firearms onto private property without a proprietor's consent or even knowledge. *See* State's Mem. in Opp'n to Pl.'s Mot. for Prelim. Inj. (Nov. 4, 2022), Dist. Ct. ECF No. 33.

---

[5] The District Attorney defendant did not oppose the preliminary injunction. (J.A. 86-87.)

**C.    The District Court's Preliminary-Injunction Ruling**

In a decision and order dated November 22, 2022, the district court issued a preliminary injunction barring defendants from enforcing the private-property provision statewide with respect to property that is open to the public. (S.A. 1-27.) The court stressed that this limitation was due to the relief requested by plaintiffs; the court would have otherwise found the provision unenforceable even with respect to private residences and other private property not open to the public. (S.A. 3-4.)

First, the district court concluded that Christian had Article III standing to challenge the provision. (S.A. 6-10.) Although the court held that "all elements" of standing were met, it discussed only injury in fact. (S.A. 6.) In particular, the court found that Christian's "activities and behavior have been impacted" in that, "but for the restriction," Christian would carry a concealed firearm into various business establishments that have not posted signs allowing it. (S.A. 8.) And the court held that the CCIA's recency, combined with statements by the Governor and State Police that New York would uphold the law, rendered Christian's fear of enforcement credible. (S.A. 8-10.)

11

Second, the district court held that Christian was likely to succeed on the merits of his constitutional challenge to the private-property provision. (S.A. 13-21.) The court inferred, without analysis, that the Second Amendment's plain text "presumptively guarantees" a right to bear arms in public for self-defense on "private property outside of [one's] own home." (S.A. 15; *see* S.A. 21.) The court also held that the "colonial and reconstruction-era enactments" the State had cited failed to show that the private-property provision had an adequate historical pedigree. (S.A. 15.) For that conclusion, the court expressly relied on a different district court's analysis in *Antonyuk v. Hochul*, with "a few additional" observations.[6] (S.A. 15-16.) One was that the State's proffered precursors were "of unknown or limited duration" and thus did not evidence "an enduring tradition" of firearm regulation. (S.A. 18-19.) Another was that, according to the court below, the "Nation's historical tradition is that individuals may carry arms on private property unless the property owner chooses otherwise" (S.A. 19)—and New York's rule of "default exclusion"

_____

[6] The State's appeal from the district court's decision in *Antonyuk* is also pending in this Court and has been calendared for oral argument together with this and several other CCIA-related cases. *See* Order (Jan. 13, 2023), CA2 ECF No. 53.

12

was unsupported by "any historical tradition to the contrary" (S.A. 20 (emphasis omitted)).

Finally, the district court found that equitable concerns weighed in favor of a preliminary injunction. (S.A. 22-24.) The court opined that the private-property provision "leaves Christian no alternatives" to carry a gun "as he moves around outside his home," while subjecting him "to the mercy of opportunistic, lawless individuals." (S.A. 22-23.) And the court determined that enjoining the statute's enforcement would "serve the public interest of fostering self-defense across the state." (S.A. 23.)

The State appealed and moved for a stay pending appeal. This Court (Sack, Wesley, Bianco, JJ.) granted the stay. *See* Order (Dec. 12, 2022), CA2 ECF No. 40.

## STANDARD OF REVIEW

This Court reviews the district court's ultimate grant of a preliminary injunction for abuse of discretion. *E.g.*, *RiseandShine Corp. v. PepsiCo, Inc.*, 41 F.4th 112, 119 (2d Cir. 2022). A district court abuses its discretion by failing to apply the correct legal standard or otherwise basing the decision on an error of law. *See id.*; *Otokoyama Co. v. Wine of Japan Imp., Inc.*, 175 F.3d 266, 270 (2d Cir. 1999). Any legal determinations on which

13

the preliminary injunction rests are reviewed de novo. *See New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015). The Court also reviews de novo legal determinations relating to subject-matter jurisdiction. *OneWest Bank, N.A. v. Melina*, 827 F.3d 214, 217 n.1 (2d Cir. 2016).

To obtain a preliminary injunction against a statute's or rule's enforcement, "the moving party must demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 279 (2d Cir.), *clarified by* 17 F.4th 368 (2d Cir. 2021), *and cert. denied*, 142 S. Ct. 2569 (2022). Where, as here, a preliminary injunction "will affect government action taken in the public interest pursuant to a statutory or regulatory scheme," the moving party is under a heightened standard to show a "clear or substantial" likelihood of success. *Sussman v. Crawford*, 488 F.3d 136, 140 (2d Cir. 2007) (quotation marks omitted). In any case, a "preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion." *Id.* at 139 (quotation marks omitted).

14

## SUMMARY OF ARGUMENT

This Court should reverse the district court's order granting a preliminary injunction.

The district court incorrectly concluded that Christian has Article III standing to maintain this preenforcement challenge to New York's private-property provision. The specific injury about which Christian complains—i.e., the inability to carry a concealed handgun onto private property without consent—is neither traceable to the private-property provision nor redressable by an injunction. The proprietor remains free in all events to prevent Christian from bringing a handgun onto the property, or to allow Christian to do so by posting a sign or otherwise indicating consent.

Even if Christian did have standing, the district court abused its discretion in assuming that the Second Amendment's plain text presumptively guarantees the right to carry a handgun into privately owned businesses and residences. Christian did not offer, and the court did not perform, any textual or historical analysis on this point. Rather, the court pointed solely to *Bruen*, which did not consider or purport to resolve the discrete private-property question raised here. A suitable historical analysis

15

would reveal that the Second Amendment respects a property owner's undisputed and plenary right to exclude people carrying firearms from the premises, even if open to the public, and that New York's law vindicates that right by setting ground rules for how any consent determination is made. The district court's contrary holding is unsupportable.

The district court independently erred in concluding that the private-property provision lacked an adequate historical pedigree. The State identified eight colonial or state statutes spanning 1715 through 1893, all of which predicated carrying firearms onto others' premises on obtaining the proprietor's consent. The district court unreasonably discounted all of these historical precursors—in the process creating a historical test so stringent that hardly any modern law could satisfy it, contrary to *Bruen*'s direction.

Finally, the district court abused its discretion by misapplying the remaining preliminary-injunction factors. Among other things, the court gave short shrift to the State's public-safety motivations for enacting the private-property provision and the benefits to proprietors statewide of knowing in advance whether arms will be carried on site. The court also impermissibly relied on its own intuition about the benefits of widespread

16

concealed carry, while flipping the burden of proof by faulting the State

for not proving that the challenged law was necessary for public safety.

Complying with the statute during this litigation should not unduly

prejudice Christian, who may seek and, if available, obtain permission to

carry a handgun into any business he wishes to frequent.

## ARGUMENT

### POINT I

#### CHRISTIAN LACKS ARTICLE III STANDING TO MAINTAIN THIS PREENFORCEMENT CHALLENGE

As a threshold matter, the district court erred in concluding that

Christian has standing to bring this preenforcement challenge to the

private-property provision.[7]

To give rise to a case or controversy under Article III, a "plaintiff

must have (1) suffered an injury in fact, (2) that is fairly traceable to the

challenged conduct of the defendant, and (3) that is likely to be redressed

by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338

---

[7] As the district court correctly recognized (S.A. 3), this Court's precedents foreclose the organizational plaintiffs from maintaining suit under § 1983 on their members' behalf, *see Connecticut Citizens Def. League, Inc. v. Lamont*, 6 F.4th 439, 447 (2d Cir. 2021).

(2016). The second of these elements requires a plaintiff to establish "a causal connection between the injury and the conduct complained of," such that the alleged injury is traceable "to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (quotation marks and alterations omitted). The third of these elements focuses "on whether the *injury* that a plaintiff alleges is likely to be redressed through the litigation," and not on whether the plaintiff will prevail on the merits. *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 287 (2008). It is met where a judicial decision's eliminating the complained-of injury is "likely, as opposed to merely speculative." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). That is not the situation here.

At base, Christian complains that the private-property provision prevents him from carrying a firearm without consent into businesses where he "would typically bring" one, such as during "visits to gas stations and monthly visits to hardware stores." (J.A. 74.) But as plaintiffs concede, "[p]roperty owners generally have a right to determine whether someone may or may not carry firearms on their property." Pls.' Mem. in Supp. of

18

Mot. for Prelim. Inj. (PI Mem.) at 22 (Sept. 28, 2022), Dist. Ct. ECF No. 19-1. The district court likewise accepted the fundamental premise that this "right has always been one belonging to the private property owner." (S.A. 19 (emphasis omitted).) Were it otherwise, "[p]rivate property owners and private lessees would face the unappetizing choice of allowing all comers or closing the [location] altogether." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1931 (2019).

Thus, Christian's asserted injury is attributable to the decision of property owners not to convey consent to his carriage of a firearm on their property—either through posted signage or otherwise. But a plaintiff generally lacks standing to sue a defendant based on injury attributable to the "*independent* action" of a third party, unless the defendant's conduct had a "determinative or coercive effect" on the third party's action. *Bennett v. Spear*, 520 U.S. 154, 169 (1997) (quotation marks omitted). Here, the allegations fail to demonstrate that Christian wishes to but cannot enter an establishment that would actually consent to his carrying a firearm absent the private-property provision. And that provision does not preclude the proprietor of a non-sensitive location from expressing such consent to anyone. "A third party's 'legitimate discretion' breaks the chain of consti-

tutional causation." *Turaani v. Wray*, 988 F.3d 313, 316-17 (6th Cir.) (quoting *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989)), *cert. denied*, 142 S. Ct. 225 (2021).

For similar reasons, an injunction against the governmental defendants named in the complaint cannot redress Christian's asserted inability to carry guns onto others' property without consent. Such an inability flows not from the private-property provision, but from decisions by property owners or lessees about whether to allow guns on the premises and when and how to convey that determination. Article III authorizes a federal court "only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." *Simon v. Eastern Ky. Welfare Rts. Org.*, 426 U.S. 26, 41-42 (1976); *see Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413 (2013). And "under traditional equitable principles, no court may lawfully enjoin the world at large, or purport to enjoin challenged laws themselves." *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 535 (2021) (citation and quotation marks omitted).

To be sure, Christian's "activities and behavior have been impacted" by the private-property provision (S.A. 8) insofar as the statute requires

20

him, in the absence of conspicuous signage, to inquire at the outset into whether the proprietor otherwise has expressly consented, or will expressly consent, to carrying a gun on the premises. But Christian does not complain of the need to seek consent, nor is it apparent, in light of the proprietor's undisputed right to exclude, how such an activity could inflict cognizable Article III injury. Rather, Christian's asserted injury is the purported inability to carry a gun into various premises that lack posted signage allowing as much. (J.A. 36-37, 74-75.) Contrary to Christian's assertion below, however, New York's law does not "bar[] even entering these locations" armed (J.A. 75). Rather, the statute bars a person from "enter[ing] into or remain[ing] on or in private property" while possessing a firearm if the "person *knows or reasonably should know* that the owner or lessee of such property has not" expressly allowed "such possession." Penal Law § 265.01-d(1) (emphasis added).

The statutory phrase "reasonably should know" connotes a due diligence requirement, which "impute[s] knowledge—often called 'constructive' knowledge—to a person who fails to learn something that a reasonably diligent person would have learned." *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 140 S. Ct. 768, 776 (2020). Here, the dispositive fact, in the

21

absence of a sign, is whether the proprietor has expressly consented to carrying. Christian can obtain information about consent in any number of ways, including in person, by phone, or by email. The private-property provision thus allows Christian or anyone else who does not know the answer a reasonable opportunity to inquire as to whether the owner or lessee consents to the presence of firearms on site. Neither Christian nor the district court analyzed the import of Christian's ability to obtain the requisite knowledge for purposes of the standing inquiry.

In any event, even without the private-property provision, Christian would have to confirm that the proprietor actually assented to carrying guns on the premises, or else risk being expelled from the property if his weapon came to light. Although Christian testified that "[c]oncealed means concealed" (J.A. 436), "not openly waved about" (J.A. 448), it is at least plausible that an employee or other customer of an establishment open to the public would notice the presence of a weapon—whether from "a glimmer of steel or a bulge of a coat," *Antonyuk v. Hochul*, No. 22-cv-986, 2022 WL 16744700, at *13 (N.D.N.Y. Nov. 7, 2022). And once the gun were noticed, the establishment could eject Christian and could exclude him from returning armed. As a result, even absent the private-property

22

provision, Christian's ability covertly to carry a firearm into any private business he regularly patronizes remains subject to multiple contingencies and thus is "merely speculative," *Friends of the Earth*, 528 U.S. at 181.

## POINT II

### PLAINTIFFS FAILED TO ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR SECOND AMENDMENT CHALLENGE TO THE PRIVATE-PROPERTY PROVISION

Even if Christian had standing to sue, he failed to meet his heightened burden, *see Sussman*, 488 F.3d at 140, to show a clear likelihood of success on the merits of his Second Amendment claim. This nonnegotiable element reflects that "'governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes . . . should not be enjoined lightly.'" *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014) (quoting *Able v. United States,* 44 F.3d 128, 131 (2d Cir. 1995)). Contrary to the district court's various conclusions, New York's law respects private property rights without violating the Second Amendment.

**A.     The Second Amendment Does Not Bestow a Right to Carry Arms onto Others' Private Property Absent Consent.**

The district court erroneously excused Christian from showing that his desired conduct—to carry firearms onto others' private property without obtaining express consent—was protected by the Second Amendment. Instead, the district court declared, without independent analysis, that the Second Amendment's "plain text . . . presumptively guarantees" a person's "right to 'bear' arms for self-defense on private property outside of his own home." (S.A. 15; *see* S.A. 21.) For this notion, plaintiffs invoked only *Bruen*'s holding that the Second Amendment protects "carrying handguns publicly for self-defense." 142 S. Ct. at 2130 (quoted in PI Mem. at 16).

However, *Bruen* made clear that the government's obligation to defend a firearms regulation as "consistent with the Nation's historical tradition of firearm regulation" is triggered only "[w]hen the Second Amendment's plain text covers an individual's conduct." *Id.* at 2129-30. Accordingly, the Court in *Bruen* confirmed that the plaintiffs made this predicate showing before shifting the burden to the State to provide historical support for its proper-cause restriction. *Id.* at 2134-35.

24

This approach is consistent with the analytical framework for other constitutional claims. For example, courts require First Amendment plaintiffs to make a threshold showing that a regulation burdens "speech" or other protected activity. *See Fields v. City of Tulsa*, 753 F.3d 1000, 1009 (10th Cir. 2014); *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 686 F.3d 889, 893 (8th Cir. 2012). A Fourth Amendment plaintiff claiming to have endured a government-initiated "seizure" must likewise first show that a seizure occurred within the meaning of the Constitution. *Burg v. Gosselin*, 591 F.3d 95, 97 (2d Cir. 2010). Similarly, a plaintiff who claims that the government drew a "distinction" that violates the Equal Protection Clause must first show that the action in fact treated similarly situated people differently. *Caswell v. Calderon*, 363 F.3d 832, 837-38 (9th Cir. 2004). And the Ex Post Facto Clause requires a threshold showing that a measure is punitive. *Kansas v. Hendricks*, 521 U.S. 346, 361 (1997).

In this case, however, neither Christian nor the district court engaged in any "textual analysis" or "canvassed the historical record" for confirmation of the Second Amendment's alleged scope, *Bruen*, 142 S. Ct. at 2127 (quotation marks omitted). Instead, the court observed that *Bruen* "did

25

not indicate that the right [of public carry] ceased at the property line of others." (S.A. 14.) But *Bruen*, like the Supreme Court's earlier decision in *District of Columbia v. Heller*, expressly did "'not undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment.'" 142 S. Ct. at 2134 (quoting 554 U.S. at 626). *Bruen* invalidated a New York statute that the Supreme Court viewed as precluding too many ordinary, law-abiding individuals from carrying concealed handguns for self-defense even on public streets. The Court did not hold (and has never held) that carrying firearms onto others' "*private* property," Penal Law § 265.01-d(1) (emphasis added), equates with "carrying handguns *publicly*," *Bruen*, 142 S. Ct. at 2134 (emphasis added), or keeping arms in one's own home, *Heller*, 554 U.S. at 628. The district court's contrary assumption consti-tuted a misapplication of *Bruen*'s first step that alone justifies vacating the preliminary injunction. *See, e.g.*, *RiseandShine*, 41 F.4th at 119; *Otokoyama*, 175 F.3d at 270.

A proper step-one inquiry under *Bruen*—altogether missing here—would have revealed that Christian failed to establish a substantial likelihood of success on this preenforcement claim of facial invalidity. The Eleventh Circuit performed the requisite textual analysis in a decision

26

that is persuasive and squarely on point. *See GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244 (11th Cir. 2012), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111. *GeorgiaCarry* rejected a facial challenge to an analogous state statute that restricted carrying handguns in places of worship, among other locations, without notifying security or management on arrival and following any instructions for securing the weapon. The Eleventh Circuit held that the Second Amendment, properly understood, did not encompass "a right to bring a firearm on the private property of another against the wishes of the owner." *Id.* at 1261. The court based this determination on an exhaustive survey of the "historical background" and "scope of any pre-existing right to bear arms on the private property of another." *Id.*; *see id.* at 1264-66 (examining relevant principles of "property law, tort law, and criminal law," which form "the canvas on which our Founding Fathers drafted the Second Amendment").

The Eleventh Circuit concluded that the Georgia law simply "vindicate[d]" the proprietors' "right to control who may enter, and whether that invited guest can be armed." 687 F.3d at 1264. New York's law does the same. And the analysis in *GeorgiaCarry* hewed to *Bruen*'s first step: the Eleventh Circuit decided whether the "restricted activity is protected

27

by the Second Amendment in the first place," and expressly did *not* "decide what level of scrutiny should be applied" or "whether a place of worship is a 'sensitive place.'" *Id.* at 1260 n.34.

There is no reason to depart from *GeorgiaCarry*'s conclusion about the Second Amendment's historical scope. Accordingly, contrary to the district court's characterization, the private-property provision here does not authorize the State to "unilaterally exercise" property owners' right to exclude or accept handguns on the premises (S.A. 2). The proprietor's prerogative remains fully intact, which respects the principle that the right to exclude "is a fundamental element of the property right that cannot be balanced away." *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2077 (2021) (citation and quotation marks omitted). The statute does so by requiring someone carrying concealed to seek affirmative consent, which may, in certain cases, entail disclosing that the person is carrying a weapon. The law does not limit the manner in which a property owner can give express consent. A property owner may post a sign or give consent to requests in advance or on site. A property owner may choose to allow all permit holders to carry weapons on the premises or to give express consent only to selected individuals. And a property owner

may choose to allow or disallow carriage on any timeline, without state involvement. The private-property provision, therefore, merely selects from among permissible default rules about when and how the consent determination must be made. That default rule does not implicate the Second Amendment's text.

## B.  The Private-Property Provision Is Consistent with the Historical Tradition of Firearms Regulation.

In any event, even if the district court's threshold textual conclusion were correct, the historical evidence presented by the State amply demonstrated that the private-property provision is consistent with the Nation's history and tradition of firearms regulation. Specifically, the State identified a significant, unambiguous line of historical statutes spanning the colonial era to Reconstruction and beyond that forbade carrying guns onto others' property without their permission. A description of these statutes follows.

In 1715, the Province of Maryland enacted a law imposing criminal penalties against anyone "of evil fame, or a vagrant, or dissolute liver, that shall shoot, kill or hunt, or be seen to carry a gun, upon any person's land, whereon there shall be a seated plantation, without the owner's

leave, having been once before warned." (J.A. 108.) In 1721, the Pennsylvania Colony made it unlawful for anyone "to carry any gun or hunt on the improved or inclosed lands of any plantation other than his own, unless he have license or permission from the owner of such lands or plantation." (J.A. 113.) The latter statute aimed to prevent and remedy the "divers[e] abuses, damages and inconveniencies" caused "by persons carrying guns and presuming to hunt on other people's lands." (J.A. 113.) In 1722, the Province of New Jersey passed a nearly identical statute, similarly recognizing that "divers[e] abuses have been committed, and great Damages and Inconveniences arisen by Persons carrying of Guns and presuming to hunt on other Peoples Land." (J.A. 119.)

In 1763, the Province of New York passed a law providing that nobody "other than the Owner, Proprietor, or Possessor, or his or her white Servant or Servants," shall "carry, shoot, or discharge any Musket, Fowling-Piece, or other Fire-Arm whatsoever, into, upon, or through any Orchard, Garden, Cornfield, or other inclosed Land whatsoever, within the City of New-York, or the Liberties thereof, without Licence in Writing first had and obtained for that Purpose from such Owner, Proprietor, or Possessor." (J.A. 124.) The statute was expressly intended "more effectu-

ally to punish and prevent" the practice of "idle and disorderly" individuals "to hunt with Fire-Arms, and to tread down the Grass, and Corn and other Grain standing and growing in the Fields and Inclosures there, to the great Danger of the Lives of his Majesty's Subjects," and "the grievous Injury of the Proprietors." (J.A. 123-124.)

In 1771, the Province of New Jersey passed another statute prohibiting a person from carrying "any Gun on any Lands not his own, and for which the Owner pays Taxes, or is in his lawful Possession, unless he hath License or Permission in Writing from the Owner or Owners or legal Possessor." (J.A. 127.) An 1865 Louisiana law similarly declared that "it shall not be lawful for any person or persons to carry fire-arms on the premises or plantations of any citizen, without the consent of the owner or proprietor, other than in lawful discharge of a civil or military order." (J.A. 137.) The following year, in 1866, Texas passed a law nearly identical in substance to Louisiana's. (J.A. 144.) Continuing this tradition, an 1893 Oregon law made it "unlawful for any person, other than an officer on lawful business, being armed with a gun, pistol, or other firearm, to go or trespass upon any enclosed premises or lands without the consent of the owner or possessor thereof." (J.A. 151.)

31

The district court erred in concluding that these statutes failed to evince an "enduring tradition" of analogous firearm regulation, for several reasons. (S.A. 18.)

First, the district court's express reliance on *Antonyuk* erroneously adopted that decision's analytical mistakes. (S.A. 15-16.) For example, *Antonyuk* unjustifiably characterized all but two of the eight cited historical statutes—the 1771 New Jersey law and the 1865 Louisiana law—as "anti-poaching laws" dissimilar to New York's current law. 2022 WL 16744700, at *79-81. The court based that determination "on the texts of these six historical laws." *Id.* at *79 n.125. But the 1866 Texas law was a near carbon-copy of Louisiana's law; except that whereas the Texas law extended only to "inclosed premises," such as structures or fenced-in curtilage (J.A. 144), the Louisiana law covered "premises" without limitation (J.A. 137). Oregon's similar 1893 restriction covered "any enclosed premises." (J.A. 151.) None of these four statutes referenced hunting.

The four laws that did mention hunting—enacted between 1715 and 1763, in Maryland, Pennsylvania, New Jersey, and New York—also barred carrying guns more generally on others' property without consent. (*See, e.g.*, J.A. 108 ("shoot, kill or hunt, or be seen to carry a gun"), 113

("carry any gun or hunt"), 119 ("carry any Gun, or hunt"), 124 ("carry, shoot, or discharge any Musket, Fowling-Piece, or other Fire-Arm whatsoever").) Consistent with their textual prohibitions, three of these statutes explicitly served the broader purpose of preventing the "divers[e] abuses" and "damages and inconveniences" arising from "persons carrying guns and presuming to hunt on other people's lands" (J.A. 113 (Pennsylvania); *accord* J.A. 119 (New Jersey)); or of protecting against "the great Danger [to] the Lives of his Majesty's Subjects" and "the grievous Injury of the Proprietors" caused by carrying guns (J.A. 123 (New York)). Only one—the earliest of all these laws, from 1715—aimed predominantly "to prevent the abusing, hurting or worrying of any stock of hogs, cattle or horses." (J.A. 108 (Maryland).)

Thus, *Antonyuk*'s focus on "not being able to hunt turkey and deer," 2022 WL 16744700, at *80, unduly narrowed most of these laws' aims. And siloing these laws to hunting alone ignored that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Bruen*, 142 S. Ct. at 2132. New York was entitled to decide that a random customer's brandishing or firing a gun at an actual or perceived

criminal inside of a business in 2023 hazards "great Danger [to] the Lives" of others and "grievous Injury [to] the Proprietors" no less than traipsing armed onto someone's property did in 1763. (J.A. 123.)

The district court in *Antonyuk* also mistakenly dismissed the relevance of the 1771 New Jersey law and the 1865 Louisiana law on the ground that census data indicated that these States comprised between 4% and 5% of the national population when the laws were in effect. *See* 2022 WL 16744700, at *80-81. That conclusion may seem to resemble *Bruen*'s dismissal of several "late-19th-century laws" of territories comprising "less than 1% of the American population." 142 S. Ct. at 2154-55. But *Bruen* did not set those laws aside because of census count alone—it found those laws unpersuasive also because of the period when they were enacted, and the fact that they were enacted by territorial legislatures. Neither of those features is present here. *Bruen* does not demand some unspecified minimum census count before *timely* and relevant *state* and *colonial* laws may support a modern gun regulation. And, as established, the pool of relevant jurisdictions was much wider than *Antonyuk* claimed.

Second, the district court's "additional points" with respect to the State's historical evidence also missed the mark. (*See* S.A. 16.) For example, the court supposed that the eight cited statutes were of "unknown or limited duration" and therefore refused to give them weight. (S.A. 19.) However, the repetition of similar provisions over the eighteenth and nineteenth centuries in locations across the Nation itself demonstrates a well-established tradition of regulation.

Contrary to the district court's suggestions (S.A. 18-19), neither *Bruen*'s dismissal of some territorial laws from the late nineteenth century nor its discounting of many twentieth-century "proper cause" laws counsels otherwise. According to *Bruen*, this "late-19th-century evidence" and "20th-century evidence" came too late to "provide insight into the meaning of the Second Amendment"—at least "when it contradict[ed] earlier evidence." 142 S. Ct. at 2154 n.28. Here, the cited precursor statutes reflect a tradition starting before the Founding of conditioning carrying firearms onto others' premises on obtaining the proprietors' consent, a tradition that several mid- to late-nineteenth-century laws carried forward. New York's private-property provision is a modern incarnation of this long-standing and widely enacted rule. Moreover, the district court's reliance

35

on a 2011 dictionary definition of "tradition" (S.A. 19) is particularly inapposite, for at least two reasons: first, that word is not part of the Second Amendment but rather a descriptive gloss on it, and second, only "[d]ictionary definitions contemporaneous with the ratification of the Constitution inform our understanding" of its scope, *Utah v. Evans*, 536 U.S. 452, 492 (2002) (Thomas, J., concurring in part).

The district court also surmised that some jurisdictions had adopted a converse default rule "that individuals may carry arms on private property unless the property owner chooses otherwise." (S.A. 19.) However, *Bruen* does not require evidence that every jurisdiction responded to a particular regulatory concern in the same way to justify a modern regulation. The Constitution generally does not require States and localities to adopt uniform approaches to matters of local concern. The key question is whether the private-property provision is relevantly similar to the precursors the State put forth. Although the Second Amendment does not require a historical twin or dead ringer for a modern regulation, *see Bruen*, 142 S. Ct. at 2133, the State provided several here.

Rather than draw the "relatively simple" line from past to present, the district court's uncharitable analysis made analogical reasoning under

36

*Bruen* a "regulatory straightjacket" effectively impossible to satisfy. *See id.* at 2132-33. History properly permits any of the range of gun regulations with enough historical support not to be an outlier. The State has easily passed that test here.

## POINT III

### THE DISTRICT COURT ERRED IN APPLYING THE REMAINING PRELIMINARY-INJUNCTION FACTORS

A party seeking a preliminary injunction must separately show a likelihood of irreparable harm in the absence of an injunction, that a preliminary injunction serves the public interest, and that the balance of other equities weighs in favor of such relief. *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013). Where the party opposing a preliminary injunction is a government entity, harm to the nonmovant and the public interest merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Christian failed to satisfy his burden as to any of these equitable factors, which decisively weigh against the granting of injunctive relief.

To assess whether a plaintiff has shown irreparable harm, the court must "consider the injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately prevails on the merits." *Salinger v.*

*Colting*, 607 F.3d 68, 80 (2d Cir. 2010). The case for an injunction is strongest when the challenged action will permanently alter the parties' rights before a court has an opportunity to resolve that challenge. *See Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985).

Here, Christian's delays in filing this action and in seeking a preliminary injunction militate against relief. *See, e.g.*, *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995). Christian waited until September 13, 2022, to file this suit and until September 28, 2022, to move for a preliminary injunction. By the latter point in time, the CCIA had been enacted for nearly three months and in effect for four weeks. A party's "failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *Citibank*, 756 F.2d at 277.

Even absent delay, Christian failed to make the requisite showing of irreparable harm. As noted above (*supra* at 20-22), the private-property provision allows Christian to seek and obtain express consent from the owner or lessee of any non-sensitive private establishment that he wishes to frequent, as he testifies he has done (*see* J.A. 456-457). Thus, the statute and the evidence both contradict the district court's conclusion

that, without a preliminary injunction, Christian would be unable to carry a gun outside his home and would therefore be subject "to the mercy of opportunistic, lawless individuals" (S.A. 22). *See Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 120 (2d Cir. 2009) (vacating preliminary injunction premised on the district court's speculation of the risk the movant faced). Moreover, any concern that Christian may need to "'constantly disarm' in order to comply with the private property restriction" (S.A. 4-5) is further allayed by his testimony that the process of disarming and storing his handgun takes around half a minute (J.A. 450).

The district court's analysis of public-interest considerations was similarly flawed. Courts must "'pay particular regard for the public consequences in employing the extraordinary remedy'" of a preliminary injunction. *We The Patriots*, 17 F.4th at 279 (quoting *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008)). Here, the district court concluded that an injunction would serve the public interest due to the court's own intuitive "'sense of the safety that a licensed concealed handgun regularly provides, or would provide, to the many law-abiding responsible citizens in the state too powerless to physically defend themselves in public without a

handgun.'" (S.A. 23-24 (quoting *Antonyuk v. Bruen*, No. 22-cv-734, 2022 WL 3999791, at \*36 (N.D.N.Y. Aug. 31, 2022)).)

A court's discretionary weighing of factors, however, must rest "not [on] its inclination, but [on] its judgment," guided in part by empirical evidence. *Martin v. Franklin Cap. Corp.*, 546 U.S. 132, 139 (2005) (quotation marks omitted). In addition, the district court erroneously flipped the burden of proof by faulting the State for "not show[ing] that the lawful carrying of firearms on private property has resulted in an increase in handgun violence" (S.A. 23). To the contrary, whether the equities support a preliminary injunction is something "the moving party must demonstrate." *We The Patriots*, 17 F.4th at 279 (quotation marks omitted).

Here, the preliminary injunction risks harm to public safety and undermines the rights of property owners and lessees statewide to make optimally informed decisions about who may enter their premises. *See, e.g.*, *United States v. Smythe*, 363 F.3d 127, 129 (2d Cir. 2004) (federal criminal law recognizes that "the mere presence of a gun" creates a risk of violence (quotation marks and alterations omitted)). This Court has observed that "New York has substantial, indeed compelling, governmental interests in public safety and crime prevention," and that the

40

State's gun regulations substantially serve those interests. *Kachalsky v. County of Westchester*, 701 F.3d 81, 97 (2d Cir. 2012). Although *Bruen* overruled *Kachalsky*'s holding that these interests validated New York's former "proper cause" law under the Second Amendment, 142 S. Ct. at 2126-27, that development does not preclude, when considering the equities on a preliminary-injunction motion, reliance on the legislative determination that firearm regulations do in fact serve the public interest.

Finally, New York's statute accords with public expectations, when a "statistically significant majority of Americans reject the default right to carry weapons onto other people's residences, unoccupied rural land, retail establishments and businesses." Ian Ayres & Spurthi Jonnalagadda, *Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J.L., Med. & Ethics 183, 189-90 (2020). The equities do not support the drastic relief of a preliminary injunction on enforcement of New York's law, which would defy general expectations about how the world operates.

## CONCLUSION

This Court should reverse the district court's order granting a preliminary injunction against enforcement of the private-property provision.

Dated:  New York, New York
        January 23, 2023

                                        Respectfully submitted,

                                        LETITIA JAMES
                                          *Attorney General*
                                          *State of New York*
                                        Attorney for Appellant


                                  By:   */s/ Eric Del Pozo*
                                        ERIC DEL POZO
                                        Assistant Solicitor General

BARBARA D. UNDERWOOD               28 Liberty Street
  *Solicitor General*              New York, NY 10005
ESTER MURDUKHAYEVA                 (212) 416-8019
  *Deputy Solicitor General*
ERIC DEL POZO
  *Assistant Solicitor General*
    *of Counsel*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Kelly Cheung, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 7,983 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

_/s/ Kelly Cheung_

# SPECIAL APPENDIX

# TABLE OF CONTENTS

**Page**

Decision & Order, dated Nov. 22, 2022 ...............................................................1

N.Y. Penal Law § 265.01-d .................................................................... 28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

BRETT CHRISTIAN,
FIREARMS POLICY COALITION,
INC., and
SECOND AMENDMENT
FOUNDATION,                                          22-CV-695 (JLS)

             Plaintiffs,

       v.

STEVEN A. NIGRELLI, and
JOHN J. FLYNN,

             Defendants.

## DECISION AND ORDER
## (PRELIMINARY INJUNCTION)

Another one of New York's new restrictions imposed in the immediate
aftermath of the Supreme Court's *Bruen* decision is the private property exclusion.
That new provision makes it a felony for a license holder to possess a firearm on *all
private property*, unless the relevant property holders actually permit such
possession with a sign or by express consent.

The Supreme Court's cases addressing the individual's right to keep and bear
arms—from *Heller* and *McDonald* to its June 2022 decision in *Bruen*—dictate that
New York's private property exclusion is equally unconstitutional. Regulation in
this area is permissible *only if* the government demonstrates that the current
enactment is consistent with the Nation's historical tradition of sufficiently
analogous regulations. As set forth below, New York fails that test.

**SA1**

Property owners indeed have the right to exclude. But *the state* may not unilaterally exercise that right and, thereby, interfere with the Second Amendment rights of law-abiding citizens who seek to carry for self-defense outside of their own homes. Thus, the motion for a preliminary injunction enjoining Defendants' enforcement of this private property exclusion is granted.[1]

## BACKGROUND

Brett Christian filed this lawsuit on September 13, 2022, joined by institutional plaintiffs, Firearms Policy Coalition, Inc. ("FPC"), and Second Amendment Foundation ("SAF"). Dkt. 1. Plaintiffs allege claims against two Defendants in their official capacities, namely, the superintendent of the New York State Police, and the Erie County District Attorney. *See id.*

Christian, who is licensed under New York law to carry a concealed firearm, "desires to carry his firearm for self-defense purposes when going about his day-to-day life." *Id.* at 26.[2] He alleges that he "will be unable to carry his firearm on his person throughout the State because of the State's designation of private property." *Id.* The private property exclusion "effectively prevents" him "from going about his daily life in the state of New York while lawfully carrying his firearm for purposes

---

[1] Plaintiffs' motion and the parties' briefs also separately address two additional restrictions on carry, namely, in public parks and on public transportation. The Court has requested further briefing on the irreparable harm issue as to those locations. These parts of Plaintiff's motion will be addressed in a subsequent decision.

[2] Unless noted otherwise, page references refer to the number in the footer of each page of the document.

2

of self-defense." *Id.* at 27.  He seeks declaratory judgment and injunctive relief.  *Id.*

at 30-31.

The relevant portion of the new statute adds to the Penal Law, as relevant

here:

> § 265.01-d  Criminal possession of a weapon in a restricted location.
> 1. A person is guilty of criminal possession of a weapon in a restricted
> location when such person possesses a firearm, rifle, or shotgun and
> enters into or remains on or in private property where such person
> knows or reasonably should know that the owner or lessee of such
> property has not permitted such possession by clear and conspicuous
> signage indicating that the carrying of firearms, rifles, or shotguns on
> their property is permitted or has otherwise given express consent. . . .[3]

Plaintiffs[4] moved for a preliminary injunction seeking to enjoin Defendants

from enforcing this private property exclusion.[5]  *See* Dkt. 19.

---

[3] Section § 265.01-d(2) provides that this restriction does not apply to, among
others, persons who are "lawfully engaged in hunting activity," persons who are
"police officers" as defined in the criminal procedure law, persons who are
"designated peace officers," as well as "security guards" and "active-duty military
personnel."

[4] FPC and SAF recognize that it is "the law of this Circuit that an organization does
not have standing to assert the rights of its members in a case brought under 42
U.S.C. § 1983." Dkt. 1, ¶ 14 (quoting *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir.
2011)). SPC and SAF "contend that this circuit precedent is erroneous and should
be overruled by a court competent to do so." Dkt. 1, ¶ 14. As such, this Decision
and Order does not address those Plaintiffs and will only focus on Plaintiff
Christian.

[5] Christian challenges this provision with respect to private property "open to the
public." Dkt. 19-1, at 8. Judge Suddaby's Preliminary Injunction was not so
limited. *See Antonyuk v. Hochul*, No. 22-CV-986, 2022 WL 16744700, at *85-86
(N.D.N.Y. Nov. 7, 2022). The State's argument is not so limited and, indeed, cites
enactments addressing private property not open to the public.  And the analysis
below, driven by the Constitution and caselaw, is not so limited. The relief here

**SA3**

Christian, who resides in Cheektowaga, New York, states that he is

"currently licensed to carry a handgun pursuant to New York law with a license

issued by Erie County." Dkt. 19-4, ¶¶ 1, 4. Prior to the enactment of the private

property exclusion, Christian "would typically bring [his] firearm with [him] on

private property open to the public, including weekly visits to gas stations and

monthly visits to hardware stores." *Id.* ¶ 10. He "intended to continue to do so, but

for the enactment and enforcement" of the private property exclusion. *Id.*

Throughout Christian's community, "establishments that are open to the public and

in which [he] previously carried a firearm" have "failed to post conspicuous signage

consenting to the carrying of firearms." *Id.* But for the enactment of the private

property exclusion, Christian "would continue to carry a firearm in establishments

such as these that neither prohibit the carrying of firearms nor post signage

consenting to the carrying of firearms." *Id.*

The private property exclusion has "particularly burdened" Christian "when

driving or running errands." *Id.* ¶ 11. When he is driving, he is "unable to take any

bathroom breaks," pick up food, or purchase gas while carrying his firearm. *Id.* He

must "disable and store" his firearm before driving or walking into the parking lot,

which means that, sometimes, he must "stop carrying for self-defense before" he

"can get physically close enough to see if any 'clear and conspicuous signage' exists."

*Id.* By having to "constantly disarm" in order to comply with the private property

---

must, however, be limited to what Christian has requested in his motion.

4

**SA4**

restriction, Christian is "left without the ability to defend" himself and is "suffering diminished personal safety on a frequent and ongoing basis." *Id.* ¶ 12. He testified at his deposition consistently with these points. *See* Dkt. 47-1.

The Court received submissions from the parties.[6] The Court then held a hearing.[7]

---

[6] On October 18, 2022, Defendant Flynn submitted an affidavit in response where he stated that he "leave[s] to the State-related co-defendant the defense of the said legislation from the plaintiffs' said challenge." Dkt. 28. On November 4, 2022, Defendant Steven A. Nigrelli submitted a Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction (Dkt. 33), which attached a Declaration of Ryan L. Belka, Esq. (Dkt. 33-1), a Declaration of Dr. Brennan Rivas, PhD (Dkt. 35-2), and a Declaration of David J. State, Esq. (Dkt. 35-3). With the Court's permission, Everytown for Gun Safety filed an *amicus curiae* brief in opposition to Plaintiffs' request for a preliminary injunction. Dkt. 45. Plaintiff filed a reply on November 18, 2022, Dkt. 46, and the State filed a sur-reply on November 21, 2022. Dkt. 47. As stated by the Court in *Bruen*, "[t]he job of judges is not to resolve historical questions in the abstract; it is to resolve *legal* questions presented in particular cases or controversies. That 'legal inquiry is a refined subset' of a broader 'historical inquiry,' and it relies on 'various evidentiary principles and default rules' to resolve uncertainties. For example, '[i]n our adversarial system of adjudication, we follow the principle of party presentation.' Courts are thus entitled to decide a case based on the historical record compiled by the parties." *New York State Rifle & Pistol Assoc., Inc. v. Bruen*, __ U.S. __, 142 S.Ct. 2111, 2130n.6 (2022) (emphasis in original) (citations omitted). The historical record itself, and not expert arguments or opinions, informs the analysis.

[7] The State requested "pre-hearing discovery and a preliminary injunction evidentiary hearing that allowed for cross-examination on the issue of standing." *See* Dkt. 33, at 9n.4. The State deposed Christian and the parties submitted the transcript. *See* Dkt. 47-1. In anticipation of the deposition, the parties advised the Court that live testimony would be unnecessary. *See* Dkt. 40.

## ANALYSIS

### I.   STANDING

The State[8] maintains that Christian lacks standing.  Dkt. 33, at 8-10.[9]  It

argues that he has identified "unspecified" gas stations, hardware stores, and

locations to take bathroom breaks, pick up food, or purchase gas—which, without

more, "cannot demonstrate any activity or location that is clearly encompassed" by

the statute.  *Id.* at 10.  The State further argues that Christian "presents no

evidence" that these locations "have not already determined to prevent (or allow)

concealed carry on their property."  *Id.*  Christian has standing here.

Standing relates to a court's constitutional power to hear and decide a case

and, therefore, implicates subject-matter jurisdiction.  *See Spokeo, Inc. v. Robins,*

578 U.S. 330, 338 (2016).  To establish standing, "a plaintiff must show (1) an

'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct

complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a

favorable decision.'"  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014)

(quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

Only the first element of the test, *i.e.*, whether the Christian has suffered an

injury-in-fact, bears discussion here (though all elements are met).  An injury-in-

fact exists where a plaintiff "suffered 'an invasion of a legally protected interest'

---

[8] "The State" and the State Defendant Nigrelli are used here interchangeably, as
the Attorney General's submissions functionally has as well.  *See* Dkt. 33, 47.

[9] Regarding the institutional Plaintiffs, *see* footnote 4 above.

**SA6**

that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo,* 578 U.S. at 336 (quoting *Lujan,* 504 U.S. at 555). A particularized injury "affect[s] the plaintiff in a personal and individual way." *Id.* (internal quotations and citation omitted). To be sure, the plaintiff's injury must be direct, and a plaintiff "may not raise the rights of a third-party. . . ." *See N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1347 (2d Cir. 1989).

Pre-enforcement challenges to criminal statutes are "cognizable under Article III." *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016). The Supreme Court has made it clear that a plaintiff suffers an injury-in-fact sufficient to establish standing when he or she faces "threatened enforcement of a law" that is "sufficiently imminent." *Susan B. Anthony List*, 573 U.S. at 158-59. When challenging a law prior to its enforcement, "a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Id.* (quoting *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 297 (1979)).

A plaintiff need not first "expose himself to liability before bringing suit to challenge the basis for the threat—for example, the constitutionality of a law threatened to be enforced." *Knife Rts., Inc. v. Vance*, 802 F.3d 377, 384 (2d Cir. 2015) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007)). *See also Steffel v. Thompson*, 415 U.S. 452, 459 (1974) ("[I]t is not necessary that [the plaintiff] first expose himself to actual arrest or prosecution to be entitled to

7

**SA7**

challenge [the] statute that he claims deters the exercise of his constitutional rights.").

The identification of a credible threat sufficient to satisfy the imminence requirement of injury in fact "necessarily depends on the particular circumstances at issue." *Picard v. Magliano*, 42 F.4th 89, 98 (2d Cir. 2022) (quoting *Cayuga Nation*, 824 F.3d at 331)). Indeed, the standard articulated by the Supreme Court "'sets a low threshold and is quite forgiving to plaintiffs seeking such pre[-]enforcement review,' as courts are generally 'willing to presume that the government will enforce the law as long as the relevant statute is recent and not moribund.'" *Picard*, 42 F.4th 89 (quoting *Cayuga Nation*, 824 F.3d at 331).

Christian has established that he suffered an injury-in-fact. He states that he would "typically bring [his] firearm with [him] on private property open to the public." Dkt. 19-4, ¶ 10. He "intended to continue to do so, but for the enactment and enforcement" of the restriction. *Id.* Christian also would have also continued "to carry a firearm in establishments" that "neither prohibit the carrying of firearms nor post signage consenting to the carry of firearms" but for the restriction. *Id.* His activities and behavior have been impacted.

Moreover, New York Governor Kathy Hochul explained, in a July 1, 2022, press statement, that individuals "who carry concealed weapons in sensitive locations . . . will face criminal penalties." *See* NEW YORK GOV.'S PRESS OFFICE, *Governor Hochul Signs Landmark Legislation to Strengthen Gun Laws and Bolster Restrictions on Concealed Carry Weapons in Response to Reckless Supreme Court*

**SA8**

*Decision*, July 1, 2022, available at https://on.ny.gov/3nXWrvA (last visited Nov. 22,
2022). On the eve of the law's enactment, Hochul criticized the Supreme Court's
decision in *Bruen* as an attempt to "strip away the rights of a governor to protect
her citizens from gun violence." BUFFALO NEWS, *Hochul: Last-Minute Pistol Permit
Seekers May be too Late to Avoid NY's New Gun Requirements*, Aug 31, 2022
updated Oct 9, 2022, available at https://buffalonews.com/news/local/crime-and-
courts/hochul-last-minute-pistol-permit-seekers-may-be-too-late-to-avoid-nys-new-
gun/article_ad5100a0-2943-11ed-af06-cbe41e631955.html (last visited Nov. 22,
2022).

In addition, First Deputy State Police Superintendent Steven Nigrelli (now
Acting Superintendent and the substituted Defendant) warned that, if "you violate
this law, you will be arrested. Simple as that." *See Antonyuk v. Hochul*, No. 22-CV-
0986, 2022 WL 4367410, at ¶ 9 n.1 (N.D.N.Y. Sept. 20, 2022) (quoting statement by
First Deputy Superintendent of the State Police Steven Nigrelli, "Governor Hochul
Delivers a Press Conference on Gun Violence Prevention,"
https://www.youtube.com/watch?v=gC1L2rrztQs at 37:40)). Nigrelli explained that,
in New York State, troopers "are standing ready" to ensure that "all laws are
enforced." *Id.* He emphasized that the troopers will have "zero tolerance," and it is
an "easy message" that he does not need to "spell it out more than this." *Id.*

These public statements show that New York residents—including
Christian—face "threatened enforcement of a law" that is "sufficiently imminent."
*Susan B. Anthony List*, 573 U.S. at 158-59. *See also Cayuga Nation*, 824 F.3d at

9

**SA9**

331 (credible threat of prosecution exists when Defendant has "announced its intention to enforce the [law] against the [plaintiff]"). Further, given the recency of the law—and lack of any indication that it will be repealed—the Court is and should be "willing to presume that the government will enforce" it. *See Picard*, 42 F.4th 89 (quoting *Cayuga Nation*, 824 F.3d at 331). Nothing in the State's sur-reply is to the contrary. On these facts, Christian has standing.[10]

## II.   PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

### A.   Preliminary Injunction Standard

Generally, a party seeking preliminary injunctive relief "must show (1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018). Where, like here, the preliminary injunction "would stay government action taken in the public interest pursuant to a statutory or regulatory scheme," the moving party "must satisfy the more rigorous prong of 'likelihood of success'" at step two. *Bronx Household of Faith v. Bd. of Educ. of City of N.Y.*, 331 F.3d 342, 349 (2d Cir. 2003).

The standard may be further heightened if "(i) an injunction would alter, rather than maintain, the status quo, or (ii) an injunction will provide the movant with substantially all the relief sought and that relief cannot be undone even if the

---

[10] Judge Suddaby reached a similar conclusion in *Antonyuk*, 2022 WL 16744700, at *38-39.

defendant prevails at a trial on the merits." *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 33-34 (2d Cir. 1995). If either scenario applies, a plaintiff must show "a clear or substantial likelihood of success on the merits" at step two. *See N. Am. Soccer League*, 883 F.3d at 37 (internal quotations and citation omitted); *Tom Doherty Assocs.*, 60 F.3d at 35.

When deciding whether an injunction is mandatory and would alter the status quo, the status quo is "the last actual, peaceable uncontested status which preceded the pending controversy." *N. Am. Soccer League*, 883 F.3d at 37 (quoting *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) (per curiam)) (internal quotations omitted). The court also considers whether the injunction would "command[] some positive act"—rather than prohibit some act—by the defendant. *Mastrovincenzo v. City of New York*, 435 F.3d 78, 89 (2d Cir. 2006) (quoting *Tom Doherty Assocs.*, 60 F.3d at 34). An injunction that enjoins a defendant from enforcing a regulation "clearly prohibits, rather than compels, government action by enjoining the future enforcement." *Id.* at 90.

Moreover, the heightened standard does not apply to "any [request for an] injunction where the final relief for the plaintiff would simply be a continuation of the preliminary relief." *Tom Doherty Assocs.*, 60 F.3d at 34. Instead, the heightened standard applies when the injunction "will render a trial on the merits largely or partly meaningless, either because of temporal concerns"—like a case involving a live, televised event scheduled for the day the court granted preliminary relief—"or because of the nature of the subject of the litigation"—like a case

11

involving disclosure of confidential information. *Id.* at 35. If a preliminary injunction "will make it difficult or impossible to render a meaningful remedy to a defendant who prevails on the merits at trial," then the heightened standard applies; "[o]therwise, there is no reason to impose a higher standard." *Id.*

In this case, Christian requests that this Court "vindicate that the Second Amendment is not a 'second-class right' by preliminarily enjoining enforcement" of the private property exclusion. Dkt. 19-1, at 24. This request seeks to prohibit Defendants from enforcing the new private property exclusion; it does not seek an order requiring Defendants to act. In other words, Christian seeks to restore the status that existed before implementation of the private property exclusion. He therefore seeks a prohibitory—not a mandatory—injunction. As stated in *Hardaway*, the Constitution and the Bill of Rights represent the status quo—not 2022 legislation on the books for a few months.[11] *See Hardaway v. Nigrelli*, No. 22-CV-771, 2022 WL 16646220, at *6 (W.D.N.Y. Nov. 3, 2022).

And relief remains available to Defendants if they prevail at trial on the merits. If Defendants prevail, the Court could vacate any injunctive relief and allow them again to enforce the private property exclusion.

Thus, the standard remains that Christian must demonstrate: (1) irreparable harm; (2) a likelihood of success on the merits; and (3) that a preliminary injunction

---

[11] The Court recognizes that courts should not lightly enjoin enforcement of laws. The law at issue here, however, is at odds with higher law, namely—the Constitution. The Court notes here too that Christian would meet the heightened standard in any event—even if it applied.

12

is in the public interest. *See N. Am. Soccer League*, 883 F.3d at 37; *Bronx Household of Faith*, 331 F.3d at 349.

### B. Likelihood of Success on the Merits

Christian is likely to succeed on the merits of his Second and Fourteenth Amendment claims. As set forth below, on this historical record, New York's new private property exclusion violates the right of individuals to keep and bear arms for self-defense outside of their homes.

That right was enshrined in the Second Amendment to the Constitution, ratified in 1791: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. And on three recent occasions, the Supreme Court explored this right and supplied the framework that resolves this issue on this motion. A thorough understanding of the Supreme Court's *Heller, McDonald,* and *Bruen* opinions is essential. This Court discussed them at length in *Hardaway*, 2022 WL 16646220, at *7-14.

Most relevant here, *Bruen* held that the Second and Fourteenth Amendments "protect an individual's right to carry a handgun for self-defense *outside the home*." *Bruen,* 142 S.Ct. at 2122 (emphasis added). Most gun owners "do not wear a holstered pistol at their hip in their bedroom or while sitting at the dinner table. Although individuals often 'keep' firearms in their home, at the ready for self-defense, most do not 'bear' (*i.e.,* carry) them in the home beyond moments of actual

13

confrontation.  To confine the right to 'bear' arms to the home would nullify half of the Second Amendment's operative protections." *Bruen,* 142 S.Ct. at 2134-35.

The Court continued, "[m]oreover, confining the right to 'bear' arms to the home would make little sense given that self-defense is 'the *central component* of the [Second Amendment] right itself.'" *Id.* (quoting *District of Columbia v. Heller,* 554 U.S. 570, 599 (2008)).  *See also McDonald,* 561 U.S. at 767, 130 S.Ct. 3020.  After all, "the Second Amendment guarantees an 'individual right to possess and carry weapons in case of confrontation,' *Heller,* 554 U.S. at 592, 128 S.Ct. 2783, and confrontation can surely take place outside the home." *Id.* at 2135.  "*Many Americans hazard greater danger outside the home than in it.  The text of the Second Amendment reflects that reality.*  The Second Amendment's plain text thus presumptively guarantees petitioners Koch and Nash a right to bear arms in public for self-defense." *Id.* (citation omitted) (emphasis added).[12]

_____

[12] *Bruen's* articulation of "in public" is not a limitation.  While *Heller* and *McDonald* were limited to the home, *Bruen* then addressed the right *outside of the home.*  The Court did not indicate that the right ceased at the property line of others.  *See, e.g., Bruen,* at 2135, 2157 ("outside the home"); *see also Heller,* 554 U.S. at 594 ("the right . . . was by the time of the founding understood to be an individual right protecting against both public and private violence.").  As stated in Justice Alito's concurrence in *Bruen,* "because many people face a serious risk of lethal violence when they venture outside their homes, the Second Amendment was understood at the time of adoption to apply under those circumstances . . . .  [As such,] a State may not enforce a law . . . that effectively prevents its law-abiding residents from carrying a gun for this purpose." *Bruen,* 142 S.Ct. at 2157 (Alito, J., concurring).  The same is true in this case.

14

**SA14**

In this case, tracking *Bruen,* Christian is an ordinary, law-abiding citizen to whom the Second Amendment applies. *Id.* at 2134. As it did for the petitioners in *Bruen,* the Second Amendment's plain text thus presumptively guarantees Christian's right to "bear" arms for self-defense on private property outside of his own home.

*Bruen* also set forth the relevant test: "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, *the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.* Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* at 2126 (citation and internal quotation omitted) (emphasis added). In other words, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127.

The State argues that its private property exclusion complies with *Bruen.* It cites to a few colonial and reconstruction-era enactments (Maryland in 1715, Pennsylvania in 1721, New Jersey in 1722, New York in 1763, New Jersey in 1771, Louisiana in 1865, Texas in 1866, and Oregon in 1893). Dkt. 33, at 16-18. They do not carry the State's burden, as explained at length in *Antonyuk*, 2022 WL

**SA15**

16744700, at *79-81.[13]  To Judge Suddaby's discussion of this issue in *Antonyuk*,

this Court adds a few additional points.

---

[13]     The three additional late-nineteenth century enactments cited in paragraphs
18, 20, and 22 of the Belka declaration (Dkt. 33-1) were not expressly addressed in
*Antonyuk*.  They are not generalized private property enactments, but are
enactments focused on large gatherings like fairs, assemblies, and social gatherings.
They are adequately addressed by the thrust of Judge Suddaby's analysis of the
State's cited enactments.  And they vastly post-date the Second Amendment.

It bears consideration of what a court might do if it were addressing an
1880s-era enactment in real time—in the 1880s.  The court would be expected to
ascertain the meaning of the right codified in the Second Amendment.  It would not
be impressed by 1880s-era laws in effect in neighboring jurisdictions that
*contravened* the earlier public understanding of the right.

In fact, *Bruen* noted that, "when it comes to interpreting the Constitution, not
all history is created equal.  'Constitutional rights are enshrined with the scope they
were understood to have *when the people adopted them.*'"  *Bruen*, 142 S.Ct. at 2136
(citing *Heller*, emphasis in original).  Courts "must also guard against giving
postenactment history more weight than it can rightly bear."  *Id.* at 2136.  In other
words, *Bruen* recognized that, "where a governmental practice has been open,
widespread, and unchallenged since the early days of the Republic, the practice
should guide our interpretation of an ambiguous constitutional provision."  *Id.* at
2137 (internal citation omitted).  And "to the extent later history contradicts what
the text says, the text controls."  *Id.*

Indeed, "post-ratification adoption or acceptance of laws that are *inconsistent*
with the original meaning of the constitutional text obviously cannot overcome or
alter that text."  *Id.* (internal citation omitted).  Because "post-Civil War discussions
of the right to keep and bear arms 'took place 75 years after the ratification of the
Second Amendment, they do not provide as much insight into its original meaning
as earlier sources.'"  *Id.*  And although it is the Fourteenth Amendment that
requires New York to respect the right addressed by the Second Amendment, the
Court has "made clear that "individual rights enumerated in the Bill of Rights and
made applicable against the States through the Fourteenth Amendment have the
same scope as against the Federal Government."  *Id.*  The Court has "generally
assumed that the scope of the protection applicable to the Federal Government and
States is pegged to the public understanding of the right when the Bill of Rights
was adopted in 1791."  *Id.*  If this were not the case, the Second Amendment could
mean one thing *vis a vis* federal laws, and entirely something else *vis a vis* state
and local laws.

Moreover, as the Court surveyed a few additional restrictions appearing
randomly in the late 19th-Century, the Court noted that, similarly, "we will not
stake our interpretation on a handful of temporary territorial laws that were

As the Supreme Court has made clear, individuals have the right to carry handguns outside their homes for self-defense. New York's exclusion is valid only if the State "affirmatively prove[s]" that the restriction is part of the Nation's historical tradition of firearm regulation. *Bruen*, 142 S.Ct. at 2127. The test is rigorous because the Second Amendment is the very product of an interest balancing, already conducted by "the People," which "elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense." *Id.* at 2131 (citing *Heller*, 554 U.S. at 635). That balance, struck by the traditions of the American people, "demands" unqualified deference. *Id.*[14]

Significant, too, is the Court's recognition that, when a "challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 2131. New York's law here concerns the same alleged societal problem addressed in *Heller*: "handgun violence," primarily in "urban

---

enacted nearly a century after the Second Amendment's adoption, governed less than 1% of the American population, and also 'contradic[t] the overwhelming weight' of other, more contemporaneous historical evidence." *Id.* at 2154-55 (internal citations omitted). As to certain territorial restrictions, "they appear more as passing regulatory efforts by not-yet-mature jurisdictions on the way to statehood, rather than part of *an enduring American tradition of state regulation*." *Id.* at 2155 (emphasis added).

[14] As *Heller* recognized, citizens must be permitted to use handguns "for the core lawful purpose of self-defense." *Heller*, 554 U.S. at 630.

**SA17**

area[s]." And, as in *Bruen*, there is no such tradition in the historical materials that the State has "brought to bear on that question." *Id.* at 2132.[15]

Also noteworthy is *Bruen*'s conclusion of its search for an enduring tradition: "At the end of this long journey through the Anglo-American history of public carry, we conclude that respondents have not met their burden to identify an American tradition justifying the State's proper-cause requirement. The Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions. Those restrictions, for example, limited the intent for which one could carry arms, the manner by which one carried arms, or the exceptional circumstances under which one could not carry arms, such as before justices of the peace and other government officials. Apart from a few late-19th-century outlier jurisdictions, American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense. Nor, subject to a few late-in-time outliers, have American governments required law-abiding, responsible citizens to 'demonstrate a special need for self-protection distinguishable from that of the general community' in order to carry arms in public." *Id.* at 2156 (internal citations omitted).

In other words, the State's cited enactments do not demonstrate a *tradition* in support of its private property exclusion. *Bruen*, 142 S.Ct. at 2135, 2138, 2150,

---

[15] *Bruen* itself invalidated a century-old New York proper-cause requirement similarly in effect in five other states as well as the District of Columbia. That seven jurisdictions enacted similar restrictions was *insufficient* in the face of a much broader and much older public-carry tradition. If such was a failure of analogs or tradition in *Bruen*, the State's argument must also fail here.

2156.[16] *Antonyuk* made that clear. And the notion of a "tradition" is the opposite of one-offs, outliers, or novel enactments. "Tradition" requires "continuity." *See generally Bruen*, 142 S.Ct. at 2135-56; *Washington v. Glucksberg*, 521 U.S. 702, 723 (1997); *Tradition*, The American Heritage Dictionary of the English Language (5th ed. 2011). The cited enactments are of unknown or limited duration,[17] and the State has not met its burden to show *endurance* (of any sort) *over time*.[18] For this reason, too, the State's argument fails.

The State also argues that private property owners have always had the right to exclude others from their property and, as such, may exclude those carrying concealed handguns. *See* Dkt. 33, at 13-15. But that right has always been one *belonging to the private property owner*—not to the State.[19] It is the property owner who must exercise that right—not the State. If a property owner wants to exclude,

---

[16] The *amicus curiae*, too, argues that a small number of state laws is sufficient so long as there is not overwhelming evidence of an enduring tradition to the contrary. *See* Dkt. 45, at 11-13. This turns the test and its burden on their heads. The *Bruen* Court itself rejected several outliers and was looking for a "broad tradition" of states "meaningfully restrict[ing] public carry." *Bruen*, 142 S.Ct. at 2156.

[17] As *Bruen* noted, courts are "not obliged to sift the historical materials for evidence to sustain" the challenged statute; "that is [the State's] burden. *Bruen,* 142 S.Ct. at 2150.

[18] Indeed, *Bruen* searched for an "enduring American tradition of state regulation." 142 S.Ct. at 2155. And the Court gave little weight to territorial enactments that, like the territories themselves, were "short lived." *Id; see also id.* at 2155 n.31 ("short lived").

[19] The Nation's historical tradition is that individuals may carry arms on private property unless the property owner chooses otherwise. *See generally* D. Kopel & J. Greenlee, The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms, 13 Charleston L. Rev. 205, 290-91 (2018).

19

then: (1) the property owner, must (2) do so.  When the State does so, it runs afoul of the Second Amendment.[20]

The State posits that a self-governing society may choose one of two default rules, namely, that carrying on private property is (a) generally permitted absent the owner's prohibition, or (b) never permitted unless the owner affirmatively consents.  Dkt. 33, at 15.  Maybe so.  But the scope of the *right codified in the Second Amendment* demonstrates that this society—*this nation*—has historically had *the former* default arrangement.  The latter proposed default was not part of any historical tradition to the contrary, and did not form a limitation of the scope of the right so codified in the Bill of Rights.  Instead, the State's current policy preference is one that, because of the interest balancing *already struck by the people* and enshrined in the Second Amendment, is no longer on the table.  *See Heller*, 554 U.S. at 636; *Bruen*, 142 S.Ct. at 2131.

In sum, the vast majority of land in New York is held privately, and it encompasses homes, farms, businesses, factories, vacant land, hotels, parking lots and garages, grocery stores, pharmacies, medical offices, hospitals, cemeteries, malls, sports and entertainment venues, and so on.  These are places that people, exercising their rights, frequent *every day* when they move around *outside their homes.*  The exclusion here makes all of these places presumptively off limits,

---

[20] The State has not identified any historical tradition for its "inversion"—whereby the government now affirmatively exercises the right to exclude concealed carriers *on behalf of all private property owners*, thereby creating *a vast default exclusion zone across the state.*

**SA20**

backed up by the threat of prison.  The Nation's historical traditions have not

countenanced such an incursion into the right to keep and bear arms across all

varieties of private property spread across the land.  The right to self-defense is no

less important and no less recognized on private property.[21]  The Constitution

*requires* that individuals be permitted to use handguns for the core lawful purpose

of self-defense.  *McDonald*, 561 U.S. at 767.  And it protects that right *outside the*

*home.  Bruen*, 142 S.Ct. at 2021.

Nothing in the Nation's history or traditions presumptively closes the door on

that right *across all private property*.  As in *Bruen*, where the Court stated that,

"[n]othing in the Second Amendment's text draws a home/public distinction with

respect to the right to keep and bear arms," *id.* at 14, nothing there casts outside of

its protection all private property.  New York's exclusion violates "the general right

to publicly carry arms for self-defense."  *Id.*  Again, it is one of the policy choices

taken "off the table" by the Second Amendment.  *Heller*, 554 U.S. at 636.

For these reasons, New York's private property exclusion "violates the

Fourteenth Amendment by preventing law-abiding citizens with ordinary self-

defense needs from exercising their right to keep and bear arms."  *Bruen,* 142 S.Ct.

at 2156.  Plaintiff is likely to succeed on the merits of his constitutional claim.

---

[21] Nothing in this decision purports to impact the traditional property right to
exclude others, so long as *the property owner* (not the State) is the one actually
exercising that right.

## C.     Irreparable Harm Absent Preliminary Injunctive Relief

Irreparable harm is "certain and imminent harm for which a monetary award does not adequately compensate." *Wisdom Imp. Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.*, 339 F.3d 101, 113 (2d Cir. 2003). Irreparable harm exists "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chem., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999).

Here, absent a preliminary injunction, Christian's constitutional rights are being violated. Law-abiding citizens are forced to give up their rights to armed self-defense outside their homes, being left to the mercy of opportunistic, lawless individuals who might prey on them and have no concern about the private property exclusion.[22] And for the reasons stated above in Section II.B, the State is wrong to

---

[22] Justice Alito queried, "Will a person bent on carrying out a mass shooting be stopped if he knows that it is illegal to carry a handgun outside the home?" *Bruen*, 142 S.Ct. at 2157. He continued: "And while the dissent seemingly thinks that the ubiquity of guns and our country's high level of gun violence provide reasons for sustaining the New York law, the dissent appears not to understand that it is these very facts that cause law-abiding citizens to feel the need to carry a gun for self-defense." *Id.* at 2158. Finally, he noted that "[t]he police cannot disarm every person who acquires a gun for use in criminal activity; nor can they provide bodyguard protection for the State's nearly 20 million residents . . . . Some of these people live in high-crime neighborhoods. Some must traverse dark and dangerous streets in order to reach their homes after work or other evening activities. Some are members of groups whose members feel especially vulnerable. And some of these people reasonably believe that unless they can brandish or, if necessary, use a handgun in the case of attack, they may be murdered, raped, or suffer some other serious injury." *Id.* Indeed, "[o]rdinary citizens frequently use firearms to protect themselves from criminal attack. According to survey data, defensive firearm use

22

**SA22**

suggest that irreparable harm does not exist because the case involves a policy decision between two defaults that should be left to the legislature to decide. *See* Dkt. 47, at 4. The private property exclusion is all-encompassing and leaves Christian no alternatives as he moves around outside his home.

In an analogous case, the Supreme Court has held that the loss of "First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63, 67 (2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Here as well, there "can be no question that the challenged restrictions, if enforced, will cause irreparable harm." *See id.* Christian satisfies the irreparable harm element.

### D. Public Interest

The Court must consider whether a preliminary injunction is in the public interest. *See Bronx Household of Faith*, 331 F.3d at 349. The State argues that broad legal carrying in dense congregate settings can result in spontaneous violence or accidental shootings. *See* Dkt. 33, at 42-43. But the State does not show that the lawful carrying of firearms on private property has resulted in an increase in handgun violence, or that public safety would be impaired if the private property restriction is enjoined.

A preliminary injunction would, however, serve the public interest of fostering self-defense across the state. The public has a significant interest in the

---

occurs up to 2.5 million times per year." *Id.* (citation omitted).

"strong sense of the safety that a licensed concealed handgun regularly provides, or would provide, to the many law-abiding responsible citizens in the state too powerless to physically defend themselves in public without a handgun." *Antonyuk v. Bruen*, No. 22-CV-0734, 2022 WL 3999791, at *36 (N.D.N.Y. Aug. 31, 2022). A preliminary injunction is in the public interest.

### E. Security

Federal Rule of Civil Procedure 65(c) requires the Court to consider whether it should require plaintiffs to post security and, if so, in what amount. *See Dr.'s Assocs., Inc. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997) ("Rule 65(c) gives the district court wide discretion to set the amount of a bond, and even to dispense with the bond requirement [in certain situations].").

On these facts, the Court will not require Christian to post security because a bond requirement does not fit the fact-pattern and interests involved in this case. *See Dr.'s Assocs.*, 107 F.3d at 135-36 (affirming district court's decision not to require security where the district court "found that [defendants] would not suffer damage or loss from being forced to arbitrate in lieu of prosecuting their state-court cases"); *see also Clarkson Co. v. Shaheen,* 544 F.2d 624, 632 (2d Cir. 1976) (Because no request for a bond was ever made in the district court, and because, under Fed. R. Civ. P. 65, "the amount of any bond to be given upon the issuance of a preliminary injunction rests within the sound discretion of the trial court.")

### F. Scope

The State argues that Christian can only bring a facial—rather than an as-applied—challenge to the private property exclusion, which would succeed only "if Plaintiffs 'show that no set of circumstances exists under which the [statute] would be valid, *i.e.*, that the law is unconstitutional in all of its applications,' or at least that it lacks a 'plainly legitimate sweep.'" Dkt. 33, at 11 (quoting *United States v. Decastro,* 682 F.3d 160, 168 (2d Cir. 2012)). The argument fails.

Christian has shown, at a minimum, that the private property exclusion lacks a "plainly legitimate sweep" in that it forces individuals to give up their rights to armed self-defense outside the home. *See Decastro,* 682 F.3d at 168 (to prevail on a facial challenge, a plaintiff "would need to show that no set of circumstances exists under which the statute would be valid, *i.e.*, that the law is unconstitutional in all of its applications, or at least that it lacks a plainly legitimate sweep") (internal citation omitted). And it bears noting that neither the parties nor the Court's imagination has identified a plainly legitimate sweep.

### G. Stay Pending Appeal

The State requests a three-day stay pending appeal. The State's request is denied. The factors "relevant to granting a stay pending appeal are the applicant's 'strong showing that he is likely to succeed on the merits,' irreparable injury to the applicant in the absence of a stay, substantial injury to the nonmoving party if a stay is issued, and the public interest." *Uniformed Fire Officers Ass'n v. de Blasio*, 973 F.3d 41, 48 (2d Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)). The

**SA25**

first two factors "are the most critical, but a stay is not a matter of right, even if irreparable injury might otherwise result, it is an exercise of judicial discretion, and the party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* (internal citation and quotation marks omitted).

Here, a stay pending appeal is not warranted. As discussed above, Plaintiff's constitutional rights are being violated absent a preliminary injunction. The State has not established irreparable injury in the absence of a stay. The balance of hardships and public interest weigh in favor of Plaintiff, also as discussed above. Finally, it is *Plaintiff* who has demonstrated that he is likely to succeed on the merits. As in *Hardaway,* legislative enactments may not eviscerate the Bill of Rights. Every day they do is one too many. *Hardaway*, 2022 WL 16646220, at *19.

## CONCLUSION

For the above reasons, the Court GRANTS the motion for a preliminary injunction as follows: it is

ORDERED that Defendants and their officers, agents, servants, employees, and all persons in concert or participation with them who receive notice of this preliminary injunction, are enjoined, effective immediately, from enforcing N.Y. Pen. L. § 265.01-d with respect to private property open to the public, and their regulations, policies, and practices implementing it;

ORDERED that this preliminary injunction shall remain in effect pending disposition of the case on the merits; and

ORDERED that no bond shall be required.

The portions of Plaintiffs' motion addressing public parks and public transportation will be addressed in a subsequent decision.

SO ORDERED.

Dated:     November 22, 2022
             Buffalo, New York

_____
JOHN L. SINATRA, JR.
UNITED STATES DISTRICT JUDGE

**SA27**

## New York Penal Law § 265.01-d. Criminal possession of a weapon in a restricted location

(1) A person is guilty of criminal possession of a weapon in a restricted location when such person possesses a firearm, rifle, or shotgun and enters into or remains on or in private property where such person knows or reasonably should know that the owner or lessee of such property has not permitted such possession by clear and conspicuous signage indicating that the carrying of firearms, rifles, or shotguns on their property is permitted or has otherwise given express consent.

(2) This section shall not apply to:

(a) police officers as defined in section 1.20 of the criminal procedure law;

(b) persons who are designated peace officers as defined in section 2.10 of the criminal procedure law;

(c) persons who were employed as police officers as defined in section 1.20 of the criminal procedure law, but are retired;

(d) security guards as defined by and registered under article seven-A of the general business law who has been granted a special armed registration card, while at the location of their employment and during their work hours as such a security guard;

(e) active-duty military personnel;

(f) persons licensed under paragraph (c), (d) or (e) of subdivision two of section 400.00 of this chapter while in the course of his or her official duties; or

(g) persons lawfully engaged in hunting activity.

Criminal possession of a weapon in a restricted location is a class E felony.