# 22-2987

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

BRETT CHRISTIAN, FIREARMS POLICY COALITION, INC.,
SECOND AMENDMENT FOUNDATION, INC.,

*Plaintiffs-Appellees*,

*v.*

STEVEN A. NIGRELLI, in his Official Capacity as Superintendent
of the New York State Police,

*Defendant-Appellant*,

*v.*

JOHN J. FLYNN, in his official capacity as District Attorney
for the County of Erie, New York

*Defendant-Appellee*.

On Appeal from the United States District Court
for the Western District of New York, No. 22-cv-0695
Before the Honorable John L. Sinatra

## BRIEF FOR PROFESSORS OF PROPERTY LAW AS AMICI CURIAE IN SUPPORT OF DEFENDANT-APPELLANT AND REVERSAL

SIMON B. KRESS
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109

ALAN SCHOENFELD
JUAN M. RUIZ TORO*
JOSHUA M. FEINZIG*
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
alan.schoenfeld@wilmerhale.com

* Admitted only in Washington, D.C.;
practicing under the supervision of
Principals of the Firm.

January 30, 2023

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................ ii

INTEREST OF AMICI CURIAE ........................................................ 1

INTRODUCTION ............................................................................ 2

ARGUMENT .................................................................................. 4

I.   NEW YORK'S RESTRICTED LOCATIONS PROVISION DOES NOT
IMPLICATE SECOND AMENDMENT RIGHTS GIVEN OWNERS' RIGHT
TO EXCLUDE .............................................................................. 4

    A.   The Right To Exclude Is Foundational To American Property
Law And Includes The Right To Set The Terms Of Entry ................. 6

        1.   Governmental regulation routinely shapes whether and
on what terms owners exercise the right to exclude ................. 6

        2.   The right to exclude inheres in all private property—
including private property open to the public .......................... 11

    B.   A Constitutional Right To Carry A Weapon Onto Another's
Property Would Vitiate The Right To Exclude And Therefore
Must Be Rejected ...................................................................... 12

    C.   Because There Is No Second Amendment Right To Carry Onto
Another's Property Nor To A Presumption That A Private
Owner Welcomes Firearms, The Restricted Locations Provision
Does Not Implicate The Second Amendment And Plaintiffs
Fail To Meet *Bruen* Step One ................................................... 18

II.  NEW YORK'S RESTRICTED LOCATIONS PROVISION IS CONSISTENT
WITH HISTORY AND TRADITION .................................................. 22

    A.   The State's Analogues Establish The Law's Consistency With
History and Tradition ................................................................. 23

    B.   New York's Restricted Locations Provision Is Properly
Understood As Default-Shifting Legislation And Not An
Outright Prohibition On Carrying Firearms ................................... 26

CONCLUSION ............................................................................... 28

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*American Manufacturers Mutual Insurance Co. v. Sullivan*,
526 U.S. 40 (1999) ........................................................................ 18

*Amalgamated Food Employees Union v. Logan Valley Plaza*,
391 U.S. 308 (1968) ...................................................................... 17

*Baker v. Howard County Hunt*, 171 Md. 159 (1936) .............................. 13

*Berman v. Parker*, 348 U.S. 26 (1954) .................................................. 22

*Birt v. Ratka*, 886 N.Y.S.2d 293 (2009) ............................................... 14

*Blum v. Yaretsky*, 457 U.S. 991 (1982) ................................................ 18

*Breard v. Alexandria*, 341 U.S. 622 (1951) ...................................... 8, 16

*Carpenter v. City of New York,* 984 F. Supp. 2d 255 (S.D.N.Y. 2013) .................... 7

*Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063 (2021) ................................ 2, 6, 11

*Central Hardware Co. v. NLRB*, 407 U.S. 539 (1972) .............................. 17

*College Savings Bank. v. Florida Prepaid Postsecondary Education
Expense Board*, 527 U.S. 666 (1999) ........................................... 6, 12

*Dietemann v. Time, Inc.*, 449 F.2d 245 (9th Cir. 1971) .......................... 16

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .......................... 2, 26

*GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244 (11th Cir. 2012) .............. 6, 13

*Hodel v. Irving*, 481 U.S. 704 (1987) .................................................. 28

*Hudgens v. NLRB*, 424 U.S. 507 (1976) ............................................... 18

*Lloyd Corp. v. Tanner*, 407 U.S. 551 (1972) .................................... 12, 15

*Madden v. Queens County Jockey Club, Inc.*, 296 N.Y. 249 (1947) ...................... 13

*Marsh v. Alabama*, 326 U.S. 501 (1946) ............................................... 15

*New York State Rifle & Pistol Association v. Bruen*,
142 S. Ct. 2111 (2022)................................................................*passim*

*Philip v. United Force Security Corp.*, 516 F. App'x 38 (2d Cir. 2013)..................9

*Ploof v. Putnam*, 71 A. 188 (Vt. 1908) ....................................................13

*PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980) ...........................12, 17

*Rowan v. U.S. Post Office Department*, 397 U.S. 728 (1970)................................15

*Shalala v. Illinois Council on Long Term Care, Inc.*,
529 U.S. 1 (2000)...................................................................18

*Shelly v. Kraemer*, 334 U.S. 1 (1948) ....................................................14

*Shiffman v. Empire Blue Cross and Blue Shield*,
681 N.Y.S. 2d 511 (1st Dep't 1998).............................................8

*Spanish Church of God of Holyoke, Mass., Inc. v. Scott*,
794 F. Supp. 2d 304 (D. Mass. 2011)..........................................16

*United States v. Messina*, 806 F.3d 55 (2d Cir. 2015)...........................................25

*United States v. Woods*, 571 U.S. 31 (2013)...........................................24

*Watchtower Bible & Tract Society v. Village of Stratton*,
536 U.S. 150 (2002).........................................................19

*Yorzinski v. City of New York*, 175 F. Supp. 3d 69 (S.D.N.Y. 2016) .......................7

## STATUTES, RULES, AND REGULATIONS

430 ILCS 66/65(b) (2021) ...................................................................12

N.Y. Penal Law
§ 140.05 ...................................................................7
§ 265.01-d ...................................................................1, 3

## OTHER AUTHORITIES

Ayres, Ian & Spurthi Jonnalagadda, *Guests with Guns: Public Support
for "No Carry" Defaults on Private Land*, 48 J.L. Med. &
Ethics 183 (Winter 2020) ...................................................................20

Blocher, Joseph & Darrell A.H. Miller, *What Is Gun Control? Direct Burdens, Incidental Burdens, and the Boundaries of the Second Amendment*, 83 U. Chi. L. Rev. 295 (2016) ................................................8, 10

Blocher, Joseph, *The Right Not to Keep or Bear Arms*, 64 Stan. L. Rev. 1 (2012) ................................................................................16

Ellickson, Robert, *Of Coase and Cattle: Dispute Resolution Among Neighbors in Shasta County*, 38 Stan. L. Rev. 623 (1986) ..........................27

Friend or Foe, Home Page, https://friendorfoe.us ...................................21

Kopel, David B. & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 203 (2018)...................................27

Kraakman, Reiner H., *Gatekeepers: The Anatomy of a Third-Party Enforcement Strategy*, 2 J.L. Econ. & Org. 53 (1986)...................................9

Merrill, Thomas W. & Henry E. Smith, *What Happened to Property in Law and Economics?*, 111 Yale L.J. 357 (2001) ......................................28

Merrill, Thomas W., *Property and the Right to Exclude*, 77 Neb. L. Rev. 730 (1998) ...............................................................................6

Poppe, Emily S. Taylor, *Choice Building*, 63 Ariz. L. Rev. 103 (2021)................28

Strahilevitz, Lior Jacob, *Information Asymmetries and the Rights to Exclude*, 104 Mich. L. Rev. 1835 (2006) ........................................9

Zambito, Thomas C., *NY's New Gun Laws Restrict Weapons in Businesses, But Some Owners Welcome Them. Here's Why*, Lohud (July 28, 2022), https://www.lohud.com/story/news/2022/07/28/as-nys-gun-laws-restrict-guns-in-businesses-some-owners-welcome-them/65382470007 .........................................................................21

# INTEREST OF AMICI CURIAE[1]

Amici curiae are law professors specializing in property law.  Ian Ayres is Oscar M. Ruebhausen Professor at Yale Law School.[2]  Fredrick Vars is Ira Drayton Pruitt, Sr. Professor of Law at University of Alabama School of Law. Professors Ayres and Vars have researched and written extensively on the relationship between property law and firearm regulation, including in their book *Weapon of Choice: Fighting Gun Violence While Respecting Gun Rights* (Harv. U. Press, 2020).

Amici have an interest in the doctrinal and policy issues implicated by this case, particularly as they relate to the constitutionality of the restricted locations provision of New York State's Concealed Carry Improvement Act (CCIA), enacted in response to *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022).  N.Y. Penal Law § 265.01-d.  The historical record and longstanding principles of property law demonstrate that New York's restricted locations provision accords with the Nation's historical tradition of firearm regulation and does not unconstitutionally impose on conduct protected by the

---

[1] No counsel for a party wrote this brief in whole or in part, and no one other than amici or their counsel contributed money to fund the preparation or submission of this brief.  The parties have consented to its filing.

[2] The views of the amici expressed here do not necessarily reflect the views of the institutions with which they are or have been affiliated, whose names are included solely for purposes of identification.

Second Amendment.  On the contrary, New York's provision is firmly rooted in "one of the most treasured" rights of property ownership: the right to exclude. *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021).  In brief, your Second Amendment right to bear arms ends at my property line—and always has.[3]

## INTRODUCTION

The Second Amendment does not guarantee an individual right to bear arms on another's private property.  The right of property owners to exclude others from using or interfering with their property is "universally held to be a fundamental element of the property right" and "one of the most essential sticks in the bundle of rights that are commonly characterized as property."  *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021).  That longstanding right to exclude necessarily encompasses property owners' right to set terms of entry, including with respect to the carrying of firearms on their property.  This is true regardless of whether the property is open to the public.  Neither *District of Columbia v. Heller*, 554 U.S. 570 (2008), nor *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022), can be read to announce a right so sweeping as to displace centuries-old property rights.

---

[3] Amici have submitted a substantially similar brief in *Antonyuk v. Hochul*, No. 22-2908, which has been calendared for oral argument together with this and other CCIA-related cases.

Because there has never been an individual Second Amendment right to bear arms on another's private property, there is no freestanding Second Amendment right to a presumption that a private owner welcomes firearms on their property until they say otherwise. Thus, New York's restricted locations provision, N.Y. Penal Law § 265.01-d, does not implicate the Second Amendment's "plain text." *Bruen*, 142 S. Ct. at 2129-2130. To the contrary, New York's selection of a presumption reflects States' enduring legislative prerogative to shape property owners' right to exclude—including the right to exclude firearms.

Even if this Court were to find that the Second Amendment is implicated here, New York's restricted locations provision is "consistent with the Nation's historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2130, and should be upheld on those grounds. As an initial matter, amici are unaware of any common law or statutory law of trespass—whether at the time of the Founding or Reconstruction—that excepted carrying of firearms from the general requirement that lawful presence was conditioned on the informed consent of the property owner. Nor are amici aware of any constitutional challenge to general trespass laws on the ground that they failed to provide a presumptive allowance for carrying firearms. The historical analogues cited by the State reflect this baseline understanding of trespass law and collectively establish that state regulations conditioning carrying of firearms on the consent of property owners are in keeping

with Second Amendment protections. As the Supreme Court affirmed in *Bruen*, determining whether proffered historical analogues bear a "relevant similarity" to the law at issue requires assaying "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-2133. The State did so here when it identified Founding- and Reconstruction-era analogues that sought to accomplish the same goals as New York's restricted locations provision using essentially the same means. As these analogues evince, there is a longstanding tradition of state firearm regulation whereby entry on private property with firearms is conditioned on the informed consent of the property owner. Attempting to ensure that property owners were informed about the presence of guns on their property, these laws—like New York's provision today—empowered property owners to decide for themselves how best to protect themselves and their property.

In short, longstanding principles of property law and the historical record demonstrate that New York's restricted locations provision is not an unconstitutional imposition on conduct protected by the Second Amendment and is consistent with the history of firearms regulation.

## ARGUMENT

### I.  NEW YORK'S RESTRICTED LOCATIONS PROVISION DOES NOT IMPLICATE SECOND AMENDMENT RIGHTS GIVEN OWNERS' RIGHT TO EXCLUDE

In *New York State Rifle & Pistol Association v. Bruen*, the Supreme Court held that a two-part inquiry guides courts' consideration of Second Amendment

claims.  First, the court must ask whether "the Second Amendment's plain text covers an individual's conduct."  142 S. Ct. 2111, 2129-2130 (2022).  Only if the plaintiff has carried their burden with respect to that inquiry does the burden shift to the government to show that the firearm regulation is "consistent with the Nation's historical tradition of firearm regulation."  *Id*. at 2130.  Plaintiffs here have failed to carry their burden because the restricted locations provision does not implicate the individual right "to carry a handgun for self-defense outside the home."  *Id*. at 2122.

Given the foundational status of the right to exclude, there is no constitutional right to enter onto another's property without the owner's permission, much less a Second Amendment right to carry weapons onto another's property without permission.  This is true regardless of whether private property is open or closed to the public.  And because there is no right to carry onto private property in the first instance, the provision's enabling of private owners to more easily avail themselves of their right to exclude gun possessors raises no constitutional problem.  Put another way, there is no freestanding Second Amendment right to have a private owner's silence on the permissibility of guns construed in either direction.  The selection of such a default rule is left to the States, part and parcel of their time-honored prerogative to reinforce property owners' right to exclude.

**A.    The Right To Exclude Is Foundational To American Property Law And Includes The Right To Set The Terms Of Entry**

The right to exclude others from interfering with one's property is "one of the most treasured" rights of property ownership.  *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021); *see also College Sav. Bank. v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 673 (1999) (characterizing the right as the "hallmark of a protected property interest").  Indeed, the right to exclude was likely the "first step in the evolution of property rights in land" and should be viewed as the "sine qua non" of property.  Merrill, *Property and the Right to Exclude*, 77 Neb. L. Rev. 730, 730, 745-747 (1998).  And "[i]t is simply beyond rational dispute that the Founding Fathers, through the Constitution and the Bill of Rights, sought to *protect* the fundamental right of private property." *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1265 (11th Cir. 2012), *abrogated on other grounds by Bruen*, 142 S. Ct. at 2111.

**1.    Governmental regulation routinely shapes whether and on what terms owners exercise the right to exclude**

The district court characterized New York's restricted locations provision as an illegitimate usurpation by the State of the right to exclude enjoyed by *private individuals*.  SA2, 19 ("It is the property owner who must exercise that right—not the State.").  This misunderstands the history and context of laws relating to property owners' right to exclude.  That right is not self-actualizing or exercised in

isolation.  It is nested within a broad range of criminal, tort, and property laws that give shape to that right, imposing liability on those who violate an owner's terms of entry, setting "default rules" around which an owner and potential entrants can negotiate claims of access, and regulating informational exchange between parties. A brief survey of these regulatory traditions makes clear that the restricted locations provision exists comfortably within them.

Most obviously, States have long exercised their police power to reinforce property owners' right to exclude by enacting relevant trespass laws.  For example, New York's criminal trespass statute provides that a "person is guilty of trespass when he knowingly enters or remains unlawfully in or upon premises."  N.Y. Penal Law § 140.05.  Such statutes take the informed consent of the property owner as the key determinant for whether an individual's presence is lawful, vindicating the owner's right to exclude by enforcing their own terms of entry through criminal sanction.  This holds true for private property generally "open" to the public as much as for "closed" property.  *See, e.g.*, *Carpenter v. City of New York,* 984 F. Supp. 2d 255, 265-266 (S.D.N.Y. 2013) (concluding that there was probable cause to arrest the plaintiff for criminal trespass in a bank open to the public because bank employees asked the plaintiff to move their protest outside); *Yorzinski v. City of New York*, 175 F. Supp. 3d 69, 77 (S.D.N.Y. 2016) (noting that when premises are "open to the public," a person "remains unlawfully if he defies a lawful order

not to enter or remain") (internal citations omitted). The law of civil trespass similarly reinforces an owner's right to exclude by empowering owners to demand compensation for unlawful entry. *See Shiffman v. Empire Blue Cross and Blue Shield*, 681 N.Y.S. 2d 511, 511-512 (1st Dep't 1998).

Inevitably, both criminal and civil trespass laws assume general "default rules" or presumptions about consent that govern where an owner does not expressly announce terms of entry. For instance, the absence of a physical fence around a private property does not communicate implicit consent to enter, though in the past States had adhered to the opposite rule. *See infra* Section II.B (discussing States' shifts from "fencing out" to "fencing in" rules). With respect to the question of whether visitors can bring guns without an owner's express permission, there will necessarily be one of two default rules accepted by courts in the course of enforcing the law of trespass: An owner's silence will be construed as either permission or prohibition. That choice of default can be made through legislation, as in the case of New York's provision and as States have done with respect to other property-related default rules. *See, e.g.*, *Breard v. Alexandria*, 341 U.S. 622, 645 (1951) (upholding an ordinance prohibiting door-to-door solicitation unless a homeowner gave prior consent). Or that choice can be made through a common-law judicial process involving individual adjudications of alleged trespasses. *See* Blocher & Miller, *What Is Gun Control? Direct Burdens,*

*Incidental Burdens, and the Boundaries of the Second Amendment*, 83 U. Chi. L. Rev. 295, 315 n.128 (2016). Either way, there will necessarily be a default rule on this issue adopted, explicitly or implicitly, by state legal institutions.

In addition to furnishing sanctions for when an owner's terms of entry are violated and setting default rules that inform how terms of entry should be interpreted, States routinely shape how owners make exclusion decisions in the first instance. State enactments that promote disclosure of information by prospective entrants can lower costs associated with the discovery of that information, enabling property owners to execute terms of entry that more closely align with their preferences. *See* Strahilevitz, *Information Asymmetries and the Rights to Exclude*, 104 Mich. L. Rev. 1835, 1837-1838 (2006).

Alongside legislation regulating informational exchange, the common law of torts influences owners' exclusion decisions by imposing duties toward guests or other entrants. For example, a property owner bears a duty to protect guests from foreseeable dangers present on the land or posed by other guests. *See Philip v. United Force Sec. Corp.*, 516 F. App'x 38, 38 (2d Cir. 2013). Legal rules imposing liability for wrongdoing or injury arising on an owner's premises will have some degree of influence on an owner's decision to exclude certain people or forms of behavior. *Cf.* Kraakman, *Gatekeepers: The Anatomy of a Third-Party Enforcement Strategy*, 2 J.L. Econ. & Org. 53, 63 (1986) (examining legal regimes

that encourage "gatekeepers" to "disrupt misconduct largely by excluding wrongdoers from a particular market").  In the context of firearms possession, such liability may influence the possession and use of guns on private premises even though these rules do not explicitly regulate guns as such.  *See* Blocher & Miller, *supra*, at 298.

Together with these many legal rules ordering private behavior, New York's restricted locations provision contributes to the backdrop against which individual owners exercise their right to exclude.  It is a default rule informing the meaning of an owner's silence as to whether guns are permitted, much like other default rules shaping the meaning of consent in the criminal and civil trespass contexts (*e.g.*, the established rule that the absence of a physical fence does not indicate implicit consent to enter).  And as with these analogous default rules, decisions over whether a gun possessor may enter remains with the owner, just as it was before the CCIA and as it has always been.  Perhaps New York's restricted locations provision will have the effect of increasing the proportion of owners who will exercise their right to exclude gun possessors, though this may be offset by the decisions of other owners to explicitly welcome firearms by posting signs on their property or notices on the Internet, or giving express consent by other low-cost means.  Any such net effect reflects the preferences of landowners to protect their

property and is not unique, considering the many ways in which court-made

common law as well as state legislation influence owners' exclusion decisions.

**2.    The right to exclude inheres in all private property—including private property open to the public**

The district court drew a distinction between private property that has been

opened to the public and that which has remained closed.  *See* SA20-21.  In doing

so, the court seemed to assume that owners of commercial property have less

constitutional leeway in setting terms of entry pertaining to gun possession than

owners of closed property.  But the constitutionality of the restricted locations

provision flows directly from the right to exclude—which remains robust for open

and closed private property alike.

Although there are important constitutional differences between open and

closed private property, those differences do not fundamentally diminish a property

owner's right to exclude.  This becomes clear from the vantage of the Court's

Takings jurisprudence.  Though some forms of unwanted entry onto closed private

property may constitute *per se* takings while those onto open private property are

analyzed under the more "flexible" *Penn Central* balancing framework, *see Cedar

Point*, 141 S. Ct. at 2072, 2076-2077, the Court has never suggested that the

owner's right to set terms of entry is *nonexistent* for owners of open property.

Indeed, the Court has consistently reaffirmed that property does not "'lose its

private character merely because the public is generally invited to use it for

- 11 -

designated purposes.'" *PruneYard Shopping Center v. Robins*, 447 U.S. 74, 81 (1980) (citation omitted); *see also Lloyd Corp. v. Tanner*, 407 U.S. 551, 569 (1972) ("The essentially private character of a store … does not change by virtue of being large or clustered with other stores in a modern shopping center.").

### B. A Constitutional Right To Carry A Weapon Onto Another's Property Would Vitiate The Right To Exclude And Therefore Must Be Rejected

Recognizing a Second Amendment right to carry a weapon onto another's private property would be an unprecedented abrogation of the owner's right to exclude—the "hallmark of a protected property interest," *Florida Prepaid*, 527 U.S. at 673. It is unsurprising, then, that no court has recognized such a constitutional exception to the exclusion right.[4]

In codifying a pre-existing common-law right, the Second Amendment "did not expand, extend, or enlarge the individual right to bear arms at the expense of other fundamental rights," including an "owner's exclusive right to be king of his own castle." *GeorgiaCarry.Org, Inc.*, 687 F.3d at 1264 (examining the

---

[4] There have been recent state *legislative* attempts to extend an array of gun-related privileges into private-property settings, including "bring your gun to work" statutes restricting employers from barring licensed carry in certain areas. *See, e.g.*, 430 ILCS 66/65(b) (2021) (restricting employers from prohibiting the carrying of a firearm within a vehicle on an employer's parking lot). But these statutes say nothing about the scope of the individual right to bear arms (*i.e.*, the constitutional floor). After *Cedar Point*, these statutes may constitute unconstitutional regulatory takings under the federal Takings Clause.

compatibility between the rights at common law).  Rather, the right to bear arms was clearly circumscribed by the common law of trespass, which reflected an unfettered right to exclude armed individuals and never exhibited special treatment for firearms.  *See, e.g.*, *Baker v. Howard Cnty. Hunt*, 171 Md. 159, 188 (1936) (surveying the history of "the relative rights of fox hunters and the owners of the land over which they hunt" and finding "no doubt that … if the hunter himself goes on the lands of another against the owner's will, he is a trespasser").

This is not to say that the right to exclude, as instantiated through the law of trespass, was absolute.  For example, the common law of trespass long accommodated defenses of necessity as well as "reasonable access" requirements meant to constrain innkeepers and common carriers from arbitrarily excluding patrons.  *See, e.g.*, *Ploof v. Putnam*, 71 A. 188, 189 (Vt. 1908) (necessity defense); *Madden v. Queens Cnty. Jockey Club, Inc.*, 296 N.Y. 249, 253 (1947) (reasonable access).  But unlike these longstanding black-letter limitations, a constitutional defense to the law of trespass based in the right to bear arms was *never* recognized—much less even considered—by courts.

The historical absence of any firearms-related exception to the right to exclude dovetails with the more general relationship, as elaborated by the federal courts in modern times, between the owner's right and the federal constitutional rights of non-owners.  Indeed, amici are aware of only two potential instances

- 13 -

where the right to exclude has been judicially limited by the federal constitutional rights of non-owners: the judicial enforcement of racially restrictive covenants and restrictions on street expression imposed by privately-run company towns. But neither offers a rationale relevant to the Second Amendment context, especially considering that they arose long after Reconstruction—the historical moment most relevant for purposes of defining the balance between the right to exclude and the right to carry.

In *Shelly v. Kraemer*, 334 U.S. 1 (1948), the Supreme Court found that the enforcement of a racially restrictive covenant was prohibited by the Equal Protection Clause. Its analysis turned on the fact that the "[t]he owners of the properties were willing sellers" and that "but for the active intervention of the state courts, … petitioners would have been free to occupy the properties in question without restraint." *Id*. at 19. In other words, *Kraemer* pit both the sellers' common-law right to disposition of the property and the buyers' constitutional right to equal treatment against the rights of the other neighborhood residents to enforce the covenant they had collectively enacted. A neighbor's right to enforce a covenant against the potential buyer of another property may seem analytically similar to the right to exclude, but such an enforcement right has never been given nearly as much legal force. *See, e.g.*, *Birt v. Ratka*, 886 N.Y.S.2d 293, 293 (2009) (extinguishing a restrictive covenant solely because it "is of no actual and

- 14 -

substantial benefit to the persons seeking its enforcement").  Thus, *Kraemer* cannot stand for a general constitutional limit on the right to exclude because it did not even involve such a right; that property rights were involved on both sides of the ledger makes it additionally difficult to isolate the role of the equal-protection right in the Court's analysis.

The only other arguable occasion where constitutional rights have limited the right to exclude involves the privately run "company towns" once prevalent in the American South.  In *Marsh v. Alabama*, 326 U.S. 501 (1946), the Supreme Court held that a private company maintaining complete ownership over an Alabama town was barred by the First Amendment from forbidding street distribution of religious materials.  The Court stressed, however, that the company town had "all the characteristics of any other American town," *id.* at 502, and later definitively limited *Marsh*'s reach to the company towns of yesteryear.  *See Lloyd Corp.*, 407 U.S. at 568 (recognizing that "this Court has never held that a trespasser or an uninvited guest may exercise general rights of free speech on property privately owned").

Other First Amendment rights likewise end at the private-property line, as courts have routinely recognized.  *See, e.g.*, *Rowan v. U.S. Post Office Department*, 397 U.S. 728, 738 (1970) (holding that "[t]he asserted [First Amendment] right of a mailer [to send unwanted material to an unreceptive addressee] … stops at the

outer boundary of every person's domain"); *Breard*, 341 U.S. at 645 (upholding a municipality's default rule that door-to-door solicitation was presumptively disallowed absent an owner's express prior consent, because "[i]t would be … a misuse of the guarantees of free speech and free press to … force a community to admit the solicitors of publications to the home premises of its residents"); *Dietemann v. Time, Inc.*, 449 F.2d 245, 249 (9th Cir. 1971) ("The First Amendment [right to newsgathering] is not a license to trespass …."); *Spanish Church of God of Holyoke, Mass., Inc. v. Scott*, 794 F. Supp. 2d 304, 313 (D. Mass. 2011) (rejecting a defense to trespass based in the right to religious exercise).  In short, a private owner's fundamental control over their dominion means that they can decide to prohibit potential entrants carrying firearms, just as they can decide to prohibit handbill distributors, association members, newsgathering journalists, or religious observers.[5]

The rejection of a constitutional right to carry onto another's private property is also consistent with the Court's reasoning in *Heller* and *Bruen*.  Neither

---

[5] Analogies to the First Amendment reveal an additional reason why the Second Amendment does not restrict an owner's right to exclude gun possessors: Just as First Amendment rights to free speech or religious exercise include the bilateral rights not to speak or not to practice, so too should the Second Amendment right to bear arms in self-defense encompass the freedom *not* to keep or bear them.  *See* Blocher, *The Right Not to Keep or Bear Arms*, 64 Stan. L. Rev. 1, 26-50.

case establishes a right to carry a handgun on other people's private property closed to the public. And contrary to the district court's suggestion, *see* SA14 n.12, neither does *Bruen* support the proposition that "a right to carry in public" includes private property open to the public.

For one, Justice Thomas's majority opinion uses only the term "public" without further elaboration, even though when the Court refers to private commercial sites in other contexts it is careful to use qualified language like "quasi-public" or "property open to the public"—suggesting that the legal meaning of "public" has long been distinct from private real property. *See, e.g.*, *Central Hardware Co. v. NLRB*, 407 U.S. 539, 547 (1972) ("The only fact relied upon for the argument that [private parking lots] have acquired the characteristics of a public municipal facility is that they are 'open to the public.'"); *PruneYard*, 447 U.S. at 81 (noting that private commercial property "does not 'lose its private character'"). More crucially, construing "public" to include "private commercial property" would be the first time since *Logan Valley Plaza* in 1968 (which the Court overturned soon thereafter) that a federal constitutional right was found to override the exclusion right inhering in private commercial property. *See Amalgamated Food Emp. Union v. Logan Valley Plaza, Inc.*, 391 U.S. 308 (1968), *abrogated by Hudgens v. NLRB*, 424 U.S. 507 (1976). Had the Court in *Bruen* wished to upset the constitutional status of the right to exclude and private property

- 17 -

at large, it would have said so. *Cf. Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000).

**C. Because There Is No Second Amendment Right To Carry Onto Another's Property Nor To A Presumption That A Private Owner Welcomes Firearms, The Restricted Locations Provision Does Not Implicate The Second Amendment And Plaintiffs Fail To Meet *Bruen* Step One**

Because there is no constitutional right to enter onto another's property without the owner's permission, much less a Second Amendment right to carry weapons onto that property, the fact that New York's restricted locations provision enables private owners to more easily avail themselves of their right to exclude gun possessors is of no constitutional concern.[6]  Put another way, there is no

_____

[6] Even if there were such a Second Amendment right to carry guns onto another's private property, Plaintiffs lack standing to challenge the restricted locations provision on that basis.  *See* Appellant's Br. Part I.  Moreover, it is not clear that the restricted locations provision encumbers that right.  Under the provision, any exclusion of a gun possessor is the decision of the individual owner—not of the State.  *Cf. American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999) (finding no state action, and thus no constitutional rights violation, where the "[a]ction taken by private entities [is] with the mere approval or acquiescence of the State").  Perhaps the provision will encourage owners to exercise their right to exclude gun possessors more readily, but that alone is not enough to trigger a constitutional problem considering how practically easy (and without any risk of legal liability) it is for owners to opt out through the posting of a sign announcing the permissibility of firearms.  The fact that private owners have the first and final word distinguishes this situation from unconstitutional legislative attempts to assign entry determinations to state actors.  *See, e.g.*, *Watchtower Bible & Tract Soc'y v. Village of Stratton*, 536 U.S. 150 (2002) (striking down an ordinance requiring that individuals obtain an official's permission to engage in door-to-door solicitations).

freestanding Second Amendment right to have a private owner's silence regarding the issue of guns construed in a particular direction, just as there is no constitutional right to either default rule informing the meaning of the absence of a physical fence for purposes of trespass. New York's restricted locations provision does not, therefore, implicate the text of the Second Amendment and this Court need not reach Step Two of the *Bruen* test.

Even accepting that there is no right to carry onto another's private property, plaintiffs may still argue that the provision implicates the *Bruen* right to carry on public property. But the right to public carry, of whatever ultimate scope, is perfectly compatible with the restricted locations provision. The provision does not restrict an individual's ability to obtain a gun and carry it in public (*i.e.*, on public property), and therefore has no resemblance to the law at issue in *Bruen*. In other words, an individual can exercise the maximum extent of the *Bruen* right all the while complying with the provision's consent requirement.

To the extent Plaintiffs claim that the provision implicates the text of the Second Amendment because it may have the effect of reducing rates of public carry (*i.e.*, gun owners seeking to enter a mix of public and private properties over the course of a day may decide to leave their guns at home), such an "effects" theory is misguided for four reasons. First, it is simply too early to know whether and to what extent the default rule will influence owners' exclusion decisions.

Second, countless laws and regulations—including those that facially have nothing to do with firearms—have significant if not comparatively greater disincentivizing effects with respect to both gun possession at large as well as private owners' decisions to exclude gun possessors. *See supra* Section I.A.1. Third, aside from the Court's passing references to potential as-applied challenges to "shall-issue" licensing regimes that in practice operate as "may-issue" regimes, *see Bruen*, 142 S. Ct. at 2138 n.9; *id.* at 2162 (Kavanaugh, J., concurring), nothing in either *Heller* or *Bruen* indicates concern for a statute's downstream effects on ownership or carry rates. And fourth, even if effects were to somehow matter constitutionally, the relevant measurement is the reduction in carrying caused by landowners who prefer to permit visitors to carry guns but for some reason fail to contract around the no-carry default. But the size of this effect may be highly circumscribed considering the broad support for a "no carry" default. *See* Ayres & Jonnalagadda, *Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J.L. Med. & Ethics 183, 187-189 (Winter 2020) (finding that only 28.7% of New York respondents said that a plumber should be allowed to bring a gun onto one's premises without express permission, only 34.9% said that a visiting friend should be allowed to bring a gun without express permission, and only 38% said that a

customer should be allowed to bring a gun onto commercial property without express permission).[7]

In a separate vein, Plaintiffs have suggested that the *Heller* right to control the presence of guns on one's own private property is implicated because the provision will allegedly make it more difficult for property owners to invite guns onto their premises. But for reasons elaborated in the State's brief, the provision imposes no legal liability on owners such that there is no standing for this theory of injury. *See* Appellant's Br. Part I. In any event, the provision does not in any way restrict an owner's choice to possess guns himself or to allow guns for potential entrants; it simply alters the meaning of an owner's silence on the issue. Ultimately, the legislative selection of this default rule, just like the selection of a presumption pertaining to trespass generally, is committed to a state's police power rather than controlled by federal constitutional rights. *See Berman v. Parker*, 348

---

[7] The effect is likely further circumscribed because, even before the passage of the CCIA, gun-friendly businesses had been holding themselves out as such to capture what market demand there is. *See, e.g.*, Zambito, *NY's New Gun Laws Restrict Weapons in Businesses, But Some Owners Welcome Them. Here's Why*, Lohud (July 28, 2022), https://www.lohud.com/story/news/2022/07/28/as-nys-gun-laws-restrict-guns-in-businesses-some-owners-welcome-them/65382470007 (describing the positive customer support received by New York businesses that have posted "[c]oncealed [c]arry is welcome here" signs). Online databases are also emerging to help gun owners locate gun-friendly businesses. *See* Friend or Foe, Home Page, https://friendorfoe.us. There is presently no evidence that the new law will inhibit gun carriers from engaging in commercial activity like buying gas or eating out.

U.S. 26, 32 (1954) (noting that "the legislature, not the judiciary, is the main guardian of the public needs to be served by social legislation").

* * *

At bottom, Plaintiffs are arguing that the constitutional rights of potential entrants override the private choices of landowners regarding access to their property. That is not how constitutional law works. The restricted locations provision enjoys considerable public support precisely because the public sees it as the better default rule—*i.e.*, it makes it easier for private owners who do not want guns on their premises to maintain those terms of entry, while enabling those who would like to permit guns to do so. The extent to which the restricted locations provision will influence the influx of guns onto private premises is difficult to predict. But what is not hard to predict is that whatever happens will dominantly be the result of private owners' preferences, not those of the State.

## II. NEW YORK'S RESTRICTED LOCATIONS PROVISION IS CONSISTENT WITH HISTORY AND TRADITION

For the reasons stated above, the Second Amendment is not implicated by the provision. But even if it were, New York's restricted locations provision should still be upheld as "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130.

## A.     The State's Analogues Establish The Law's Consistency With History and Tradition

The historical analogues on which the State relies amply support the proposition that New York's restricted locations provision is consistent with the nation's history and tradition.  In *Bruen*, the Supreme Court affirmed that determining whether two regulations are "relevantly similar," turns on "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2132-33.  And it instructed that "analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin."  *Id*. at 2133.  In rejecting the State's proffered historical analogues, the district court failed to accord the analogues their due weight.[8]  More specifically, instead of taking seriously the plain text of those historical statutes, it focused its attention on unsubstantiated assumptions.

Below, the State identified eight analogues: colonial-era laws from New York (1763), New Jersey (1722 and 1771), Pennsylvania (1721), and Maryland (1715), as well as Reconstruction-era laws from Louisiana (1865), Texas (1866), and Oregon (1893).  JA88-92.  Like the restricted locations provision, each statute conditioned the carrying of firearms on the express consent of the private owner by prohibiting the carrying or possession of a gun on another's private property

---

[8] For the reasons stated in amici's brief in *Antonyuk v. Hochul*, the district court's reliance on *Antonyuk*'s analogical reasoning was also mistaken.

without permission.  *See, e.g.*, JA113 ("carry[ing] any gun"); 108 ("be[ing] seen to carry a gun"); 124 ("carry[ing], shoot[ing], or discharg[ing] any Musket, Fowling-Piece, or other Fire-Arm whatsoever").  In other words, *how* the historical analogues would burden alleged Second Amendment rights is similar—if not identical—to Plaintiffs' argument regarding New York's provision.  *See Bruen*, 142 S. Ct. at 2132-2133.  Both then and now, the only instances potentially burdening Second Amendment rights are those where property owners want to allow visitors to carry firearms but are unable to communicate consent.  But given the multiplicity of means (*e.g.*, online posts or physical signs) by which owners can provide consent under New York's provision, such instances will likely be proportionately rarer than they were under the analogues.

The district court summarily dismissed these similarities.  SA19.  It is true that some prohibit additional conduct—including "hunting," "poaching," or "killing"— but these additional prohibitions are each set off with the disjunctive "or."  The ordinary purpose of "or" is to denote alternatives.  *See United States v. Woods*, 571 U.S. 31, 45-46 (2013).  And that is the most natural reading here— indeed, if the statutes were meant to prohibit only conduct relating to hunting or poaching, the term "carrying" would be rendered superfluous.  Whatever the animating concerns of these laws were, their texts plainly prohibit the possession of guns on another's property without first obtaining consent.  That plain and

unambiguous meaning, which the district court failed to even consider, should "control[] without need for further inquiry." *United States v. Messina*, 806 F.3d 55, 67 (2d Cir. 2015).

The district court further misunderstood both the historical analogues and New York's current statute. In attempting to distinguish the purpose of the analogues from that of the current statute, the court pegged the restricted locations provision to "handgun violence," primarily in "urban area[s]." SA17-18. But that mischaracterizes the "general societal problem," *Bruen*, 142 S. Ct. at 2131, that the restricted locations provision seeks to prevent. Nothing in the text of the statute, much less the restricted locations provision, reflects a particular concern with handgun violence or limits its scope to urban areas. Rather, the provision's text only reflects an interest in enforcing the precepts of private property and the right to exclude. That purpose is shared between the provision and the analogues, which likewise empowered owners to decide whether permitting guns would enhance or undermine their safety and security. It is also at the heart of the Second Amendment: to protect "the home, where the need for defense of self, family, and property is most acute." *District of Columbia v. Heller*, 554 U.S. 570, 628 (2008).

Finally, the district court improperly concluded that the historical analogues failed to indicate an enduring tradition of regulation. Contrary to the Supreme Court's clear guidance that analogues must be drawn from the Founding and

Reconstruction eras, the district court seemed to expect historical evidence *postdating* Reconstruction. *See* SA18-19. That demand for modern historical evidence is not just irrelevant to the historical inquiry as elaborated in *Heller* and *Bruen*; it is in very tension with the fundamental notion that the Second Amendment "codified a pre-existing right," *Heller*, 554 U.S. at 592, extended to the States by the Fourteenth Amendment. Given that the appropriate inquiry is fixed to Founding and Reconstruction history, the State carried its burden here.

### B. New York's Restricted Locations Provision Is Properly Understood As Default-Shifting Legislation And Not An Outright Prohibition On Carrying Firearms

As discussed above in Parts I and II, New York's restricted locations provision simply shifts a default rule—one that private actors are free to contract around. It in no way effects a *ban* on the carrying of firearms on private property or any other defined location, and is therefore distinct from "sensitive-place" laws falling within the ambit of the Second Amendment. *See Bruen*, 142 S. Ct. at 2133; Kopel & Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 203, 289 (2018) ("Private property in general is not part of the sensitive places doctrine."). Though the district court recognized the default-shifting nature of the provision, it still reached *Bruen*'s Step Two and concluded that there was no historical tradition for the "inversion" effectuated by New York's provision. *See* SA19-20 & n.20. That historical conclusion is simply incorrect.

As demonstrated by the eight historical analogues, there is a clear legislative tradition of revising default rules with respect to the issue of bringing guns onto another's land without their prior consent.  Beyond the firearms context and across additional areas of property law, State legislatures have also long "inverted" default rules.

In the nineteenth century, for instance, States adopted new default rules with respect to whether domesticated cattle were allowed to graze on the land of another property owner.  *See* Ellickson, *Of Coase and Cattle: Dispute Resolution Among Neighbors in Shasta County*, 38 Stan. L. Rev. 623, 660-661 & n.95 (1986) (documenting the shifts to "fencing in" regimes that find trespass if cattle graze on another's property without that owner's affirmative consent).  Before and after the shift in default, property owners were empowered to permit or prohibit grazing.  But state legislatures decided that, as a matter of public policy, it was best to refocus responsibility on the cattle owner and away from other landowners.  *See* Merrill & Smith, *What Happened to Property in Law and Economics?*, 111 Yale L.J. 357, 389-390 (2001).  After the default shift, grazing cattle on another owner's land without their permission became an actionable trespass.  And in the context of intestacy law, which governs how property is distributed at death, States have long refashioned presumptions over distribution that control until an owner opts out.  *See* Poppe, *Choice Building*, 63 Ariz. L. Rev. 103, 112-117 (2021) (discussing how

intestacy laws impose default rules); *see also Hodel v. Irving*, 481 U.S. 704, 717 (1987) ("reaffirm[ing] the … broad authority [of States] to adjust the rules governing the descent and devise of property"). New York's provision falls within this longstanding tradition of default-shifting legislation.

## CONCLUSION

History, tradition, and enduring principles of property law establish that New York's restricted locations provision is constitutional. Not only does this context show that the Second Amendment cannot be fairly read to trammel on property owners' right to exclude, but it also establishes that the provision is concordant with a long and extensive history of firearm regulation. The Court should reverse the district court's order granting a preliminary injunction.

Respectfully submitted.

/s/ Alan Schoenfeld

SIMON B. KRESS
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA  02109

ALAN SCHOENFELD
JUAN M. RUIZ TORO*
JOSHUA M. FEINZIG*
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY  10007
alan.schoenfeld@wilmerhale.com

\* Admitted only in Washington, D.C.;
practicing under the supervision of
Principals of the Firm.

January 30, 2023

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B).

1.     Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(a)(7)(B), the brief contains 6,755 words.

2.     The brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font.  As permitted by Fed. R. App. P. 32(a)(7)(C), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.


/s/ Alan Schoenfeld
ALAN SCHOENFELD

January 30, 2023