# 22-2987

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

———————————

BRETT CHRISTIAN, FIREARMS POLICY COALITION, INC., SECOND AMENDMENT FOUNDATION, INC.,

*Plaintiffs-Appellees*

– v. –

STEVEN A. NIGRELLI, in his Official Capacity as Acting Superintendent of the New York State Police,

*Defendant-Appellant,*

*(Caption continues inside front cover.)*

———————————

On Appeal from the United States District Court
for the Western District of New York, No. 1:22-cv-695 (Sinatra, Jr., J.)

———————————

## BRIEF OF AMICI CURIAE GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE, BRADY, AND MARCH FOR OUR LIVES IN SUPPORT OF APPELLANTS AND REVERSAL

———————————

P. Benjamin Duke
COVINGTON & BURLING LLP
620 Eighth Ave.
New York, NY 10018
Tel: (212) 841-1000
pbduke@cov.com

*Counsel for Amici Curiae*
*Giffords Law Center to Prevent Gun*
*Violence, Brady, and March for Our*
*Lives*

*(Caption continues from front cover.)*

JOHN BROWN,

*Plaintiff,*

v.

JOHN J. FLYNN, in his official capacity as District Attorney for the County of Erie, New York,

*Defendant-Appellee.*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................. i

INTEREST OF AMICI CURIAE ...................................................... 1

INTRODUCTION ...................................................................... 4

ARGUMENT ........................................................................... 6

I.    The Law's Private Property Rule Does Not Implicate the Second Amendment ...................................................................... 6

II.   For Regulations that Do Implicate the Second Amendment, the Circuit Courts Must Articulate a Workable Test Under *Bruen*. ................... 7

III.  The District Court Erred in its Application of *Bruen*. ................... 12

IV.  The Efficacy of Gun Laws in Accomplishing Their Purpose Is Relevant Under the *Bruen* Standard. ............................................. 15

     A.    The Safety-Promoting Purpose of Firearm Regulation Is a Key Consideration Under *Bruen*. ............................................. 16

     B.    Science Shows New York's Law Effectively Accomplishes the Underlying Safety Purpose. ............................................. 18

           1.    Stronger Gun Regulations Reduce Violent Crime and Enhance Safety. ............................................. 19

           2.    Firearms Are Rarely Used in Self-Defense Outside of the Owner's Home and More People Carrying Guns Undermines Safety. ............................................. 22

           3.    Science Supports the Conclusion that New York's Law Will Promote Safety. ............................................. 27

CONCLUSION ........................................................................ 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Antonyuk v. Hochul*,
2022 WL 16744700 (N.D.N.Y.) ................................................................2, 15

*Ass'n of N.J. Rifle & Pistol Clubs v. Att'y Gen. N.J.*,
910 F.3d 106 (3d Cir. 2018) ...................................................................2

*Cedar Point Nursery v. Hassid*,
141 S. Ct. 2063 (2021) ...........................................................................6

*Christian v. Nigrelli*,
2022 WL 17100631 (W.D.N.Y. Nov. 22, 2022) ...............................13

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ...............................................................2, 3, 6, 13

*GeorgiaCarry.Org, Inc. v. Georgia*,
687 F.3d 1244 (11th Cir. 2012) .............................................................6

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
45 F.4th 306 (D.C. Cir. 2022) ................................................................3

*Hardaway v. Nigrelli*,
2022 WL 16646220 (W.D.N.Y. Nov. 3, 2022) ...................................9

*Hirschfeld v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
417 F. Supp. 3d 747 (W.D. Va. 2019) ..................................................2

*Libertarian Party v. Cuomo*,
970 F.3d 106 (2d Cir. 2020) ..................................................................2

*McCulloch v. Maryland*,
4 Wheat. 316 (1819) .............................................................................17

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) ...............................................................................2

*Md. Shall Issue v. Hogan*,
353 F. Sup. 3d 400 (D. Md. 2018) .........................................................2

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    142 S. Ct. 2111 (2022) ..................................................................*passim*

*New York State Rifle & Pistol Ass'n, Inc v. City of New York*,
    140 S. Ct. 1525 (2020) ........................................................................3

*Peruta v. County of San Diego*,
    824 F.3d 919 (9th Cir. 2016) ...............................................................2

*Stimmel v. Sessions*,
    879 F.3d 198 (6th Cir. 2018) ...............................................................2

*United States v. Perez-Gallan*,
    2022 WL 16858516 (W.D. Tex. Nov. 10, 2022) ...................................8

*Wade v. University of Michigan*,
    MSC No. 156150 (Mich.) .....................................................................3

**Statutes**

1763–1775 N.J. Laws 346, An Act for the Preservation of Deer and
    Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10
    https://bit.ly/3A3lg00 ...........................................................................16

1784–1785 N.Y. Laws 152, An Act to Prevent Firing of Guns and
    Other Firearms, ch. 81, https://bit.ly/3QpYRzw ................................17

A Law for the Better Securing of the City of New York from the
    Danger of Gun Powder (1763) https://bit.ly/3oZ9Vrw .......................16

Ordinances of the City of Pittsburgh, An Act to Suppress the
    Disorderly Practice of Firing Guns, § 1 (1774),
    https://bit.ly/3p2y7cE  .........................................................................17

Proceedings of the Conventions of the Province of Maryland Held at
    the City of Annapolis, in 1774, 1775, & 1776,
    https://bit.ly/3BKRH4N .......................................................................17

## Other Authorities

Abhay Aneja et al., *The Impact of Right to Carry Laws and the NRC Report: The Latest Lessons for the Empirical Evaluation of Law and Policy* (Stan. L. and Econ. Olin Working Paper No. 461, 2014), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2443681 ........................27

Arlin J. Benjamin, Jr. et al., *Effects of Weapons on Aggressive Thoughts, Angry Feelings, Hostile Appraisals, and Aggressive Behavior: A Meta-Analytic Review of the Weapons Effect Literature*, PERSONALITY & SOC. PSYCH. REV. 22(4) (2018) ............................26

Brady, Giffords Law Center to Prevent Gun Violence, and March for Our Lives, *The Gun Industry's Advertising: Effective, Deadly, and Actionable*, Petition to the Federal Trade Commission (Apr. 7, 2022), https://firearmsaccountability.org/FTCPetition.pdf ................................22

Charles C. Branas et al., *Investigating the Link Between Gun Possession and Gun Assault*, 99 AM. J. PUB. HEALTH 2034 (Nov. 2009), https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2008.143 099.........................................................................................................23, 24, 25

Daniel W. Webster et al., *Firearms on College Campuses: Research Evidence and Policy Implications* 8 (Oct. 15, 2016)..........................................21

David Hemenway & Sara J. Solnick, *The Epidemiology of Self-Defense Gun Use: Evidence from the National Crime Victimization Surveys 2007–2011*, 79 PREVENTIVE MED. 22 (Oct. 2015) ..........................22, 23

Emily Badger, *More Guns, Less Crime? Not Exactly*, WASH. POST (July 29, 2014) .................................................................................26

*Firearms and Violence—A Critical Review* 137 (Charles F. Wellford et al. eds., 2004), https://www.nap.edu/read/10881/chapter/8#137 ..................27

Ian Ayres & John J. Donohue III, *Shooting Down The More Guns, Less Crime Hypothesis*, 55 STAN. L. REV. 1193 (2003) .....................................26

John Donohue et al., *More Guns, More Unintended Consequences: The Effects of Right-to-Carry on Criminal Behavior and Policing in U.S. Cities* (Nat'l Bureau of Econ. Res. Working Paper No. 30190, June 2022) ........................................................19, 20

John R. Lott, Jr., *More Guns Less Crime* (3d ed. 2010) ..........................................26

Joshua Rhett Miller, *9-Year-Old Houston Girl Dies after Being Shot by Robbery Victim*, N.Y. POST (Feb. 16, 2022) ....................................25

Michael Siegel et al., *Easiness of Legal Access to Concealed Firearm Permits and Homicide Rates in the United States*, AM. J. PUB. HEALTH 1 (Dec. 2017) ....................................................21

Mitchell L. Doucette et al., *Officer-Involved Shootings and Concealed Carry Weapons Permitting Laws: Analysis of Gun Violence Archive Data, 2014–2020*, J. URBAN HEALTH (2022) ........................................20

Rashna Ginwalla et al., *Repeal of the Concealed Weapons Law and Its Impact on Gun-Related Injuries and Deaths*, 76 J. TRAUMA ACUTE CARE SURG. 569 (2014), https://www.academia.edu/10480999 ......................21

*Police: Man Arrested for Shooting Uber Driver Thought He Was Helping*, FOX 4 NEWS (May 16, 2017), https://www.foxla.com/news/police-man-arrested-for-shooting-uber-driver-thought-he-was-helping.amp ............................................25

*Teen Crash Victim Shot, Killed Bystander Trying to Help at Lowell Intersection, Police Say*, WSOC TV (Aug. 10, 2022), https://www.wsoctv.com/news/local/lowell-police-investigate-wreck-deadly-shooting-busy-intersection-suspect-custody/AG2C7SJNGNDU7PR2U4XDI2PUTQ/..............................................25

Violence Policy Center, *Firearm Justifiable Homicides and Non-Fatal Self-Defense Gun Use* (June 2015), https://www.vpc.org/studies/justifiable17.pdf.....................................................23

William Saletan, *Friendly Firearms*, SLATE (Jan. 11, 2011), http://www.slate.com/articles/health_and_science/human_nature/2011/01/friendly_firearms.html.....................................................25

## INTEREST OF AMICI CURIAE[1]

*Amicus curiae* Giffords Law Center to Prevent Gun Violence ("Giffords Law Center") is a non-profit policy organization serving lawmakers, advocates, legal professionals, gun violence survivors, and others who seek to reduce gun violence and improve the safety of their communities. The organization was founded more than a quarter-century ago following a gun massacre at a San Francisco law firm and was renamed Giffords Law Center in 2017 after joining forces with the gun-safety organization led by former Congresswoman Gabrielle Giffords. Today, through partnerships with gun violence researchers, public health experts, and community organizations, Giffords Law Center researches, drafts, and defends the laws, policies, and programs proven to effectively reduce gun violence. Giffords Law Center also advocates for the interests of gun owners and law enforcement officials who understand that Second Amendment rights have always been consistent with gun safety legislation and community violence prevention strategies.

---

[1] All parties have consented to the filing of this brief. *See* Fed. R. App. P. 29(a). No counsel for a party authored this brief in whole or in part; no counsel or party made a monetary contribution to fund its preparation or submission; and no person other than Amicus, its members, or its counsel made a monetary contribution to fund the preparation or submission of the brief. *See* Fed. R. App. P. 29(a)(4)(E); Local R. 29.1(b).

Giffords Law Center has contributed technical expertise and informed analysis as an *amicus* in numerous cases involving firearm regulations and constitutional principles affecting gun policy. *See, e.g.*, *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); *District of Columbia v. Heller*, 554 U.S. 570 (2008); *Libertarian Party v. Cuomo*, 970 F.3d 106 (2d Cir. 2020); *Antonyuk v. Hochul*, 2022 WL 16744700 (N.D.N.Y.). Several courts have cited research and information from Giffords Law Center's *amicus* briefs in Second Amendment rulings. *See, e.g.*, *Ass'n of N.J. Rifle & Pistol Clubs v. Att'y Gen. N.J.*, 910 F.3d 106, 121-22 (3d Cir. 2018); *Stimmel v. Sessions*, 879 F.3d 198, 204, 208, 210 (6th Cir. 2018); *Peruta v. County of San Diego*, 824 F.3d 919, 943 (9th Cir. 2016) (en banc) (Graber, J., concurring); *Hirschfeld v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 417 F. Supp. 3d 747, 754, 759 (W.D. Va. 2019); *Md. Shall Issue v. Hogan*, 353 F. Sup. 3d 400, 403-05 (D. Md. 2018).

*Amicus curiae* Brady is the nation's most longstanding nonpartisan, nonprofit organization dedicated to reducing gun violence through education, research, and legal advocacy. Brady has a substantial interest in ensuring that the Constitution is construed to protect Americans' fundamental right to live. Brady also has a substantial interest in protecting the authority of democratically elected officials to address the nation's gun violence epidemic. Brady has filed amicus

briefs in many cases involving the regulation of firearms, including *Bruen*, 142 S. Ct. 2111 (2022); *Heller*, 554 U.S. 570 (2008), and *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 45 F.4th 306 (D.C. Cir. 2022).

*Amicus curiae* March For Our Lives Foundation ("MFOL") is a youth-led non-profit organization dedicated to promoting civic engagement, education, and direct action by youth to achieve sensible gun violence prevention policies that will save lives. Formed after the mass shooting at Marjory Stoneman Douglas High School in Parkland, Florida, MFOL immediately began organizing the largest single day of protest against gun violence in the nation's history. From its Road to Change initiative that registered 50,000 new voters in 2018 to its successful advocacy for dozens of state, local, and federal laws, MFOL uses the power of youth voices to create safe and healthy communities and livelihoods for all. These young people—all too familiar with mass shootings and other forms of gun violence—have a vital interest in ensuring that the Constitution is correctly interpreted to allow for the enactment of reasonable gun violence prevention measures, including public carry licensing regimes, to protect all Americans.

MFOL has participated as amicus curiae in other cases that affect its core interest in preventing gun violence. It has filed amicus briefs in *Bruen*, 142 S. Ct. 2111 (2022); *New York State Rifle & Pistol Ass'n, Inc v. City of New York*, 140 S. Ct. 1525 (2020), and *Wade v. University of Michigan*, MSC No. 156150 (Mich.).

3

## INTRODUCTION

As the Supreme Court has held, law-abiding, responsible citizens have a right to carry firearms, but that right is not unlimited. In its recent decision, *New York State Rifle & Pistol Association v. Bruen*, the Supreme Court explained that—if a challenged regulation impinges upon the Second and Fourteenth Amendments—then courts should undertake a historical analysis when considering constitutional attacks against it. Recognizing that modern regulations often will not have a corresponding "historical twin," the Court endorsed an approach that allows for analogical reasoning, examining the "hows" and "whys" of modern and historical gun regulations to determine if they are in keeping with the "balance struck by the founding generation" and later generations, including around the time of Reconstruction. The standard under *Bruen* does not require a surface-level historical match for a modern regulation. Instead, the test is whether the *motivation underlying* modern regulations (the why) and *methods used* by modern regulations (the how) are in line with that balance. The motivations underlying *historical* regulations and the methods used by such regulations in the past will inform this inquiry.

The district court below erred at the outset, by seeking to apply *Bruen*'s test to a provision of law that does not implicate the Second Amendment at all. Additionally, the district court erred in applying *Bruen*, by failing to do so in the

way that the Supreme Court mandated. District courts throughout this Circuit have similarly misunderstood and misapplied *Bruen*, and this Court is well-positioned to articulate the correct standard.

Further, given the proper understanding of *Bruen*'s standard, and as explained below, scientific research provides critical evidence that courts should consider when analyzing the "hows" and "whys" of gun regulations. And, the results of the research are clear: More guns in a space—including on the private property at issue here—make us less safe. This conclusion confirms that laws concerning how individuals decide whether to allow firearms onto their property are driven by a well-founded motivation to promote safety, a motivation that has deep roots in the historical tradition of gun regulations in this country. The New York Concealed Carry Improvement Act ("CCIA"), which prohibits an individual's entering the private property of others with a firearm when he knows or reasonably should have known that the owner or lessee has not expressly consented to firearms on the property, is such a law. Because this regulation is clearly constitutional under the standard articulated in *Bruen*, this Court should reverse the decision below.

## ARGUMENT

I. **The Law's Private Property Rule Does Not Implicate the Second Amendment.**

The Second Amendment test set out in *Bruen* only applies if "the Second Amendment's plain text covers [the] conduct" at issue. *Bruen*, 142 S. Ct. at 2126. The conduct at issue here—carrying firearms onto the property of other persons without their consent—is not covered by the Second Amendment. To the contrary, the right to exclude is an essential property right. *See, e.g.*, *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2077 (2021). This right gives property owners the ability to banish many constitutionally protected activities from their personal property, including, for example, free speech, free assembly, and, as here, the bearing of arms. *See, e.g.*, *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1265 (11th Cir. 2012), *abrogated on other grounds by Bruen*, 142 S. Ct. at 2126, n.4 (refusing to "turn *Heller* on its head by interpreting the Second Amendment to destroy one cornerstone of liberty—the right to enjoy one's private property—in order to expand another—the right to bear arms.").

As appellant Nigrelli has shown in his briefing in this case, and as other *amici* have shown in briefing concerning the New York law, the state law here does nothing more than to preserve this historical private right to exclude. To the extent that the New York law changes anything, it merely switches the default presumption, such that property owners can exercise their right to exclude simply

6

by virtue of their ownership, rather than requiring them to take overt action. Now, as before the New York law was enacted, individuals are permitted to carry firearms onto private property only if the owner has decided to act, or not act, to allow them to do so. Because the law takes no Second Amendment rights away from New Yorkers, it does not implicate conduct that the Second Amendment "covers."

This should be the end of the matter. Thus, as discussed further in Section III, the district court erred by ignoring the threshold question of whether New York's private property regulation limits Second Amendment rights at all. But, because the private property regulation would be constitutional even if it did implicate the Second Amendment, we nonetheless next address the *Bruen* standard.

## II. For Regulations that Do Implicate the Second Amendment, the Circuit Courts Must Articulate a Workable Test Under *Bruen*.

In *Bruen*, the Supreme Court set out a history-based test for evaluating the constitutionality of firearm regulations. 142 S. Ct. at 2126. It begins with a threshold inquiry, identifying the relevant course of conduct and asking whether the "plain text" of the Second Amendment protects that conduct. *Id.* The plaintiff challenging the regulation bears the burden on that inquiry. *Id.* The test then proceeds to an analogical inquiry comparing modern and historical laws. *Id.* Thus far, and as exemplified by the district court's decision here, district courts are

7

flailing in their attempts to correctly understand and apply *Bruen*'s historical test. In their confusion, some district courts have misunderstood this test to involve nothing more than a superficial comparison between modern regulations and historical ones. This approach has led to rigid analyses that are not consistent with the considerably more nuanced approach that the *Bruen* Court mandated.

As an example, consider *United States v. Perez-Gallan*, 2022 WL 16858516 (W.D. Tex. Nov. 10, 2022), currently on appeal, concerning the constitutionality of a statute that, in order to primarily protect vulnerable women and children exposed to special dangers, restricts certain domestic abusers' access to firearms. In trying to apply *Bruen*, the court there reached a conclusion that cannot reasonably be viewed as consistent with what the framing generation intended to accomplish by adopting the Second Amendment. To the contrary, historical evidence indisputably reveals that "founding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety." *Id.* at *11. The district court nonetheless incorrectly struck down the federal statute at issue because the historical record lacked specific evidence of the "federal government's disarmament of *domestic abusers*." *Id.* at *12 (emphasis added). In reaching this result, the district court failed to set reasoned parameters for the analogical inquiry. Societal judgments about what constituted domestic abuse in 1791 bear little or no resemblance to the current judgments about that serious problem. Rather, the

"nuanced approach" to the *Bruen* analogical inquiry should have focused on using

societal judgments regarding violence and dangerousness as a measure for who

may be armed, then and now. *See Bruen,* 142 S. Ct. at 2132 (acknowledging that

"other cases implicating unprecedented societal concerns or dramatic technological

changes may require a more nuanced approach").

Or consider *Hardaway v. Nigrelli*, 2022 WL 16646220 (W.D.N.Y. Nov. 3,

2022), also on appeal, in which the district court remarkably concluded that a well-

established tradition of firearm bans in public spaces such as legislative

assemblies, polling places, and courthouses supports such restrictions only in

places "where a bad-intentioned armed person could disrupt key functions of

*democracy*," *id.* at *14 (all but final emphasis removed), but not similar protections

against "bad-intentioned armed person[s]" who would kill numerous congregants

in a single attack in a *religious* assembly. *Id.*

The muddled reasoning behind these lower-court decisions puts Second

Amendment jurisprudence in precisely the kind of "regulatory straightjacket" that

*Bruen* disclaimed. *Bruen*, 142 S. Ct. at 2133. Properly understood, *Bruen*'s test

does not call for the kind of surface-level historical matching game that these

district courts have played. Instead, a proper application of *Bruen*'s standard

requires courts to consider the *motivation underlying* regulations and the *methods*

*used* by the regulations to determine whether modern regulations are in line with

the balance struck by earlier generations. The steps required for this deeper inquiry are set out in *Bruen*.

At the outset, the *Bruen* Court instructed that modern regulations implicating conduct covered by the "plain text" of the Second Amendment must be "*consistent with* this Nation's historical tradition of firearm regulation." *Id.* at 2126 (emphasis added). A modern regulation is "consistent" with this historical tradition if it is "analogous" to—although not necessarily a "twin" of or "dead ringer" for—historical regulations. *Id.* at 2133. When explaining the analogical method to use, the Court identified two relevant metrics: the "how" and the "why" of the regulation's effect on Second Amendment rights. *Id*. Assessing and weighing a challenged regulation's "how" and "why" is necessary to determine whether the regulation imposes a "comparable burden" that is "comparably justified" when compared with founding-era restrictions. *Id.* If the "how" and "why" are comparable to historical regulations, then the regulation is in keeping with the "balance struck by the founding generation," and is constitutional. *Id.* at 2133 n.7.

Naturally, determining whether the regulation's "how" and "why" are in keeping with this "balance" requires courts to identify and apply the relevant considerations of the legislature when passing the law. On one side are arrayed the undeniably strong governmental interests in protecting public safety, or what *Bruen* calls the regulation's "why." *Id.* at 2133. On the other side is the way in

10

which the regulation limits Second Amendment rights to achieve that interest—what *Bruen* calls the regulation's "how." *Id.* Courts applying *Bruen* must look closely into these considerations and determine whether the historical and modern laws are relevantly analogous. *Id.* at 2132–33.

Thus, the underlying motivation for the regulation—its "why"—is critical to *Bruen*'s test. One of the key errors in district court opinions such as the cases cited above—as well as the ruling below here—is that they have failed to properly assess and, importantly, *analogize* the reason for the regulations they have considered.

This case presents an ideal opportunity for this Court to correct these errors by setting out a workable template for how courts in this Circuit are to apply *Bruen*. This case is an excellent example of these issues because it concerns the same regulatory context that the Supreme Court considered in *Bruen*, as well as a licensing scheme written to meet the *Bruen* Court's specific guidance about what would make such a regulation constitutional. Thus, this case allows this Court to elaborate on its application of *Bruen* consistent with the *Bruen* Court's instructions. In addition, and as explained in more detail below, the district court's erroneous application of *Bruen* here is a prime example of what the *Bruen* test is *not*. By reversing the lower court and setting out the proper standard, this Court

11

will clarify the standard for other courts to follow in considering challenges to legislatively enacted restrictions implicating the Second Amendment.

The emphasis on an *analogical* inquiry, as opposed to a one-to-one match or other more rigid method of comparison, is of critical importance. Inherent in the *Bruen* methodology is a recognition of the massive differences between the circumstances faced by 18th-, 19th-, and even early-20th-century legislatures and those faced by legislatures today. Technological and societal changes have drastically altered the harms that legislators must address with firearms regulations. Modern gun violence perpetrated by single individuals wielding high-velocity weapons with large magazines would have been as foreign to legislators of centuries past as the notion of space travel. The greater the "unprecedented societal concerns or dramatic technological changes" addressed by the modern legislature, the more critical it is to use the "more nuanced approach" to the analogical inquiry that *Bruen* expressly dictates. *Id.* at 2132. And we know that the *Bruen* Court acknowledged the validity of one major, historical concern: promoting safety. *Id.* at 2144–45.

## III. The District Court Erred in its Application of *Bruen*.

Taking into account the proper analogical framework prescribed by *Bruen*, it is clear the district court here erred in its analysis.

*First*, as noted in Section I, the district court did not properly analyze whether plaintiffs had met their burden on the first step of the *Bruen* analysis: whether the Second Amendment text covers the individual's conduct. Here, the relevant conduct is carrying firearms onto others' property without their consent. Remarkably, after noting that *Bruen* held "[t]he Second Amendment's plain text . . . presumptively guarantees petitioners . . . a right to bear arms in public for self-defense," *Christian v. Nigrelli*, 2022 WL 17100631, at *6 (W.D.N.Y. Nov. 22, 2022) (quoting *Bruen*, 142 S. Ct. at 2135), the district court declared that "*Bruen*'s articulation of 'in public' is not a limitation," *id.* at *6 n.12. Such unsupported reasoning extends far beyond *Bruen*'s holding. *Bruen* does not extend the Second Amendment's text to protect bearing arms *on the private property of others*.

Nothing in the Supreme Court's discussion in either the *Heller* or *Bruen* decisions supports such a notion, which would have been antithetical to the framers' obvious concerns to protect private property rights, as demonstrated in the first ten amendments to the Constitution. Through those amendments, that generation forbade quartering soldiers in peacetime "in any house, without the consent of the owner"; protected the "right of the people to be secure in their . . . houses" against unreasonable searches without warrants; and prohibited any deprivation of "property, without due process of law" or taking of "private property . . . for public use, without just compensation." *See* U.S. Const. amends.

13

III−V. Yet, the district court here would have us believe that the Second Amendment, which was ratified at the same time, was intended to undermine the relative sanctity of private property by requiring owners to state affirmatively that guns could not be carried onto their property.

*Second*, the court places much emphasis on its determination that the right to exclude belongs to the private property owner, not the state, and thus the state cannot enact a regulation that intrudes upon a right belonging to the private property owner. *Id.* at *9. But this regulation does not intrude upon that right; rather, it standardizes the means for communicating such exclusion, or non-exclusion; the decision (and therefore the right) still rests with the property owner. The New York law in no way intrudes on the rights of property owners, who remain free to decide unilaterally—with no government interference or permission needed—if they wish to allow other persons to carry weapons onto their property. In any event, governments regularly pass regulations that limit the rights private property owners may exercise, and those regulations apply equally to Second Amendment-related activity on property. For example, gun ranges are subject to zoning ordinances or building codes. Even if such ordinances or codes limit how people can participate in Second Amendment-related activities, the government can limit the size of buildings, or restrict a gun range from being built at all on particular property.

14

*Third*, the district court conducted no independent analogical reasoning of the "how" and "why" of the historical regulations as compared to the modern regulation. Instead, the court emphasized that the historical regulations cited by the state did not carry the state's burden for the same reasons given in *Antonyuk*. *Id.* at *7. The district court's failure to conduct its own independent analysis merely compounds *Antonyuk*'s error on this point. In *Antonyuk*, the court engaged in surface-level matching of the historical and modern regulations, categorizing six of the eight historical regulations as "anti-poaching laws," and then reasoning that because the modern restriction did not specifically involve hunting it could not be analogized. *Antonyuk*, 2022 WL 16744700, at *79. This is despite acknowledging that (a) poaching—like modern-day handgun violence—"was a pernicious problem at the time [of the regulations]," and (b) modern regulations preventing carrying firearms onto the property of others are an accepted way to address such a problem. *Id.*

The errors apparent in the district court's opinion, and confusion from district courts throughout the Second Circuit, necessitate an explanation of the proper application of *Bruen* by this Court.

## IV. The Efficacy of Gun Laws in Accomplishing Their Purpose Is Relevant Under the *Bruen* Standard.

One of the most significant flaws in the district court's reasoning here was its failure to fully consider and compare the reason—the "why"—underlying either

historical regulations or the New York law.  As explained in Part I, *Bruen* makes clear that understanding a regulation's "why" is key to determining whether the "regulatory burden" of the challenged statute is "comparably justified" when compared to historical regulations, and therefore in keeping with the historical balance.

Modern legislatures look to scientific research to understand the scope of a public harm as well as the effective means for addressing it through legislation. Here, a key purpose of the New York law is to give property owners a more effective and efficient means of keeping their property safe from those who would bear dangerous arms on their private property without consent.  Thus, this purpose—as well as scientific research bearing on whether the statute is effective in promoting that purpose—are key considerations under *Bruen.*

## A. The Safety-Promoting Purpose of Firearm Regulation Is a Key Consideration Under *Bruen*.

Promoting public safety is, and always has been, a significant part of the "why" underlying relevant firearm regulations.  This was true at the time of the Nation's founding, as reflected by numerous contemporary gun regulations.[2]

---

[2] *See, e.g.*, A Law for the Better Securing of the City of New York from the Danger of Gun Powder (1763) https://bit.ly/3oZ9Vrw (setting storage requirements due to the danger of gunpowder); 1763–1775 N.J.  Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10 https://bit.ly/3A3lg00 ("Whereas a *most dangerous* Method of setting Guns has too much prevailed in this Province . . . .") (emphasis added));

Safety continues to be the crux of modern firearms regulations. And because the Second Amendment sets a "balance"—not a frozen-in-time rule—new safety issues may justify novel regulations that serve the same broad purposes as historical ones. As *Bruen* recognized, present-day safety issues may raise "unprecedented societal concerns." *Bruen*, 142 S. Ct. at 2132. These new problems may require new regulations, including regulations that would have been "unimaginable at the founding." *Id.* It is precisely this responsiveness to new societal issues that enables the Second Amendment "to be adapted to the various crises of human affairs," and thus "endure for ages to come." *Id.* at 2132 (quoting *McCulloch v. Maryland*, 4 Wheat. 316, 415 (1819)).

Indeed, the Second Amendment would be of little use to the people if it did not allow for legislatures to respond to new circumstances—whether immediately after its ratification, or today. Given the passage of time, today's safety issues may

---

Ordinances of the City of Pittsburgh, An Act to Suppress the Disorderly Practice of Firing Guns, etc. on the times therein mentioned, § 1 (1774), https://bit.ly/3p2y7cE (preventing firing guns in urban setting because of the danger it posed to the public); Proceedings of the Conventions of the Province of Maryland Held at the City of Annapolis, in 1774, 1775, & 1776, https://bit.ly/3BKRH4N (requiring permission from the "*council of safety*" to transport guns out of the province) (emphasis added)); 1784–1785 N.Y. Laws 152, An Act to Prevent Firing of Guns and Other Firearms within this State, on Certain Days Therein Mentioned, ch. 81, https://bit.ly/3QpYRzw (noting that "*great dangers have arisen*" due to the "pernicious practice of firing guns") (emphasis added)).

17

require new regulations.[3]  So long as the balance between the reasons motivating the regulation and the degree of its restriction remains in keeping with the "balance struck" at the founding, these new measures are constitutional.

Thus, understanding the safety-promoting reasons for the challenged regulation is crucial to applying the *Bruen* test.

### B.  Science Shows New York's Law Effectively Accomplishes the Underlying Safety Purpose.

For decades, academic researchers have studied the effects of gun possession on safety.  Though the details of the studies and their specific focuses vary, one consistent conclusion has emerged from the reliable scientific data available:  more guns in spaces make us less safe, not more.  This scientific consensus illustrates that New York's law at issue here, which has to do with the way that property owners decide whether to allow firearms on their property, is driven by a concern for safety.  This is the same motivation—the "why"—that inspired regulations on guns before and at the founding, during Reconstruction, and into the modern era.

---

[3] This is particularly true here, where there are significant new concerns about shootings on private property from firearms that the property owners did not want present.  Consider, for example, the 2022 Buffalo, New York shooting in a privately owned supermarket that killed 10 people and wounded 3 more; the 2017 Las Vegas shooting from a privately owned hotel that killed 58 people and wounded hundreds more; the 2016 shooting at a privately owned Orlando nightclub that killed 49 people and wounded over 50 more; or the recent California shootings in January 2023, at a privately owned dance studio and two farms, killing 18 people in total.

### 1. Stronger Gun Regulations Reduce Violent Crime and Enhance Safety.

Reliable studies based on hard data consistently demonstrate that lenient right-to-carry ("RTC") laws are associated with increased violent crime and homicide rates. Indeed, "the predominant conclusion from studies in the last five years has been that RTC laws increase violent crime."[4] Stanford professor John Donohue's work in this area shows persistent increases in violent crime rates in states with more permissive licensing regimes. In a recent June 2022 study analyzing a sample drawn from 47 major U.S. cities, Donohue and his colleagues concluded that right-to-carry gun laws "increase overall firearm violent crime as well as the component crimes of firearm robbery and firearm aggravated assault by remarkably large amounts with an attendant finding of no sign of any benefit from RTC laws."[5]

In particular, Donohue's study found that these lenient RTC laws led to 29 and 32 percent increases in firearm violent crime and firearm robbery, respectively.[6] The study found a "massive 35 percent increase in gun theft, with

---

[4] *See* John Donohue et al., *More Guns, More Unintended Consequences: The Effects of Right-to-Carry on Criminal Behavior and Policing in U.S. Cities*, at 1 (Nat'l Bureau of Econ. Res. Working Paper No. 30190, June 2022).

[5] *Id.* at 25.

[6] *See id.* at 3, 25.

further crime stimulus flowing from diminished police effectiveness."[7]  The study observed that right-to-carry laws "cause a roughly 13 percent decline in the rates that police clear violent crime, suggesting that [right-to-carry] laws strike at the very heart of law enforcement's abilities to address criminal conduct."[8]

Sadly, lenient gun laws make it more likely that interactions between members of the public and the police will become more violent.  A recent study published by researchers at Johns Hopkins University found that states moving to more lenient, permitless concealed carry regimes experience an almost 13 percent increase in officer-involved shootings.[9]  Further compounding the danger posed by more guns outside the home, scientific research confirms that guns are rarely used in self-defense in such settings, and often cause harm to innocent bystanders when they are.[10]  Ultimately, Donohue and his colleagues conclude that "any such [deterrent] benefits are substantially offset by the crime-enhancing impacts of increased gun carrying."[11]

---

[7] *Id.* at 27.

[8] *Id.* at 3.

[9] *See* Mitchell L. Doucette et al., *Officer-Involved Shootings and Concealed Carry Weapons Permitting Laws: Analysis of Gun Violence Archive Data, 2014–2020*, J. URBAN HEALTH (2022)

[10] *See infra* Section IV.B.2.

[11] Donohue et al., *supra* note 4 at 2.

The recent research by Donohue is supported by additional scientific research confirming that lenient gun laws increase violent crime.[12]  For example, in December 2017, researchers at Boston University and Duke University released the first-ever analysis of the impact of concealed carry laws on handgun and long-gun homicide rates.[13]  Their study concluded that permissive right-to-carry concealed carry laws were significantly associated with higher crime rates—in particular, 6.5 percent higher total homicide rates, 8.6 percent higher firearm-related homicide rates, and 10.6 percent higher handgun-specific homicide rates, compared to states with stronger regulations.[14]  This robust, well-supported body of evidence confirms that, just as governments at the nation's founding and during Reconstruction sought to protect their citizens by restricting the use and display of guns outside the home, New York's licensing law promotes safety by protecting

---

[12] *See, e.g.*, Rashna Ginwalla et al., *Repeal of the Concealed Weapons Law and Its Impact on Gun-Related Injuries and Deaths*, 76 J. TRAUMA ACUTE CARE SURG. 569, 569, 573 (2014), https://www.academia.edu/10480999 (lax concealed carry permitting laws are associated with increased gun fatalities); Daniel W. Webster et al., *Firearms on College Campuses: Research Evidence and Policy Implications* 8 (Oct. 15, 2016) (discussing data on 111 high-fatality mass shootings from 1966–2015, finding that in the 41 states with RTC laws or no concealed carry regulations, the average death toll in high-fatality mass shootings increased following the implementation of an RTC law).

[13] Michael Siegel et al., *Easiness of Legal Access to Concealed Firearm Permits and Homicide Rates in the United States*, AM. J. PUB. HEALTH 1 (Dec.  2017).

[14] *Id.*

New York citizens from statistically proven increases in violent crime and firearm homicide.

> **2.    Firearms Are Rarely Used in Self-Defense Outside of the Owner's Home and More People Carrying Guns Undermines Safety.**

Regulating the carry of firearms is motivated by a concern for safety. Contrary to some popular beliefs,[15] carrying firearms outside the home for self-defense produces no safety benefits for society and likely exposes even gun carriers themselves to greater harm.  Recent research confirms that crime victims rarely use guns in self-defense outside of their own homes and that persons carrying firearms are, objectively, no safer than other crime victims.  A 2015 study found that victims of violent crimes use firearms in self-defense in less than one percent of all criminal incidents.[16]  And, compared to other self-protective actions that do not involve a firearm, data from the National Crime Victimization Surveys provide little evidence that defensive gun use is beneficial in reducing the

---

[15] For decades, the gun industry has been deceptively marketing firearms as a safe means of protection.  *See generally*, Brady, Giffords Law Center to Prevent Gun Violence, and March for Our Lives, *The Gun Industry's Advertising: Effective, Deadly, and Actionable*, Petition to the Federal Trade Commission (Apr. 7, 2022), https://firearmsaccountability.org/FTCPetition.pdf.

[16] *See* David Hemenway & Sara J. Solnick, *The Epidemiology of Self-Defense Gun Use: Evidence from the National Crime Victimization Surveys 2007–2011*, 79 PREVENTIVE MED. 22, 23 (Oct. 2015).

likelihood of injury or property loss.[17]  A 2019 analysis of data from the FBI's

Uniform Crime Reporting program confirmed that while guns can be, and

sometimes are, successfully used for self-defense, these cases are the exception,

rather than the rule.[18]  The analysis instead emphasized that "[t]he reality of self-

defense gun use bears no resemblance to the exaggerated claims of the gun lobby

and gun industry": "When analyzing the most reliable data available, what is more

striking is that in a nation of more than 300 million guns, how *rarely* firearms are

used in self-defense."[19]

In fact, one study concluded that carrying a firearm may *increase* a victim's

risk of firearm injury during the commission of a crime.  In an analysis of 677

shootings over a two-and-a-half-year period in Philadelphia, researchers found,

after adjusting for confounding factors, that individuals carrying a gun were 4.46

times more likely to be shot in an assault than those not carrying a gun, and they

were more than 4.23 times as likely to be fatally shot.[20]  Even in assaults where the

---

[17] *See id.*, at 23–24.

[18] *See* Violence Policy Center, *Firearm Justifiable Homicides and Non-Fatal Self-Defense Gun Use* 7 (June 2015), https://www.vpc.org/studies/justifiable17.pdf.

[19] *Id.*

[20] *See* Charles C. Branas et al., *Investigating the Link Between Gun Possession and Gun Assault*, 99 Am. J. Pub. Health 2034, 2037 (Nov. 2009), https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2008.143099.

23

victim had at least some opportunity to resist, individuals carrying a gun were 5.45 times more likely to be shot than those not carrying a gun.[21]

Moreover, it is essential to understand that to the extent individuals may attempt to use a firearm in self-defense, it is unlikely that they possess the skills to do so safely and effectively. Put bluntly, real life is not like a Hollywood movie in which a hero with a gun appears to expertly and accurately shoot the villain and save the day. As a 2016 report from public health experts at Johns Hopkins University reported, "[s]hooting accurately and making appropriate judgments about when and how to shoot in chaotic, high-stress situations requires a high level of familiarity with tactics and the ability to manage stress under intense pressure."[22] Accuracy "is influenced by distance, the opponent shooter's actions, lighting, use of cover, type of gun, and more."[23] This report confirmed that most people simply do not have the tactical ability to successfully use a gun for self-defense, particularly in urban or densely populated areas, and may end up

---

[21] *See id.*

[22] *See* Webster et al.*, supra* note 12, at 10.

[23] *Id.*

"wounding or killing innocent victims" if they attempt to do so.[24]  Such incidents

occur with tragic regularity.[25]

Moreover, regardless of their degree of tactical training, recent examples

demonstrate that when individuals carry guns outside of their own homes, there is

an increased risk that they will wield their firearms in situations that actually place

themselves and others in greater danger.  Gun carriers—even those with training—

have injured and killed innocent people after mistakenly perceiving a threat.[26]  And

the mere presence of a gun can exacerbate everyday disputes into lethal

confrontations.  This is consistent with a broader body of behavioral research

---

[24] *Id.*

[25] *See Teen Crash Victim Shot, Killed Bystander Trying to Help at Lowell Intersection, Police Say*, WSOC TV (Aug. 10, 2022), https://www.wsoctv.com/news/local/lowell-police-investigate-wreck-deadly-shooting-busy-intersection-suspect-custody/AG2C7SJNGNDU7PR2U4XDI2PUTQ/ (reporting that a bystander was fatally shot by a car crash victim when he opened a car door to render aid); Joshua Rhett Miller, *9-Year-Old Houston Girl Dies after Being Shot by Robbery Victim*, N.Y. POST (Feb. 16, 2022), https://nypost.com/2022/02/16/9-year-old-dies-after-being-shot-by-houston-robbery-victim/(reporting that a 9-year-old girl was fatally shot by a robbery victim who opened fire on a vehicle that he thought contained the robber, but actually contained an innocent family of five).

[26] *See, e.g.*, *Police: Man Arrested for Shooting Uber Driver Thought He Was Helping*, FOX 4 NEWS (May 16, 2017), https://www.foxla.com/news/police-man-arrested-for-shooting-uber-driver-thought-he-was-helping.amp; William Saletan, *Friendly Firearms*, SLATE (Jan. 11, 2011), http://www.slate.com/articles/health_and_science/human_nature/2011/01/friendly_firearms.html.

demonstrating that merely seeing a weapon can increase aggressive thoughts and hostile appraisals, and possibly even aggressive behavior.[27]

Thus, the body of reliable scientific evidence demonstrates both that (1) guns are unlikely to be used in self-defense, and (2) if guns are used in self-defense, they are likely to be used in a dangerous and ineffective way. Despite this scientific consensus, gun rights activists often point to discredited arguments made by John Lott, an economist, who claims that loose concealed carry regulations reduce violent crime.[28] But in fact, Lott's conclusion that RTC laws are associated with lower crime rates has been widely rejected.[29] Lott's research is infamous because its core conclusion has been debunked by researchers who were either

---

[27] *See* Arlin J. Benjamin, Jr. et al., *Effects of Weapons on Aggressive Thoughts, Angry Feelings, Hostile Appraisals, and Aggressive Behavior: A Meta-Analytic Review of the Weapons Effect Literature*, PERSONALITY & SOC. PSYCH. REV. 22(4) (2018), https://www.researchgate.net/publication/319878868_Effects_of_Weapons_on_Aggressive_Thoughts_Angry_Feelings_Hostile_Appraisals_and_Aggressive_Behavior_A_Meta-Analytic_Review_of_the_Weapons_Effect_Literature.

[28] *See* John R. Lott, Jr., *More Guns Less Crime* (3d ed. 2010).

[29] *See, e.g.*, Ian Ayres & John J. Donohue III, *Shooting Down The More Guns, Less Crime Hypothesis*, 55 STAN. L. REV. 1193, 1284 (2003), http://digitalcommons.law.yale.edu/fss_papers/1241("We take these results to be generally devastating to Lott's 'More Guns, Less Crime' hypothesis"); Emily Badger, *More Guns, Less Crime? Not Exactly*, WASH. POST (July 29, 2014), https://www.washingtonpost.com/news/wonk/wp/2014/07/29/more-guns-less-crime-not-exactly/.

unable to replicate his findings[30] or reached opposite conclusions,[31] or who believe that Lott's analytical model is unreliable and may be used to achieve almost any desired outcome.[32] Gun policy experts now consider Lott's research to be "completely discredited,"[33] and, as discussed above, recent research shows that the very opposite of Lott's hypothesis is true: stronger restrictions on firearm carry reduce crime and enhance safety. Outlier activists and questionable research methodologies do not change the conclusion reached by reliable study after reliable study: more guns in spaces make us less safe.

### 3. Science Supports the Conclusion that New York's Law Will Promote Safety.

As explained above, science demonstrates that more guns do not make spaces safer; in fact, they have the opposite effect. New York's law takes steps to promote safety by empowering private property owners in the way that they decide whether they want to allow firearms—and the danger that comes with them—onto

---

[30] The National Research Council disagreed with Lott's central claim and noted that in fact, "it is at least possible that errors" in the crime data Lott used may account for his results. *Firearms and Violence—A Critical Review* 137 (Charles F. Wellford et al. eds., 2004), https://www.nap.edu/read/10881/chapter/8#137.

[31] Abhay Aneja et al., *The Impact of Right to Carry Laws and the NRC Report: The Latest Lessons for the Empirical Evaluation of Law and Policy* (Stan. L. and Econ. Olin Working Paper No. 461, 2014), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2443681.

[32] *See* Ayres & Donohue, *supra* note 29 at 1230.

[33] *See* Badger, *supra* note 29.

their private property.  In passing this law, New York has acted in the interest of safety, and the balance between the reasons motivating New York's law and the degree of its restrictions—its "why" and "how"—remains in keeping with the "balance struck" by earlier generations.  That balance is precisely the type of judgment that legislatures are best able to make, not courts second-guessing the people's decision.

## CONCLUSION

This Court should reverse the district court's order granting the preliminary injunction.

*/s/ P. Benjamin Duke*
P. Benjamin Duke
COVINGTON & BURLING LLP
620 Eighth Ave.
New York, NY 10018
Tel: (212) 841-1000
pbduke@cov.com

*Counsel for Giffords Law Center to Prevent Gun Violence, Brady, and March for Our Lives*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned certifies that this brief contains 6,367 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), and has been prepared in proportionally spaced typeface using 14-point Times New Roman font.  As permitted by Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned has relied upon the word count feature of this word-processing system in preparing this certificate.

Dated:  January 30, 2023

*/s/ P. Benjamin Duke*
P. Benjamin Duke

## CERTIFICATE OF SERVICE

I hereby certify that on January 30, 2023, an electronic copy of the foregoing was filed with the Clerk of Court for the United States Court of Appeals for the Second Circuit using the appellate CM/ECF system.  I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished on them via the appellate CM/ECF system.

Dated:  January 30, 2023

*/s/ P. Benjamin Duke*
P. Benjamin Duke
