# 22-2987

## United States Court of Appeals
*for the*
## Second Circuit

BRETT CHRISTIAN, FIREARMS POLICY COALITION, INC.,
SECOND AMENDMENT FOUNDATION, INC.,

*Plaintiffs-Appellees*,

JOHN BROWN,

*Plaintiff*,

– v. –

STEVEN A. NIGRELLI, IN HIS OFFICIAL CAPACITY AS
SUPERINTENDENT OF THE NEW YORK STATE POLICE,

*Defendant-Appellant*,

JOHN J. FLYNN, IN HIS OFFICIAL CAPACITY AS
DISTRICT ATTORNEY FOR COUNTY OF ERIE, NEW YORK,

*Defendant-Appellee*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NEW YORK, No. 1:22-cv-00695 (Sinatra, Jr., J.)

## BRIEF OF PLAINTIFFS-APPELLEES

| | |
|---|---|
| Nicolas J. Rotsko | David H. Thompson |
| PHILLIPS LYTLE LLP | Peter A. Patterson |
| One Canalside | John W. Tienken |
| 125 Main Street | COOPER & KIRK, PLLC |
| Buffalo, NY 14203-2887 | 1523 New Hampshire Ave., N.W. |
| (716) 847-5467 | Washington, DC 20036 |
| NRotsko@phillipslytle.com | (202) 220-9600 |
| | dthompson@cooperkirk.com |

*Attorneys for Plaintiffs-Appellees*

# **<u>TABLE OF CONTENTS</u>**

**<u>Page</u>**

TABLE OF AUTHORITIES .................................................................. iii

INTRODUCTION ............................................................................. 1

STATEMENT OF THE ISSUES.......................................................... 3

STATEMENT OF THE CASE............................................................. 3

   I.   New York's Anti-Carry Default................................................. 3

   II.   Immediate Effect of the Anti-Carry Default on Plaintiffs. ...................... 6

   III.   Procedural History.......................................................... 7

SUMMARY OF THE ARGUMENT ....................................................... 8

STANDARD OF REVIEW ................................................................. 11

ARGUMENT .................................................................................. 13

   I.   Plaintiffs Have Article III Standing......................................... 13

      A. Plaintiff Christian Has Standing........................................ 14

      B. Plaintiffs FPC and SAF Have Standing. ............................... 20

   II.   Plaintiffs are Likely to Succeed On the Merits. ........................... 22

      A. Plaintiffs' Proposed Course of Conduct is Presumptively
      Protected by the Text of The Second Amendment........................... 22

      B. The State Has Failed to Meet Its Historical Burden........................ 27

         1.   The Founding Era Laws are Hunting Regulations of Long
         Guns............................................................... 28

         2.   The State's Late Nineteenth Century Evidence Comes Too
         Late and Is Insufficient............................................ 36

i

III.    The District Court Correctly Concluded The Other Factors Weigh In Favor of a Preliminary Injunction. ...........................................................45

      A. Plaintiffs Have Demonstrated Irreparable Harm. ............................45

      B. The Public Interest and Balance of Equities Weigh in Favor of a Preliminary Injunction. .....................................................................48

CONCLUSION .........................................................................................................50

# TABLE OF AUTHORITIES

**Cases**          **Page**

*Agudath Israel of Am. v. Cuomo*, 983 F.3d 620 (2d Cir. 2020).........................11, 45

*A.H. v. French*, 985 F.3d 165 (2d Cir. 2021)......................................................13, 45

*Antonyuk v. Hochul*, 2022 WL 16744700 (N.D.N.Y Nov. 7, 2022) ................40, 41

*Bennett v. Spear*, 520 U.S. 154 (1997) .............................................................18, 19

*Bery v. City of New York*, 97 F.3d 689 (2d Cir. 1996)..............................................45

*Bronx Household of Faith v. Bd. of Educ. of City of New York*,
     331 F.3d 342 (2d Cir. 2003) .................................................................................45

*Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786 (2011)...............................17, 18, 44, 45

*Caplin & Drysdale, Chartered v. United States*,
     491 U.S. 617 (1989).......................................................................................46, 47

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*,
     868 F.3d 104 (2d Cir. 2017) .................................................................................21

*Church of Scientology of Cal. v. United States*, 506 U.S. 9 (1992).........................19

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013).......................................2, 8, 16

*Clinton v. City of New York*, 524 U.S. 417 (1998) ..................................................19

*Conn. Dep't of Env't Prot. v. O.S.H.A.*, 356 F.3d 226 (2d Cir. 2004)...............45, 46

*Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167 (2d Cir. 2021) ......................22

*Covino v. Patrissi*, 967 F.2d 73 (2d Cir. 1992)........................................................45

*Dist. of Columbia v. Heller*, 554 U.S. 570 (2008) ...........................................*passim*

*Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246 (2020)...........................41, 42

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ....................................47, 48

*F.E.C. v. Cruz*, 142 S. Ct. 1638 (2022)....................................................................14

*Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*,
     528 U.S. 167 (2000)..............................................................................................20

*GeorgiaCarry.Org, Inc., v. Georgia*, 687 F.3d 1244 (11th Cir. 2012)..............26, 27

*Grace v. Dist. of Columbia*, 187 F. Supp. 3d 124 (D.D.C. 2016) ...........................48

*Hartford Courant Co., LLC v. Carroll*, 986 F.3d 211 (2d Cir. 2021) ....................45

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982).......................................8, 21

*Johnson v. Connolly*, 378 F. App'x 107 (2d Cir. 2010) ....................................45, 46

*Jolly v. Coughlin*, 76 F.3d 468 (2d Cir. 1996) ...................................................13, 45

*Kane v. De Blasio*, 19 F.4th 152 (2d Cir. 2021) .........................................11, 13, 45

*Little Sisters of the Poor v. Pennsylvania*,
140 S. Ct. 2367 (2020) ..........................................................................................20

*Lynch v. City of New York*, 589 F.3d 94 (2d Cir. 2009) ....................................45, 46

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) .......................10, 36, 37, 39, 47

*Mitchell v. Cuomo*, 748 F.2d 804 (2d Cir. 1984).....................................................46

*Moya v. United States Dep't of Homeland Sec.*,
975 F.3d 120 (2d Cir. 2020) ............................................................................8, 21

*New York v. United States Dep't of Homeland Sec.*,
969 F.3d 42 (2d Cir. 2020) ..................................................................................48

*N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483 (2d Cir. 2013) ......................49

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
142 S. Ct. 2111 (2022)...................................................................................*passim*

*Nnebe v. Daus*, 644 F.3d 147 (2d Cir. 2011) ..........................................................21

*Ramos v. Louisiana*, 140 S. Ct. 1390 (2020) ..........................................................41

*RAV v. City of St. Paul*, 505 U.S. 377 (1992) .........................................................17

*Rhode v. Becerra*, 445 F. Supp. 3d 902 (S.D. Cal. 2020).......................................48

*Rhode v. Bonta*, 2022 WL 17099119 (9th Cir. 2020).............................................48

*Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020) ......................46

*Rumsfeld v. FAIR*, 547 U.S. 47 (2006) ...................................................................20

*State v. Hopping*, 18 N.J.L. 423 (1842) ............................................................33, 34

*Steffel v. Thompson*, 415 U.S. 452 (1974) ..................................................14, 15, 17

*Statharos v. N.Y. City Taxi & Limousine Comm'n*,
198 F.3d 317 (2d Cir. 1999) ................................................................................46

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014)....................13, 14, 15, 17

*Sussman v. Crawford*, 488 F.3d 136 (2d Cir. 2007)...............................................12

*We The Patriots USA, Inc. v. Hochul*,
17 F.4th 266 (2d Cir. Nov. 4, 2021) ....................................................................11

*Wright v. Giuliani*, 230 F.3d 543 (2d Cir. 2000) ..............................................12, 13

iv

*Yang v. Kosinski*, 960 F.3d 119 (2d Cir. 2020)......................................................46

**Constitutions, Statutes and Legislative Materials**

U.S. CONST. amend. II.........................................................................9, 22

U.S. CONST. amend. III .........................................................................23

U.S. CONST. amend. IV .........................................................................23

N.Y. PENAL LAW

    § 265.01-d(1)...............................................................4, 5, 50
    § 265.01-d(2)(a)-(f)..................................................................5
    § 265.01-d(2)(g) ......................................................................5

**Other Authorities**

1 BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND (1765) .....................29

1823 N.H. Laws, An Act to Establish a System of Police in the Town of
    Portsmouth, and for Other Purposes, ch. 34, § 4 ..........................32, 33

11A WRIGHT & MILLER, FED. PRAC. & PROC. CIV. § 2948.1 (3d ed. 2020)............46

19 THE COLONIAL RECORDS OF THE STATE OF GEORGIA: PART I, STATUTES,
    COLONIAL AND REVOLUTIONARY 1768–1773 .....................................32

ST. GEORGE TUCKER, BLACKSTONE'S COMMENTARIES (1803) ..........................35, 36

A DIGEST OF THE LAWS OF THE STATE OF GEORGIA,
    1800 Ga. Laws 157 (Watkins, eds.).....................................................32

*A Test Case For the President*, NEW YORK TRIBUNE (March 7, 1866), *in* 9 PUBLIC
    OPINION: A COMPREHENSIVE SUMMARY OF THE PRESS THROUGHOUT THE
    WORLD ON ALL IMPORTANT CURRENT TOPICS 304 (1866) ..........................38, 39

Act of May 28, 1746, ch. XI, Acts & Laws of Massachusetts Bay ........................32

*An Act to admit the States of North Carolina, South Carolina, Louisiana,
    Georgia, Alabama, and Florida to Representation in Congress*,
    15 Stat. 73 (June 25, 1868) ................................................................38

*An Act to Admit the State of Texas to Representation in the Congress of the
    United States*, 16 Stat. 80 (March 30, 1870) ......................................38

Ian Ayres and Spurthi Jonnalagadda, *Guests with Guns: Public Support for "No
    Carry" Defaults on Private Land*, 48 J L. MED. & ETHICS (2020)...............43, 44

Catie Carberry, *What's in a name? The Evolution of the Term 'Gun'*, CTR. FOR
    FIREARMS LAW AT DUKE UNIV. (July 24, 2019), https://bit.ly/3Z8Y4XZ .........33

*Governor Hochul Signs Landmark Legislation to Strengthen Gun Laws and Bolster Restrictions on Concealed Carry Weapons in Response to Reckless Supreme Court Decision*, N.Y. GOV.'S PRESS OFFICE (July 1, 2022), https://on.ny.gov/3nXWrvA ................................................................5

NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE: A CRITICAL REVIEW (2005), https://bit.ly/3XOPufP ...........................................................49

RAND, *The Effects of Gun-Free Zones* (updated January 10, 2023), https://bit.ly/2OefCyQ ...............................................................49

Mark W. Smith, *'Not all History is Created Equal': In the Post-Bruen World, the Critical Period for Historical Analogues Is when the Second Amendment Was Ratified in 1791, and not 1868* (Oct. 1, 2022) (working draft), *available at* https://bit.ly/3CMSKjw .........................................36, 37

*Texas Black Codes*, DIGITAL HISTORY (2021), *available at* https://bit.ly/3KV7suz.................................................38

WEBSTER'S AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828)...31, 39, 40

## INTRODUCTION

Following its loss in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the State of New York enacted a sweeping series of restrictions on the right to carry firearms that together rid the right to carry of much of its practical utility. At issue in this appeal is one particularly pernicious part of the State's law—the State's decree that it is criminal to carry firearms on every parcel of private property throughout the State, including private property open to the public, absent the express consent of the owner or lessee of the property. N.Y. PENAL LAW § 265.01-d(1). Far from being "consistent with this Nation's historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2126, New York's Anti-Carry Default is unprecedented in the Nation's 246-year history, and the district court properly ordered it preliminarily enjoined.

On appeal, the State reiterates its flawed arguments from below. At the threshold, the State argues that Plaintiff Christian lacks standing. But Christian is directly injured by the Anti-Carry Default. Before September 1, 2022, Christian was able to and did lawfully carry a firearm for self-defense in businesses that were open to the public and that did not affirmatively either bar or allow firearms. Starting September 1, 2022, Christian no longer carries firearms in those same businesses, still open to the public and still not affirmatively barring or allowing firearms, because if he did he would face criminal penalties. The *only* change was New York's

1

law. The State's "actual action has caused the substantial risk of harm" by "regulat[ing], constrain[ing], or compel[ling]" Christian to leave his firearm at home or to not set foot on property open to the public while bearing arms. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5, 419 (2013). In other words, his conduct has been "unquestionably regulated by the relevant statute," and thus he unquestionably has standing to sue. *Id*. at 420.

The State's arguments regarding the constitutionality of the Anti-Carry Default are similarly unavailing. The Second Amendment analysis is straightforward. Since the plain text of the Second Amendment presumptively protects Christian's proposed course of conduct, *i.e.*, carrying a handgun for self-defense, the State bears the burden of "demonstrating" that the Anti-Carry Default is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. To do so, the State needed to have evidence of historical laws that similarly burden the right to bear arms for similar reasons. *Id.* It cannot rely on just *any* laws, but only those from the Founding that are "well-established and representative." *Id*. at 2133. The State lacks such evidence in this case. Instead, the State relies on a handful of colonial hunting regulations that are plainly disanalogous, provisions of the Black Codes enacted by Louisiana and Texas in the aftermath of the Civil War before those states were even readmitted to the Union, and a similar outlier provision from Oregon enacted over one hundred years after

2

adoption of the Second Amendment. As the State has not demonstrated that the Anti-Carry Default is consistent with the Second Amendment, this Court should affirm the preliminary injunction.

## STATEMENT OF THE ISSUES

1. Whether Plaintiffs have Article III standing.

2. Whether Defendants' enforcement of New York Penal Law §§ 265.01-d(1)—which makes it a felony offense for ordinary, law-abiding Americans to carry a firearm for self-defense and "enter[] into or remain[] on or in private property where such person knows or reasonably should know that the owner or lessee of such property has not permitted such possession by clear and conspicuous signage indicating that the carrying of firearms . . . is permitted or has otherwise given express consent."

3. Whether the District Court appropriately granted Plaintiffs' motion for a preliminary injunction.

## STATEMENT OF THE CASE

### I. New York's Anti-Carry Default.

In *Bruen*, the Supreme Court considered the constitutionality of New York's "proper cause" licensing regime, which restricted licenses for carrying firearms in public to those New Yorkers who "demonstrate[d] a special need for self-protection distinguishable from that of the general community." 142 S. Ct. at 2123. The

Supreme Court held that this "proper cause" requirement was unconstitutional because the text of the Second Amendment "presumptively guarantees" the "right to 'bear' arms in public for self-defense," and New York did not meet its burden to rebut this presumption by demonstrating that the "proper-cause requirement [was] consistent with this Nation's historical tradition of firearm regulation." *Id*. at 2135. In doing so, the Supreme Court exhaustively surveyed American history, finding no "historical limitation" that "operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose." *Bruen*, 142 S. Ct. at 2150. In fact, the Supreme Court identified an "enduring American tradition *permitting* public carry." *Id*. at 2154. History indicated that only in "exceptional circumstances" could governments mandate that ordinary, law-abiding citizens "*not* carry arms." *Id*. at 2156 (emphasis added).

New York responded to *Bruen* by enacting Senate Bill S51001 ("S51001") (June 30, 2022, Extraordinary Session). J.A. 43–63. Among other things, S51001 implemented expansive new criminal laws that ban the carry of firearms in so-called "restricted locations," even for those who lawfully obtain a license under the State's updated licensing scheme. J.A. 52. Under S51001, all private property in the State is "a restricted location" where public carry of firearms for self-defense is unlawful—unless "the owner or lessee of such property" has "permitted" "possession by clear and conspicuous signage indicating that the carrying of

4

firearms, rifles, or shotguns on their property is permitted or has otherwise given express consent." N.Y. PENAL LAW § 265.01-d(1). If an otherwise law-abiding, licensed firearm owner possesses a firearm and "enters into or remains on or in private property" where the owner or lessee has not put up the requisite conspicuous sign or given express consent, he or she commits a Class E Felony. *Id*. This default ban on carrying for self-defense outside the home does not apply to police officers, state-designated peace officers, and the like. *Id*. at § 265.01-d(2)(a)–(f). It also does not apply to "persons lawfully engaged in hunting activity." *Id*. at § 265.01-d(2)(g).

As explained by New York's Governor, "[i]ndividuals who carry concealed weapons" in restricted locations "will face criminal penalties." *Governor Hochul Signs Landmark Legislation to Strengthen Gun Laws and Bolster Restrictions on Concealed Carry Weapons in Response to Reckless Supreme Court Decision*, N.Y. GOV.'S PRESS OFFICE (July 1, 2022), https://on.ny.gov/3nXWrvA. Defendant Nigrelli "explained that, in New York State, troopers 'are standing ready' to ensure that 'all laws are enforced.' He emphasized that the troopers will have 'zero tolerance,' and it is an 'easy message' that he does not need to 'spell it out more than this.'" State S.A. 9. The State's establishment of all private property in the State as a place where carrying firearms is banned by default took effect on September 1, 2022.

## II.      Immediate Effect of the Anti-Carry Default on Plaintiffs.

The Anti-Carry Default had an immediate and enduring effect on Plaintiffs. For Plaintiff Brett Christian, the imposition of the rule—that businesses that are silent as to firearms are presumed to ban them—drastically changed his day-to-day life. Christian has exercised his constitutional right to carry only *three times* since the Anti-Carry Default took effect, compared to nearly every day before, due to the State's promise that the Anti-Carry Default would be vigorously enforced. J.A. 475:19–23. For example, before September 1, 2022, Christian would carry at places open to the public, including a local gas station and a local hardware store. J.A. 474:1–24. After September 1, 2022, he can no longer carry there. These businesses were silent before September 1. After September 1, they were silent still. J.A. 440:20–24; 455:17–24; 461:5–10. Indeed, several businesses have responded to Christian's inquiries by refusing to either affirmatively allow or bar carrying— thus leaving New York's default anti-carry rule in place. J.A. 451:14–21; 452:18– 453:2; 454:20–455:16. Christian's daily routine of carrying for self-defense during his day-to-day activities has been brought to a screeching halt by the Anti-Carry Default.

As for FPC and SAF, both organizations have members in the State of New York who are affected by New York's Anti-Carry Default. J.A. 81–82 ¶ 4; J.A. 78 ¶ 4. The new law has caused FPC and SAF to field inquiries from members about

6

where and when they can carry their firearms. J.A. 82 ¶ 8; J.A. 78–79 ¶¶ 7–9. After all, the Anti-Carry Default brings with it the threat of arrest and criminal penalties, circumstances that FPC's and SAF's members understandably seek to avoid. Because of the Anti-Carry Default, along with New York's other recently enacted restrictions on carry in firearms, FPC and SAF have established hotlines to answer questions and provide information to their New York members. J.A. 82 ¶9; J.A. 78–79 ¶ 9. In doing so, FPC and SAF have diverted staff time and other financial resources that could have been directed to other organizational activities but have not been because of S51001, including the Anti-Carry Default. J.A. 82 ¶¶ 7–10; J.A. 78–79 ¶¶ 7–9.

### III. Procedural History.

Plaintiffs filed this suit on September 13, 2022. J.A. 11–41. On September 28, Plaintiffs filed a motion for a preliminary injunction, which, as relevant here, sought an order enjoining enforcement of the Anti-Carry Default with respect to property open to the public. J.A. 64–65. On November 22, following briefing and a hearing, the district court entered a preliminary injunction. State S.A. 26. Plaintiffs' motion also sought to preliminarily enjoin S51001's designation of public parks and public transportation as "sensitive locations." The district court sought additional briefing with respect to those two restrictions and reserved decision for a subsequent opinion.

State S.A. 27. Acting Superintendent Nigrelli filed a notice of appeal and sought a stay pending appeal, which this Court granted. *See* J.A. 522.

## SUMMARY OF THE ARGUMENT

Plaintiffs have demonstrated standing to bring suit. Plaintiff Christian's Second Amendment right to bear arms for self-defense has been directly infringed by imminent threat of enforcement of the Anti-Carry Default by Defendants. Up to August 31, 2022, Christian could carry a firearm for self-defense on private property open to the public when that property was silent as to any firearm policy. On September 1, 2022, the law changed and now Christian has been banned from carrying a firearm in those same places. The *only* change bringing about this violation of Christian's Second Amendment right was New York's law. The State's "actual action has caused the substantial risk of harm" by "regulat[ing], constrain[ing], or compel[ling]" Christian to leave his firearm at home or to not set foot on property open to the public while bearing arms. *Clapper*, 568 U.S. at 419–20, 414 n.5.

Plaintiffs FPC and SAF have demonstrated standing too as they have been "perceptibly impaired" in their activities by the Anti-Carry Default. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). Both organizations have "divert[ed] [their] resources away from" their "[other] current activities." *Moya v. United States Dep't of Homeland Sec.*, 975 F.3d 120, 129–30 (2d Cir. 2020). This diversion has

8

been compelled by the imminent risk to their members based on the State's violation of their Second Amendment rights. When organizations divert time and money in this way, they have standing to challenge the enforcement of a statute.

On the merits, the Second Amendment provides an "unqualified command": "the right of the people to keep and bear Arms shall not be infringed." *Bruen*, 142 S. Ct. at 2126; U.S. CONST. AMEND. II. Under *Bruen*, if the plain text of the Second Amendment applies to the Plaintiffs' proposed course of conduct, then the Plaintiffs' actions are presumptively protected. The government may bar or otherwise restrict the Plaintiffs' conduct if, and only if, it demonstrates that its restriction is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. In this, the government bears the burden to demonstrate—by historical evidence—that its modern enactment is constitutional.

The State has failed to demonstrate that the Anti-Carry Default is historically justified as "part of an enduring American tradition of state regulation." *Id*. at 2155. In this case, the Court's historical analysis begins and ends with the Founding Era. When evaluating history, *Bruen* requires that the State identify "well-established and representative historical analogue[s]." 142 S. Ct. at 2133. In order to be a true analogue, a law must similarly burden the right to bear arms for similar reasons. *Id.* (requiring courts to consider "how" and "why" a law burdened individuals' right to self-defense). But the State's purported analogues did not do so. The State's

Founding Era evidence is almost exclusively limited to hunting statutes that regulated long guns. Under *Bruen*'s "how" and "why" analysis, these laws are simply not "relevantly similar" to a presumptive ban of carrying firearms on all property and in every structure open to the public. To begin with, these are hunting statutes regulating the distinct harms of hunting. But, of course, the Anti-Carry Default is not so limited. Moreover, as hunting laws, these applied to open land— where hunting occurs—with no indication that they applied to retail establishments open to the public. And, as hunting statutes, all but one applied only to "guns," which was a term understood at the time to generally *not* apply to handguns. Hunting statutes that regulated only long guns simply do not burden the right to bear arms for self-defense in a similar manner and for similar reasons as the Anti-Carry Default.

To make up for its lack of "relevantly similar" Founding Era evidence, the State adds three statutes from the late nineteenth century. This evidence comes too late. It also is too little. Indeed, the laws from Texas and Louisiana were part of those former Confederate states' discriminatory "Black Codes," which systematically sought to take away the newly freed slaves' rights. *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 847 (2010) (detailing this discriminatory history). Such laws should be left in the dustbin of history, not used as tools to restrict rights of modern-day New Yorkers. *Cf. Bruen*, 142 S. Ct. at 2149 (cautioning against reliance on laws

10

where prosecutions were directed only against "black defendants who may have been targeted for selective or pretextual enforcement").

Since the Anti-Carry Default is likely unconstitutional, the district court correctly held that the other factors weighed in favor of granting preliminary injunctive relief. The violation of the Second Amendment—like the violation of other constitutional rights—is presumptively irreparable. And the State has no interest in enforcing an unconstitutional law, let alone one that hinders its citizens from being ready to defend themselves as they go about their day-to-day lives.

This Court should affirm the preliminary injunction.

## STANDARD OF REVIEW

"When a preliminary injunction will affect government action taken in the public interest pursuant to a statute or regulatory scheme, the moving party must demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." *Kane v. De Blasio*, 19 F.4th 152, 163 (2d Cir. 2021) (quoting *Agudath Isr. of Am. v. Cuomo*, 983 F.3d 620, 631 (2d Cir. 2020)); *see also We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 295 (2d Cir. Nov. 4, 2021) ("When the government is a party to the suit, our inquiries into the public interest and the balance of the equities merge."). This Court reviews the district court's decision to grant injunctive relief for an abuse of discretion and assesses its legal holdings de novo. *Id*.

The State argues that a higher standard is required to demonstrate a "clear" or "substantial" likelihood of success, but in so arguing the State conflates two distinct issues. Br. for Appellant, Doc. 63 at 14 (Jan. 23, 2023) ("State Br."). The State relies on *Sussman v. Crawford*, 488 F.3d 136 (2d Cir. 2007), for this argument. There, this Court explained that any party seeking a preliminary injunction "must demonstrate that it will suffer irreparable harm." 488 F.3d at 140. The Court also explained that parties seeking an injunction that would "affect government action taken in the public interest pursuant to a statutory or regulatory scheme" must additionally meet "the more rigorous likelihood-of-success standard." *Id*. That raises the question, more rigorous than what? The answer to that question is found in the case cited by *Sussman*, *Wright v. Giuliani*, 230 F.3d 543 (2d Cir. 2000). There, the Court explained that when a government regulation is not at issue, a movant for a preliminary injunction need not show a likelihood of success on the merits but rather "that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party." *Id*. at 547. Plaintiffs have never argued that the "sufficiently serious questions" standard applies here.

A challenge to a government program standing alone does not, however, require a heightened showing of a "clear" or "substantial" likelihood of success. Such a requirement applies only when the injunction additionally "will alter rather

12

than maintain the status quo," *id*. at 547, or, in other words, "is properly characterized as a 'mandatory' rather than 'prohibitory' injunction," *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996). *Sussman* is not to the contrary because the plaintiffs in that case sought a mandatory injunction that would have altered the status quo by requiring the United States Military Academy to "allow a demonstration by approximately 1,000 protestors to be held inside the gates of West Point during [the] graduation ceremony at which the Vice President of the United States will deliver a commencement address." 488 F.3d at 137. The injunction Plaintiffs are seeking is not similarly mandatory; rather, Plaintiffs are seeking an injunction requiring Defendants to *refrain* from enforcing the State's newly enacted law and thereby to maintain the status quo set by the Constitution and demonstrated by the absence of any State-decreed presumptive ban on firearms on private property at any time throughout the history of New York State prior to September 1, 2022. *A.H. v. French*, 985 F.3d 165, 176 (2d Cir. 2021); J.A. 64. In all events, this Court need not resolve any disputes about the standard because a preliminary injunction is proper under any potentially applicable standard. *See Kane*, 19 F.4th at 163 n.11.

## **ARGUMENT**

### I. **Plaintiffs Have Article III Standing.**

To establish standing, Plaintiffs must establish a "personal stake in the outcome of the controversy" by demonstrating an injury in fact fairly traceable to

the challenged conduct of Defendants that will be redressed by a favorable decision of this Court. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotation marks omitted). All Plaintiffs have demonstrated that here.

### A. Plaintiff Christian Has Standing.

The State does not argue that Christian lacks an injury in fact. Nor could it. It is undisputed that up to August 31, 2022, Christian could carry a firearm for self-defense on private property open to the public when that property was silent as to any firearm policy. On September 1, 2022, the law changed and now Christian has been banned from carrying a firearm in those same places. Accordingly, he has stopped carrying for self-defense in locations without express firearms policies. For purposes of standing, this Court must assume that this immediate and actual disarmament unconstitutionally infringes Plaintiff Christian's Second Amendment rights. *See F.E.C. v. Cruz*, 142 S. Ct. 1638, 1647–48 (2022).

Since the State's enforcement officials have made abundantly clear that this law *will be enforced* absent injunctive relief, "threatened enforcement of [the] law" is sufficiently imminent to establish injury in fact. *Susan B. Anthony List*, 573 U.S. at 158. After all, a plaintiff need not "first *expose* himself to actual arrest or prosecution to be entitled to challenge a statute that he claims *deters* the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459, (1974) (emphases added); *accord Susan B. Anthony List*, 573 U.S. at 158 ("[A]n actual arrest,

14

prosecution, or other enforcement action is not a prerequisite to challenging the law."). Thus, in *Steffel*, the plaintiff had standing to challenge a criminal trespass statute that had caused him to *refrain* from engaging in certain handbilling activities that he believed were constitutionally protected: he "alleged … that … he had not done so because of his concern that he … would be … arrested for violation of" the challenged law. 415 U.S. at 456. The same reasoning applies here: Plaintiff Christian has standing because he has refrained from carrying firearms in businesses open to the public only because of the very real prospect of arrest and prosecution should he do so.

With Plaintiff Christian's injury in fact well-established, the State instead argues that his injuries are not traceable to the State and thus cannot be redressed by an injunction barring enforcement of the Anti-Carry Default. The State claims that "Christian's asserted injury is attributable to the decision of property owners not to convey consent to his carriage of a firearm on their property—either through posted signage or otherwise." State Br. at 19. The State's argument is meritless for at least six reasons.

First, Christian's inability to carry in places open to the public is plainly attributable to the State's enactment establishing a new default rule governing the carry of firearms for the first time in its history. On August 31, 2022, Christian was able lawfully to carry a firearm for self-defense in businesses open to the public and

15

silent as to firearms. Such places included a local gas station and a local hardware store. J.A. 474. Starting September 1, 2022, Christian no longer could visit those same businesses, still open to the public and still silent as to firearms, because *he will* face criminal penalties. The *only* change was New York's law. The State's "actual action has caused the substantial risk of harm" by "regulat[ing], constrain[ing], or compel[ling]" Christian to leave his firearm at home or to not set foot on property open to the public while bearing arms. *Clapper*, 568 U.S. at 420. In other words, his conduct has been "unquestionably regulated by the relevant statute," and his change in conduct unquestionably is traceable to the State's threatened enforcement of criminal penalties for violating that statute. *Id.*

This is still true even if the Anti-Carry Default (improperly) is conceptualized, as the State briefly attempts, as simply a "due diligence" requirement. State Br. 21–22. As an initial matter, any "due diligence" itself is an injury that would be redressed by an injunction against the Anti-Carry Default. And in any event, Christian has contacted several businesses that have refused to take any position on whether or not firearms are allowed on their premises. J.A. 451:14–21; 452:18–453:2; 454:20–455:16. Thus, even exercising the due diligence that the State says the Anti-Carry Default requires has led to the exact same disarmament: firearms are now banned by silence, when before they were allowed.

16

Second, the fact that private property owners have a right to bar carrying firearms is irrelevant. After all, even the State concedes that "[t]o be sure, Christian's activities and behavior have been impacted" by the Anti-Carry Default. State Br. at 20 (quotation marks omitted). Consider that *Steffel* concerned a criminal trespass law, invoked by a private property owner to bar plaintiffs' actions. 415 U.S. at 454–56 (noting shopping center manager "called the police"). Yet the Supreme Court found the plaintiffs had standing to challenge the constitutionality of that law all the same. *Id*. at 475; *accord Susan B. Anthony List*, 573 U.S. at 159. That is because it is *the State*'s threatened enforcement that causes the unconstitutional injury. *Id*.

If there were any doubt about the irrelevance of private property owners' authority to the constitutional analysis, *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992), dispels it. There, the Supreme Court considered the constitutionality of an ordinance that banned the placement of discriminatory objects or symbols on public *or* private property, *id*. at 380. It was no defense to the law's constitutionality that the *private* landowner in that case could have banned the trespasser anyway. The government *still* violated the First Amendment by layering on an additional criminal penalty based on the nature of the trespass, which proved inconsistent with the Constitution. The private property owner's independent right to exclude was irrelevant. Consider also *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786 (2011), in which the Court evaluated a video game labeling regime and the First Amendment. There,

17

the Court explained it was, of course, true that parents had independent "authority" over their children's speech and thus parents could ban the video games at issue. But it was irrelevant because the State was interposing "governmental authority"—which the parents retained the right to "veto" (by providing the games to their children anyway)—but for which there was no "precedence." 564 U.S. at 795 n.3. So too here, the State is interposing "governmental authority" by establishing a new Anti-Carry Default. Private property owners can still "veto" this Anti-Carry Default for their own property, but that is irrelevant for purposes of determining the constitutionality of the State's action.

Third, property owners' rights do not make Christian's injury any less traceable to the State's threatened enforcement of the Anti-Carry Default. That is because—as the State concedes—a third party only breaks the causal chain when it is their "*independent* action" that is the cause of the plaintiff's injury. State Br. at 19 (quoting *Bennett v. Spear*, 520 U.S. 154, 169 (1997)). But when the State's challenged conduct has a "determinative or coercive effect," an injury is still traceable to the State. *Bennett*, 520 U.S. at 169. This is especially so when the State's action is "of the sort" that "alters the legal regime." *Id*. Here, the State has unquestionably altered the legal regime, so much so that the State's threatened enforcement has been completely determinative of Christian's ability to carry

18

firearms in several locations: property owners have not done anything different, but Christian's ability to carry in those places has entirely changed.

In all events, the State's argument makes a mistake that the Supreme Court has explicitly counseled against. Whether an "injury" is "fairly traceable" to the defendant *must not* be "equate[d]" with demonstrating that "the defendant's actions are the very last step in the chain of causation." *Id*. at 168–69. Here, property owners' continued silence may be the last causal step in barring Plaintiff Christian's ability to carry firearms where he previously could. But the State's new Anti-Carry Default has been "determinative" of what that means, and that is enough for standing. *Id*.; *see also Clinton v. City of New York*, 524 U.S. 417 (1998) (finding standing to challenge use of line-item veto to strike a provision granting New York relief from federal tax liability, even though New York had a waiver application pending that could have resulted in waiver of the liability).

Fourth, Christian's legal injuries are redressable by injunctive relief. Contrary to the State's argument, Plaintiffs do not seek to "enjoin the world at large." State Br. at 20. An injunction against the Anti-Carry Default provides complete relief from the State's enforcement of the unconstitutional law, and, at the very least, a partial remedy for those like Christian who seek to carry for self-defense in their day-to-day lives. *See Church of Scientology of Cal. v. United States*, 506 U.S. 9, 13 (1992).

19

Fifth, the State argues that it is "speculative" whether such an order would redress Christian's injuries because a property owner may see his firearm and then eject him from the property anyway. *See* State Br. 22–23. But it is the State that is speculating. The undisputed record evidence is that Christian previously carried in places open to the public as part of his day-to-day life up to August 31, 2022. Should a preliminary injunction issue, there is no reason whatsoever to speculate that he would not be able to carry in these places again.

Sixth, to the extent the State is speculating that currently silent businesses could adopt anti-carry policies in the future (a proposition for which the State has no evidence), that too is irrelevant for standing, which is assessed at the time of the filing of the complaint. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 189 (2000). And here, the evidence demonstrates that at the time the complaint was filed (and indeed through the taking of Christian's deposition, which is the most recent evidence in the record), the Anti-Carry Default was prohibiting Christian from carrying in businesses open to the public.

### B. Plaintiffs FPC and SAF Have Standing.

Because Christian has standing, there is neither need nor warrant to determine whether Plaintiffs FPC and SAF also have standing. *See Little Sisters of the Poor v. Pennsylvania*, 140 S. Ct. 2367, 2379 n.6 (2020); *Rumsfeld v. FAIR*, 547 U.S. 47, 53 n.2 (2006). But the organizations do have standing. As an initial matter, they should

20

have standing to assert the claims of their members, and we reserve the right to challenge this Court's precedent holding that organizations cannot assert 42 U.S.C. § 1983 claims on behalf of their members before the en banc Court or in a petition for a writ of certiorari. *See Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011). This Court's precedent does, however, support FPC's and SAF's standing to bring suit on behalf of themselves. An organization satisfies the "irreducible constitutional minimum of standing" when it is suffering "(i) an imminent injury in fact to itself as an organization (rather than to its members) that is distinct and palpable; (ii) that its injury is fairly traceable to [the challenged act]; and (iii) that a favorable decision would redress its injuries." *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109, 120 (2d Cir. 2017) (quotation marks omitted).

Both organizations are suffering imminent injuries because they have been "perceptibly impaired" in their activities by the Anti-Carry Default. *Havens Realty Corp.*, 455 U.S. at 379. Both organizations have "divert[ed] [their] resources away from" their "[other] current activities." *Moya*, 975 F.3d at 129–30. FPC has incurred material costs in terms of organizational "time and other resources, including financial," "preparing an informational memorandum for FPC's members in New York" about how, inter alia, the Anti-Carry Default "affects its members." J.A. 78 ¶¶ 7–8. SAF has spent time addressing member inquiries as well, "consuming

21

resources that would have been directed elsewhere." J.A. 82 ¶8. Moreover, since the Anti-Carry Default has been in effect, both organizations have established hotlines to address their members' questions about where, and under what circumstances, they are permitted to bear firearms in public. J.A. 82 ¶9; J.A. 78–79 ¶ 9. FPC's and SAF's diversion of resources is an injury in fact for purposes of standing. *See Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167, 173–74 (2d Cir. 2021). That injury is traceable to the Anti-Carry Default and will be redressed by affirmance of the preliminary injunction barring its enforcement. Accordingly, Plaintiffs FPC and SAF have standing.

## II.    Plaintiffs are Likely to Succeed On The Merits.

### A.    Plaintiffs' Proposed Course of Conduct is Presumptively Protected by The Text of The Second Amendment.

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. AMEND. II. In *Bruen*, the Supreme Court articulated a framework for determining if firearms regulations are constitutional. It begins with the plain text. If the plaintiffs' proposed course of conduct falls within the Second Amendment's plain text, then "the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2126. The Supreme Court has defined all of the Second Amendment's key terms. "The people" means "all Americans"; "Arms" includes "all instruments that constitute bearable arms"; and, most relevant here, to

22

bear simply means to "carry." *District of Columbia v. Heller*, 554 U.S. 570, 580–82, 584 (2008). "Nothing in the Second Amendment's text draws a home/public distinction," *Bruen*, 142 S. Ct. at 2134—or for that matter, any distinction between locations at all. That makes the Second Amendment unlike other Amendments. *See* U.S. CONST. amend. III ("No Soldier shall, in time of peace be quartered in any house, without the consent of the Owner, nor in time of war, but in a manner to be prescribed by law."); U.S. CONST. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."). And it means that any locational restrictions on Second Amendment rights must come from history, not from the plain text.

As the district court correctly held, the Supreme Court's binding determination of the meaning of these words and phrases definitively resolves the question of whether Plaintiffs' proposed conduct is presumptively protected by the Second Amendment. State S.A. 15–17. Plaintiff Christian is an American who seeks to carry bearable arms for self-defense. As in *Bruen*, these undisputed facts end the textual inquiry: "the plain text of the Second Amendment protects [Plaintiffs'] proposed course of conduct—carrying handguns publicly for self-defense." 142 S. Ct. at 2134. Accordingly, under *Bruen*'s unambiguous directions, "the burden falls on [the State] to show that [the challenged ban] is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2135. "Only if [Defendants] carry

that burden can they show that the pre-existing right codified in the Second Amendment, and made applicable to the States through the Fourteenth, does not protect [Plaintiffs'] proposed course of conduct." *Id.* And at this stage of the analysis, the State bears the burden of both production and persuasion. *Id*. at 2150 (noting it is the government's burden to "sift the historical materials"); *id*. at 2130 n.6.

The State argues that the district court erred in holding that the Second Amendment's text covers Plaintiffs' proposed conduct—and, consequently, in shifting the burden of proof to the government. The State claims that having Plaintiffs bear the burden of establishing that their proposed conduct is within the scope of the text would be "consistent with the analytical framework for other constitutional claims." State Br. at 25. Even if correct, the State's argument is irrelevant here. That is because, as explained above, the Supreme Court already has determined what the plain text of the Second Amendment means, and the Supreme Court's interpretation demonstrates that Plaintiffs' conduct falls within it here. The question of who has the burden to establish the plain text's meaning therefore is wholly academic.

Furthermore, the question of burden is less important at the plain text stage than at the historical stage. That is because it is at the historical stage that the Court is required to evaluate historical evidence of the right's scope—and it is the government's burden to bring forth that evidence. The plain text stage, by contrast,

primarily involves reading the text of the Second Amendment and, if necessary, looking to sources such as dictionaries to resolve ambiguities. And here, regardless of whether *Heller* and *Bruen* dispositively resolve the issue (and Plaintiffs submit that they do), it follows from what those cases indisputably did hold that the plain text of the right is implicated by the Anti-Carry Default. "At the time of the founding, as now, to 'bear' meant to 'carry.' " 554 U.S. at 584. And "[w]hen used with 'arms,' . . . the term has a meaning that refers to carrying for a particular purpose— confrontation." *Id*. Because "confrontation can surely take place outside the home"—including in businesses and other private property open to the public—it follows that as a textual matter the right to carry firearms extends to private property open to the public. *See Bruen*, 142 S. Ct. 2134–35. And this is so regardless of whether a business or other private property open to the public is considered as a technical matter a "public" or "private" location. Nothing in the Second Amendment's plain text makes any locational distinction whatsoever.

The State further claims that it should not bear the burden of proving its limitations because the Supreme Court in *Heller* said it "expressly did not undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment." State Br. at 26 (quoting *Heller*, 554 U.S. at 626). According to the State, this apparently means *Heller* and *Bruen* did not finish the relevant textual analysis. Yet this snippet from *Heller* was in reference to historical limitations on the right to bear

arms, it was *not* in reference to any leftover textual analysis that courts still need to perform. *Heller*, 554 U.S. at 627 (discussing what limits the "historic tradition" yielded); *Bruen*, 142 S. Ct. at 2128 (noting that *Heller*'s discussion came "[a]*fter* holding that the Second Amendment protected an individual right to armed self-defense") (emphasis added).

The State relies heavily on a pre-*Bruen* case for a different approach. *See* State Br. 26–28 (discussing *GeorgiaCarry.Org, Inc., v. Georgia*, 687 F.3d 1244 (11th Cir. 2012). Such reliance is flawed. First, this case was cited by *Bruen* as a case that employed the incorrect—and hence no longer valid—approach to the Second Amendment. *Bruen*, 142 S. Ct at 2127 n.4. Second, *Bruen* explained that all canvassing of the historical record is emphatically the State's burden to bear. *See id.* at 2135 ("[T]he burden falls on respondents to show that New York's proper-cause requirement is consistent with this Nation's historical tradition of firearm regulation"); *id.* ("Only if respondents *carry that burden* can they show that the pre-existing right codified in the Second Amendment, and made applicable to the States through the Fourteenth, does not protect petitioners' proposed course of conduct."); *id.* at 2138; *id.* at 2150; *id.* at 2156. Recognizing how out-of-step *GeorgiaCarry.Org* is with *Bruen*'s command is as simple as noting that the case makes *zero mention* of the State' historical burden at all. It cannot be an exemplar of Second Amendment analysis when it fails to apply the analysis prescribed or the appropriate burden.

26

Third, it is apparent from the face of *GeorgiaCarry.Org* that the Court *did not* conduct a plain-text analysis. That is because the court *never* asked whether the plain text of the Second Amendment covered the conduct in question. Rather, the Court went straight to analysis "of the historical background of the Second Amendment." *GeorgiaCarry.Org*, 687 F.3d at 1261. A case cannot be persuasive authority about a question it did not even purport to address.

### B.   The State Has Failed to Meet Its Historical Burden

The State puts so much emphasis on flipping the burden because, when the proper burden of both production and persuasion is assessed, it is plain that the State cannot meet it to justify the Anti-Carry Default. For the first time in the history of the Nation, the State has now enacted an extraordinary default ban on carrying firearms by ordinary citizens on every parcel of private property in the State, even property that is open to the public. That it is unprecedented only underlines that the State searches in vain for any historical evidence to justify it. Instead, a review of the history provides no "relevantly similar" analogues sufficient to demonstrate the Anti-Carry Default is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126, 2132.

The State relies on laws that can be generally grouped into two buckets: (i) laws enacted by colonial governments in Maryland, New Jersey, Pennsylvania, and New York and (ii) three laws from the latter-half of the nineteenth century, including

Reconstruction Era laws from Texas and Louisiana and an 1893 law from Oregon. These purported analogues are neither "relevantly similar" nor informative of the scope of the Second Amendment as originally understood.

### 1. The Founding Era Laws are Hunting Regulations of Long Guns.

The State relies on a 1715 Maryland law, J.A. 105–109, New Jersey laws enacted in 1722 and 1771, J.A. 116–120, J.A. 126–133, a 1721 Pennsylvania law, J.A. 110–115, and a New York law from 1763, J.A. 121–125. These colonial laws are not "relevantly similar" to the Anti-Carry Default enacted by New York. In evaluating historical analogues, the Supreme Court instructs courts to consider "why" and "how" a burden was imposed on carrying firearms for self-defense to determine if the laws at issue are "relevantly similar" to a challenged modern regulation. *Bruen*, 142 S. Ct. at 2132–33. The statutes identified by the State fail both tests.

Start with "why" these laws were enacted. All of these laws are hunting restrictions. This is evident from the substantive provisions, which make repeated references to hunting, the season for deer, and preserving the rights of property owners to hunt on their own land. In 1722, New Jersey banned hunting of deer in "January, February, March, April, May, or June," forbade the sale of "any green Deer Skins" during those same months, but allowed "Free Native Indians" to hunt and those who "kill[] any kind of Deer within his Fields where Corn is growing."

28

J.A. 118. Pennsylvania allowed deer hunting "betwixt the first day of July and first day of January," banned the sale of "any green deer skins" during non-hunting months, and banned "shoot[ing] at or kill[ing] with a firearm any pigeon, dove, partridge, or other fowl in the open streets of the city of Philadelphia, or in the gardens, orchards and inclosures adjoining upon and belonging to any of the dwelling houses within the limits of the said city." J.A. 114. New York singled out the carrying, shooting, or discharging of "any Musket, Fowling-Piece, or other Firearm-Arm whatsoever, into, upon, or through any Orchard, Garden, Cornfield, or inclosed Land whatsoever, within the City of New-York, or the Liberties thereof." J.A. 124. In 1771, New Jersey limited deer hunting season to the "First Day of September and the First Day of January," banned the sale of "any green Deer Skins or fresh Venison," defined who was "qualified" to hunt on the "waste and unimproved Lands in this Colony," restricted the size of any "Trap of Steel or Iron," but also made clear its statute would not "restrain the Owners of Parks, or of Tame Deer, from killing, hunting, or driving their own Deer." J.A. 127–29. As Blackstone contemporaneously explained, a statute must be read in "context" and "words are always to be understood as having a regard" to the "subject matter." 1 BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND, 60–62 (1765). Here, that subject matter is indisputably hunting.

What the substance provides, the titles of several of these statutes confirm. *See* J.A. 112 ("An Act to prevent Killing of Deer out of Season, and against Carrying of Guns and Hunting by Persons not Qualified"); J.A. 118 ("An Act to Prevent the Killing of Deer Out of Season, and Against Carrying of Guns or Hunting By Persons Not Qualified"); J.A. 123 ("An Act to prevent hunting with Fire-Arms in the City of New York, and the Liberties thereof"); J.A. 90 ¶10 ("An Act for the Preservation of Deer and other Game, and to prevent trespassing with Guns.").[1]

If there were any doubt at all, the colonial legislatures announced their purposes were to related to hunting and problems *that* activity creates. Maryland sought "to prevent the abusing, hunting or worrying of any stock of hogs, cattle or horse, with dogs, or otherwise." J.A. 108. New York described that it was seeking to "punish and prevent" "great Numbers of idle and disorderly Persons" from "hunt[ing] with Fire-Arms, and to tread down the Grass, and Corn and other Grain standing and growing in the Fields and Inclosures there." J.A. 123–124. New Jersey explained in 1771 that its prior "Laws" for the "Preservation of Deer and other Game," and to prevent trespassing, "*with Guns, Traps and Dogs*, have, by Experience been found insufficient to answer the salutary Purposes thereby intended," so it was passing another law. J.A. 127 (emphasis added).

---

[1] The State's exhibit of New Jersey's 1771 law appears to cut off the first page of New Jersey's 1771 statute, which is also available on page 343 at this link: https://bit.ly/3uz5I0p.

Next consider "how," *i.e.*, the burden imposed on law-abiding citizens. The Court can quickly dispatch with Maryland's 1715 law as an analogue. This restriction applied only to those "convicted" of certain crimes or who were of "evil fame," "a vagrant," or a "dissolute liver." J.A. 108. This was not a broad prohibition on ordinary citizens.

And, with the exception of New York's 1763 hunting law, *all* of these laws ban only carrying a "gun." This is an essential limiting feature of these laws. Noah Webster provided the following definition of "gun" in 1828:

> GUN, noun. An instrument consisting of a barrel or tube of iron or other metal fixed in a stock, from which balls, shot or other deadly weapons are discharged by the explosion of gunpowder. The larger species of guns are called cannon; and the smaller species are called muskets, carbines, fowling pieces, etc. But one species of fire-arms, the pistol, is never called a *gun*.

*Gun*, WEBSTER'S AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828). This means that those "guns" being banned while trespassing are exactly (and only) the instruments that were typically used in hunting: long guns. Not only does this reaffirm that these statutes are hunting statutes, but it also demonstrates that these statutes imposed a materially different burden on ordinary, law-abiding citizens. The Anti-Carry Default is not limited to long guns or implements useful for hunting but bans handguns too—"the most popular weapon chosen by Americans for self-defense." *Heller*, 554 U.S. at 629.

The Court need not take only Noah Webster's word for it—contemporary enactments in colonial and early state legislatures confirm this differing usage between "Gun" and "Pistol." For instance, Pennsylvania's 1721 statute itself made it unlawful "to carry any gun or hunt on the improved or inclosed lands of any plantation," but when it referred to *shooting* in "the open streets of Philadelphia" or "gardens, orchards, and inclosures adjoining upon and belonging to any of the dwelling houses" in the city, it did not similarly ban carrying a "gun," but instead made it unlawful to "shoot at or kill *with a firearm* any pigeon, dove, partridge or other fowl." J.A. 113–114 (emphasis added). Thus, Pennsylvania made a distinction between the mode of weapon useful to hunting versus any firearm that individuals may have in the city with which they may wantonly target birds for sport. In 1746, Massachusetts provided that "no person shall…discharge any gun *or* pistol, charged with shot or ball, in the town of Boston…" *See* Act of May 28, 1746, ch. XI, Acts & Laws of Massachusetts Bay 208 (emphasis added). In 1770, Georgia mandated that individuals on Sundays carry arms to "any church, or other place of divine worship," providing that an individual met their obligation by "carry[ing] with him a gun, *or* a pair of pistols, in good order and fit for service." 19 THE COLONIAL RECORDS OF THE STATE OF GEORGIA: PART I, STATUTES, COLONIAL AND REVOLUTIONARY 138, 1768–1773; A DIGEST OF THE LAWS OF THE STATE OF GEORGIA, 1800 Ga. Laws 157 (Watkins, eds.) (emphasis added). And in 1823, New Hampshire made it

unlawful "within the compact part of the town of Portsmouth" to "fire or discharge any cannon, gun, pistol, or other fire arms." 1823 N.H. Laws 73–74, An Act to Establish a System of Police in the Town of Portsmouth, and for Other Purposes, ch. 34, § 4.

As these examples show, the difference between naming "guns" and omitting "pistols" is significant. Catie Carberry, *What's in a name? The Evolution of the Term 'Gun'*, Ctr. for Firearms Law at Duke Univ. (July 24, 2019), https://bit.ly/3Z8Y4XZ. "[T]here is consistency in the use of 'gun' in isolation: nearly all of the laws that mention guns but not pistols address hunting. Perhaps in such cases though it was unlawful to carry guns, it was lawful to carry pistols as they were not hunting weapons." *Id.* Accordingly, the State's identified laws cannot serve as analogues for banning pistols or other handguns for self-defense because these regulations did not purport to ban them.

Moreover, the burden from these statutes appears to be limited to trespassing on land, rather than entering into taverns, shops, or other structures open to the public. For instance, New Jersey's 1722 statute, New York's 1763 law, and Pennsylvania's 1721 statute all refer to "inclosed Land" when referencing carrying guns. *See* J.A. 119; J.A. 124; J.A. 113. As the Supreme Court of Judicature of New Jersey explained in 1842, "improvements is a legal and technical word, and means

33

inclosures, or inclosed fields: lands fenced in, and thus withdrawn and separated from the wastes or common lands." *State v. Hopping*, 18 N.J.L. 423, 424 (1842).

Moreover, the use of the broader term "lands" not only further exemplifies that these were hunting laws but also represents a notable omission: *none* of the statutes make any reference to buildings of any kind with their broad prohibitions on carrying "guns." The fact that contemporaneous statutes, including Pennsylvania's 1721 statute, directly regulated conduct in and around such places leads to the strong inference that these laws simply did not apply to businesses on main street.

Another indication that the colonial hunting laws did not have the broad reach of New York's Anti-Carry Default is the lack of any evidence of prosecutions for violating the laws based on carrying firearms in businesses and other similar properties open to the public. *See Bruen*, 142 S. Ct. at 2149. This "barren record of enforcement" is an "additional reason to discount [the laws'] relevance." *Id*. at 2149 n.25.

Further, because the relevant inquiry is an assessment of the tradition of American firearm regulation, it is important to also consider how *other* colonies and early States contemporaneously regulated the carrying of firearms on private property during the Founding Rra. Other statutes underline that, if there was any widespread tradition of carry prohibitions on private property during the Founding, these were *limited* to hunting activity. *See, e.g.*, THE PUBLIC LAWS OF SOUTH

34

CAROLINA 276 (1790) J.A. 176; ACTS AND LAWS OF THE STATE OF CONNECTICUT 37 (1784) J.A. 181; "Hunting," A MANUAL OF THE LAWS OF NORTH CAROLINA 234–236 (1814) J.A. 182–186; DIGEST OF THE LAWS OF GEORGIA 428 (1800) J.A. 189. Additionally, at least one Founding Era law imposed an opposite burden than the one imposed by the Anti-Carry Default. In North Carolina, the property owner had to post signage *banning* hunting for the hunting carry restriction to apply. S*ee* A MANUAL OF THE LAWS OF NORTH CAROLINA, *supra*, at 236, J.A. 186.

\*   \*   \*

It would be hardly surprising to the Founders that a government would attempt to make use of hunting laws to restrict the fundamental right to bear arms. As St. George Tucker explained in his influential 1803 edition of Blackstone's Commentaries, the Second Amendment "may be considered as the true palladium of liberty" because it did what the English "bill of rights" failed to do: preserve the right to individual self-defense. *See* 2 ST. GEORGE TUCKER, BLACKSTONE'S COMMENTARIES, 143 (1803). After all, despite the English "bill of rights," the English people "ha[d] been disarmed, generally, under the specious pretext of preserving the game." *Id*. app. 300 The hunting rationale was "a never failing lure" to pass disarming legislation that was "calculated for very different purposes." *Id.* As the Supreme Court explained in *Heller*, Tucker "believed that the English game laws had abridged the right by prohibiting 'keeping a gun or other engine for the

35

destruction of game.'" 554 U.S. at 606 (quoting 1 TUCKER'S BLACKSTONE 300). William Rawle, the author of another "influential treatise" in 1825 believed similarly—these English hunting restrictions were "violating the right codified in the Second Amendment." *Id.* at 607.

This Court should not countenance a latter-day attempt to leverage colonial hunting restrictions to disarm law-abiding citizens in New York in 2023. A series of laws that regulated hunting activity, generally on rural land, often fenced in, while individuals carried "[long] guns," simply does not impose a comparable burden to a presumptive ban on carrying a handgun for self-defense while going about one's errands or everyday life on or in every single piece of privately held property and structure open to the public within the State.

### 2. The State's Late Nineteenth Century Evidence Comes Too Late and Is Insufficient.

The State's citations to Reconstruction Era laws in Louisiana and Texas and an 1893 law in Oregon come too late. Contrary to the State's argument, the Founding Era is when the meaning of the Second Amendment was set under *Bruen*, even with respect to the States. This Court is bound by two lines of Supreme Court precedent, which mandate (1) that the scope of the Second Amendment with respect to the Federal Government is based on the public understanding in 1791, *see, e.g., Heller*, 554 U.S. at 634–35, and (2) that incorporated Bill of Rights provisions mean the same thing when applied to the States and the Federal Government, *see, e.g.,*

36

*McDonald*, 561 U.S. at 765–66. And these holdings are not limited to the Second Amendment context; they are general principles of constitutional adjudication. *See generally* Mark W. Smith, *"Not all History is Created Equal": In the post-Bruen World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868* (Oct. 1, 2022) (working draft), *available at* https://bit.ly/3CMSKjw.

The State's later evidence cannot help it meet its burden because "the post-Civil War discussions of the right to keep and bear arms took place 75 years after the ratification of the Second Amendment," and therefore "they do not provide as much insight into its original meaning as earlier sources." *Bruen*, 142 S. Ct. at 2137 (internal quotation marks omitted). At most, the Supreme Court has looked to the Reconstruction Era to "confirm[] … what the Court thought had already been established" at the Founding. *Id*. And here, to the extent the State's post-Civil-War laws extend beyond hunting they contradict the earlier evidence rather than confirm it.

Indeed, at least two of the three post-Civil-War laws are if anything *anti*-analogues, i.e., they demonstrate practices that the right to keep and bear arms was meant to *combat*. These are the 1865 Louisiana and 1866 Texas statutes. The former provided that "it shall not be lawful for any person or persons to carry fire-arms on the premises or plantations of any citizen, without the consent of the owner or

proprietor, other than in lawful discharge of a civil or military order." J.A. 137. The latter was nearly identical: "It shall not be lawful for any person or persons to carry firearms on the inclosed premises or plantation of any citizen, without the consent of the owner or proprietor, other than in the lawful discharge of a civil or military duty." J.A. 144.

The reason these statutes are anti-analogues is that they were part of the Black Codes enacted shortly after the Civil War by recalcitrant legislatures seeking to maintain white dominance in formerly Confederate states, *before those states were even readmitted to the union*. *See An Act to Admit the States of North Carolina, South Carolina, Louisiana, Georgia, Alabama, and Florida to Representation in Congress*, 15 Stat. 73 (June 25, 1868); *An Act to Admit the State of Texas to Representation in the Congress of the United States*, 16 Stat. 80 (March 30, 1870); *Texas Black Codes*, DIGITAL HISTORY (2021), *available at* https://bit.ly/3KV7suz. An 1866 article in the New York Tribune quoted the Louisiana law in support of its argument that the government of Louisiana was "nothing but a machine for restoring to political power the rebels who, in 1861, ... engineered the State out of the Union." *A Test Case For the President*, NEW YORK TRIBUNE (March 7, 1866), *in* 9 PUBLIC OPINION: A COMPREHENSIVE SUMMARY OF THE PRESS THROUGHOUT THE WORLD ON ALL IMPORTANT CURRENT TOPICS 304 (1866). The article explained that it and other similar laws were not meant to apply equally to blacks and whites: "That sort of law

is mercifully reserved for the whites. For the blacks we find a code of laws establishing a system of serfdom, forbidding the free passage of blacks from one plantation to another, and under the form of apprenticeship and Vagrant laws, re-enacting slavery in fact." *Id*. Indeed, the exception for individuals acting in discharge of a lawful civil or military order could easily have been exploited to effectively exempt whites from the law's restrictions. As *McDonald* explained, "[i]n the years immediately following the Civil War, a law banning the possession of guns by all private citizens would have been nondiscriminatory only in the formal sense" because it "presumably would have permitted the possession of guns by those acting under the authority of the State and would thus have left firearms in the hands of the militia and local peace officers," who "were widely involved in harassing blacks in the South." 561 U.S. at 779. The Louisiana and Texas statutes fit this description perfectly. And these are the types of statutes that the incorporation of the Second Amendment was meant to invalidate, not perpetuate. *Cf. Bruen*, 142 S. Ct. at 2149 (cautioning against reliance on laws where prosecutions were directed only against "black defendants who may have been targeted for selective or pretextual enforcement").

Furthermore, the Louisiana and Texas laws did not sweep as far as New York's. The statutes applied to "premises or plantations" or "inclosed premises or plantation," respectively. Both premises and plantations could mean land or

farmland. *See, e.g.*, *Plantation*, WEBSTER'S AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) ("[p]lantation" as "[i]n the United States and the West Indies" is "a cultivated estate; a farm"); *Premises*, WEBSTER'S AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) ("[i]n law, land or other things mentioned in the preceding part of a deed"). The use of "inclosed" to modify premises in the Texas statute, along with its being used in parallel with plantation, supports reading the word in this sense. In any event, there is no evidence that the laws were interpreted to apply to businesses and other similar private property open to the public. And, to the extent there is any ambiguity, it must be interpreted in favor of the Second Amendment. *See Bruen*, 142 S. Ct. at 2141 n.11 ("To the extent there are multiple plausible interpretations of *Sir John Knight's Case*, we will favor the one that is more consistent with the Second Amendment's command."). Read this way, the laws more closely approximate the colonial hunting statutes than New York's broad anti-carry presumption. *See Antonyuk v. Hochul*, 2022 WL 16744700, at *79 (N.D.N.Y. Nov. 7, 2022) (classifying 1866 Texas law as among laws that "appear to be what are called 'anti-poaching laws,' aimed at preventing hunters . . . from taking game off of other people's lands (usually enclosed) without the owner's permission").

That leaves the 1893 Oregon law, which similar to the Louisiana and Texas laws, made it "unlawful for any person, other than an officer on lawful business, being armed with a gun, pistol or other firearm, to go or trespass upon any enclosed

premises or lands without the consent of the owner or possessor thereof." J.A. 151. Regardless of whether this law had similarly unsavory origins, *cf. Ramos v. Louisiana*, 140 S. Ct. 1390, 1405 (2020) (discussing "racist origins of ... Oregon's" non-unanimous jury law), it too appears not to reach businesses and other similar private property open to the public, *see Antonyuk*, 2022 WL 16744700, at *79, and in any event it is a single outlier enacted over 100 years after adoption of the Second Amendment. Such a law provides little if any insight into the original meaning of the Second Amendment. *See Bruen*, 142 S. Ct. at 2153–54. Indeed, the 1893 Oregon law was enacted only twenty years before the original enactment of the New York may-issue policy invalidated in *Bruen. Id*. at 2132.

The State makes several arguments to try to shore up its deficient historical showing, but they all fail. First, the State claims that it was improper for the district court in *Antonyuk* to ground its rejection of the State's analogues based on census data. State Br. at 34. Not only did *Bruen* do something similar, 142 S. Ct. at 2154–55, but census data is relevant evidence, like the number of states that had similar restrictions, for assessing whether any law or type of law was widespread enough to be part of a "well-established" tradition of regulation. *Id*. at 2133. If a law is adopted by only one or a handful of States, or adopted by jurisdictions populated by a very small proportion of the country's citizens, that is evidence against such a law being well-established. In fact, the Supreme Court has rejected a practice that existed in

"more than 30 states" when it was inconsistent with the Founding Era evidence. *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2258–59 (2020).

Second, the State claims that "New York was entitled to decide that a random customer's brandishing or firing a gun at an actual or perceived criminal inside of a business in 2023 hazards" danger similar to those posed by the State's purported analogues. State Br. at 33–34. Plaintiffs are *not* challenging a restriction on the unjustified brandishing or firing of firearms on private property. If the Anti-Carry Default was an Anti-Brandishing statute or an Anti-Discharge statute, then the historical analysis perhaps would be different. *See* Amicus Br. of Center for Human Liberty, *Antonyuk v. Nigrelli*, No. 22-2908, Doc. 313 at 25–27 (2d Cir. Feb. 9, 2023) (collecting Colonial and Founding Era firearm discharge restrictions). But the State enacted an Anti-*Carry* Default. The State cannot defend that law using an argument about what it does not prohibit and what it is therefore not analogous to. *Bruen*, 142 S. Ct. at 2133 (describing the analogical inquiry is not a "blank check").

Third, the State argues that to embrace *Bruen*'s required analogical analysis would lead to a "regulatory straitjacket," contrary to the principle that States are not required to "adopt uniform approaches to matters of local concern." State Br. at 42. But the Second Amendment *does* require uniformity: it takes "certain policy choices off the table," *Heller*, 554 U.S. at 636, that conflict with the Second Amendment's text and this Nation's enduring history of regulation, *Bruen*, 142 S. Ct. at 2155. And

42

it is notable that, in fact, the states have been uniform with respect to private property default rules. According to the source the *State* cites, s*ee* State Br. at 41 (discussing Ian Ayres and Spurthi Jonnalagadda, *Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J L. MED. & ETHICS 183 (2020)), New York is as out-of-step with trespass restrictions across the country *today* as it is with the Founding. The authors note that, as of 2020, "[t]wenty-five states have flipped the default *for hunting*, requiring that *hunters* obtain permission before entering private property." *Id*. at 184 (emphasis added). This is notable because it is consistent with the tradition at the Founding, as discussed above—regulating possession of a gun on private property while *hunting*, but not all property generally. The authors further note that, as of 2020, "*no state* has adopted generalized 'no carry' defaults for retail establishments." *Id*. (emphasis added). What the State's own source makes clear is this: the Anti-Carry Default was an outlier at the Founding, and it is unquestionably an outlier now. Indeed, it is the first law of its kind in the history of this Nation.

Fourth, a running theme throughout the State's brief is that the Anti-Carry Default is simply a refinement on how property owners may exclude individuals from their property. *See, e.g.*, State Br. at 28–29. But if New York truly wants to simply honor property owner wishes, it need only enforce traditional trespass rules to allow owners to exclude guns if they are unwanted. The only way the Anti-Carry Default can make any difference from New York's perspective is if there are owners

who do not *exclude* guns but nevertheless do not expressly *permit* them. Indeed, the Ayres & Jonnalagadda article that the State cites makes clear that this is an intended feature of anti-carry defaults laws: "Given the inertial tendency to stick with the status quo," the authors write, "lawmakers should expect that a 'prohibited-unless-permitted' default would radically expand the private spaces where guns could not be carried." 48 J. L. MED. & ETHICS at 184. Such an expansion "might have knock-on effects, reducing preferences to carry and possess firearms more generally, as it becomes increasingly inconvenient to do so." *Id*. The accuracy of this prediction can be seen by the experience of Plaintiff Christian, who has drastically reduced his practice of carrying firearms for self-defense since New York's law went into effect. But while New York's lawmakers and some economists may wish to radically expand places where guns cannot be carried and to reduce preferences to carry firearms more generally, that is not a goal the Second Amendment permits governments to pursue.

Furthermore, it does not follow from a right of property owners to exclude people with guns that the *government* can require people to get property owners' consent before they can carry. Or, to put it another way, it does not follow that the government can interpose in that private decision by asserting its authority and granting property owners only a "veto" over the new default. *Brown*, 564 U.S. at 795 n.3. As the Supreme Court explained in *Brown*, even if going all the way back

44

to the Founding, parents had an absolute right to decide what information their minor children could and could not access, it did not mean that the government could *require* businesses to get parental permission before providing that information to children. That is because the historical existence of *private* authority cannot justify a modern assertion of "*state* control." *Id.* (emphasis added). The same reasoning defeats the State's claim here.

## III. The District Court Correctly Concluded The Other Factors Weigh In Favor of a Preliminary Injunction.

### A. Plaintiffs Have Demonstrated Irreparable Harm.

"The denial of a constitutional right ordinarily warrants a finding of irreparable harm, even when the violation persists for 'minimal periods' of time." *A.H. by & through Hester*, 985 F.3d at 184 (quoting *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 71 (2d Cir. 1996)). The Second Circuit has reaffirmed this time and time again. *See, e.g., Kane*, 19 F.4th at 170; *Hartford Courant Co., LLC v. Carroll*, 986 F.3d 211, 224 (2d Cir. 2021); *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 636 (2d Cir. 2020); *Johnson v. Connolly*, 378 F. App'x 107, 108 (2d Cir. 2010) (summary order); *Lynch v. City of New York*, 589 F.3d 94, 99 (2d Cir. 2009); *Conn. Dep't of Env't Prot. v. O.S.H.A.*, 356 F.3d 226, 231 (2d Cir. 2004); *Bronx Household of Faith v. Bd. of Educ. of City of New York*, 331 F.3d 342, 350 (2d Cir. 2003); *Bery v. City of New York*, 97 F.3d 689, 693 (2d Cir. 1996); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996); *Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir. 1992);

*Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984). With this mountain of precedent, the Second Circuit finds itself squarely in the mainstream of constitutional litigation throughout the country. "When an alleged deprivation of a constitutional right is involved, such as the right to free speech or freedom of religion, most courts hold that no further showing of irreparable injury is necessary." 11A WRIGHT & MILLER, FED. PRAC. & PROC. CIV. § 2948.1 (3d ed. 2020) (collecting cases).

While many times the irreparability of harm flows from the various rights protected by the First Amendment, *see e.g.*, *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020), these precedents are by no means limited to the First Amendment context. This Circuit has understood the violation of constitutional rights to cause irreparable injury when the injury stems from the denial of Fourth Amendment rights, *Lynch*, 589 F.3d at 99, Eighth Amendment rights, *Mitchell*, 748 F.2d at 806; *accord Johnson*, 378 F. App'x at 108, the right to participate in elections, *Yang v. Kosinski*, 960 F.3d 119, 129 (2d Cir. 2020), a claimed constitutional right to privacy, *Statharos v. N.Y. City Taxi & Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir. 1999), and the constitutional solicitude for state sovereign immunity, *Conn. Dep't of Env't Prot.*, 356 F.3d at 231.

The violation of a Second Amendment right must be considered equally irreparable. There is no "hierarchy among ... constitutional rights." *Caplin &*

*Drysdale, Chartered v. United States*, 491 U.S. 617, 628 (1989). And, if there were any doubt, the Supreme Court has twice made clear the Second Amendment is not a "second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Bruen*, 142 S. Ct. at 2156 (quoting *McDonald*, 561 U.S. at 780 (plurality)). The State may argue that, notwithstanding the clear command of the Supreme Court, the alleged public safety rationale behind the State's firearms restrictions somehow justifies a different irreparability analysis. Not so. The Supreme Court rejected such a Second-Amendment-is-different argument in *McDonald*, with the lead opinion noting that it is "not the only constitutional right that has controversial public safety implications." 561 U.S. at 783 (plurality). This statement was reiterated by a majority of the Court in *Bruen*. 142 S. Ct. at 2126 n.3. "All of the constitutional provisions that impose restrictions on law enforcement and on the prosecution of crimes fall into the same category." *McDonald*, 561 U.S. at 783 (plurality). There is no basis to conclude that a plaintiff's irreparable harm from a violation of his Second Amendment rights is somehow lessened by allegations of an effect on public safety.

Every day that Plaintiffs are unable to protect themselves outside the home is exactly the kind of injury that cannot be remedied by damages after litigation has concluded. The Second Amendment protects fundamental, intangible interests— much like the First Amendment—and such interests are quintessentially

irremediable by damages and are irreparable after the fact. *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011). The Second Amendment protects the right to be "armed and ready for offensive or defensive action in a case of conflict with another person." *Bruen*, 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 584). Because this is a right "for self-defense," it is "a right that can be infringed upon whether or not plaintiffs are ever actually called upon to use their weapons to defend themselves." *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 150 (D.D.C. 2016). A person whose need for self-defense is thwarted because of a Second Amendment violation suffers "the heaviest kind of irreparable harm." *Rhode v. Becerra*, 445 F. Supp. 3d 902, 954 (S.D. Cal. 2020), *vacated and remanded, Rhode v. Bonta*, 2022 WL 17099119 (9th Cir. 2020).

### B. The Public Interest and Balance of Equities Weigh in Favor of a Preliminary Injunction.

When the government is a party, the balance of equities and public interest merge and are considered together. *New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 86 (2d Cir. 2020). Here, as the district court correctly concluded, both weigh in favor of granting an injunction.

The State argues to the contrary with an apparent attempt to smuggle in the very kind of considerations that *Bruen* and *Heller* instructed courts not to consider, *i.e.*, asking this Court to determine if vindicating Second Amendment rights is "*really worth* insisting upon." *Bruen*, 142 S. Ct. at 2129 (quoting *Heller*, 554 U.S.

at 634). The Court should reject the State's effort because the State "does not have an interest in the enforcement of an unconstitutional law." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013). Thus, whatever the policy desires of the State, they are unquestionably beside the point. *Cf. Bruen*, 142 S. Ct. at 2126 n.3 (rejecting argument based on "statistics presumably to justify granting States greater leeway in restricting firearm ownership and use").

In all events, the State's arguments miss the mark. The State argues that the preliminary injunction risks harm to public safety. Yet it is far from clear that its unprecedented Anti-Carry Default will yield the benefit it claims—after all, such a default rule has never been imposed before. And with respect to banning firearms, the research is anything but settled. In 2004, the National Research Council found that existing studies "d[id] not credibly demonstrate a causal relationship between the ownership of firearms and the causes or prevention of criminal violence or suicide." NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE: A CRITICAL REVIEW 6 (2005), https://bit.ly/3XOPufP. And, in research updated just last month, RAND found it "inconclusive" whether establishing "gun-free zones" decreased violent crime. RAND, *The Effects of Gun-Free Zones* (updated January 10, 2023), https://bit.ly/2OefCyQ.

Finally, the State argues that a preliminary injunction is in the interest of property owners. *See* State Br. at 47. But it fails to explain how the existing default

49

rule, which has persisted in this State (and the Nation generally), is disserving them. After all, even if an injunction is granted, property owners remain free to establish no-firearm policies, should they see fit.

## <u>CONCLUSION</u>

For the foregoing reasons, the District Court's order preliminarily enjoining the enforcement of N.Y. PENAL LAW § 265.01-d(1) should be affirmed.

Dated: March 6, 2023

Respectfully submitted,

Nicolas J. Rotsko
PHILLIPS LYTLE LLP
One Canalside
125 Main Street
Buffalo, NY 14203-2887
(716) 847-5467
(716) 852-6100 (fax)
NRotsko@phillipslytle.com

/s/ David H. Thompson
David H. Thompson
Peter A. Patterson
John W. Tienken
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
jtienken@cooperkirk.com

*Attorneys for Plaintiffs-Appellees*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitations of FED. R. APP. P. 32(7)(B) because this brief contains 12,335 words.

Pursuant to FED. R. APP. P. 32, this brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: March 6, 2023                    /s/David H. Thompson
                                        David H. Thompson

                                        *Attorney for Plaintiffs-Appellees*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 6th day of March 2023, I filed the foregoing via the Court's CM/ECF appellate system, which will electronically notify all counsel requiring notice.

Dated: March 6, 2023

/s/David H. Thompson
David H. Thompson

*Attorney for Plaintiffs-Appellees*