No. 22-2987

# United States Court of Appeals for the Second Circuit

———————◆———————

BRETT CHRISTIAN, ET AL.,
*Appellees,*

v.

STEVEN A. NIGRELLI, in his official capacity as
Superintendent of the New York State Police,
*Appellant.*

———————◆———————

On Appeal from the United States District Court
for the Western District of New York

———————◆———————

**BRIEF OF AMICUS CURIAE PROJECT 21
IN SUPPORT OF APPELLEES**

———————◆———————

David C. Tryon
*Counsel of Record for Amicus Curiae*
Robert Alt
Jay R. Carson
Alex M. Certo
The Buckeye Institute
88 East Broad Street
Suite 1300
Columbus, OH 43215
(614) 224-4422
D.Tryon@BuckeyeInstitute.org

i

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the federal rules of appellate procedure, *amicus curiae* states it is a non-profit 501(c)(3) organization. *Amicus curiae* has no Corporate parent and is not owned in whole or in part by any publicly held Corporation.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ................................................ii

TABLE OF AUTHORITIES ...........................................................iv

INTEREST OF *AMICI CURIAE* ...................................................... 1

SUMMARY OF ARGUMENT ........................................................ 2

ARGUMENT ................................................................. 3

I.   History can affirmatively prove the legitimacy or illegitimacy of a firearm regulation. ........................................................... 3

II.  "All [firearms owners] are equal, but some [ ] are more equal than others."  George Orwell, *Animal Farm.* ......................................... 5

a.   Early American history demonstrates that Americans were expected to own and carry firearms. ....................................................... 5

b.   Firearms regulations have been used to disarm and oppress minorities for generations. .................................................. 8

c.   During Reconstruction (1865–1877), black Americans' right to bear arms continued to be denied through passage of the black codes. ......... 11

d.   During Jim Crow (1877–1964) States used facially neutral laws and blatant prohibitions to prevent black Americans and Native Americans from exercising their right to bear arms. .................................... 13

e.   New York's race and minority-targeting Sullivan Law. ..................... 16

III.  Meet the new Hochul Law, worse than the old Sullivan Law. ...... 18

IV.  The Hochul law deprives minorities and other disadvantaged people from protecting themselves in the locations where they need it the most. .......................................................................... 24

CONCLUSION ............................................................... 27

CERTIFICATE OF COMPLIANCE ........................................... 28

CERTIFICATE OF SERVICE ................................................. 29

# TABLE OF AUTHORITIES

## Cases

*Arizona v. Gant*, 556 12 U.S. 332 (2009)……………………………………..21

*Cantwell v. Connecticut*, 310 U.S. 296 (1940)………..…………....…17,20

*City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750
(1988)…………………………………………………………………………20

*Cox v. State of Louisiana*, 379 U.S. 536 (1965)……………………………20

*Cooper v. Savannah*, 4 Ga. 72 (1848)…………….…………………………9

*District of Columbia v. Heller*, 554 U.S. 570 (2008)……………….passim

*Grace v. District of Columbia*, 187 F.Supp.3d 124 (D.D.C. 2016)………..5

*Harman v. Forssenius*, 380 U.S. 528 (1965)…………………………………23

*Harper v. Virginia State Bd. of Elections*, 383 U.S. 663
(1966)………………………………………………………………………23

*McDonald v. City of Chicago, Ill.*, 561 U.S. 742
(2010)……………………………………………………………7,11,13,14

*Marshall v. Barlow's, Inc.*, 436 U.S. 307 (1978)…………………………21

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012)……………………………7

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct.
2111(2022)………………………………………………………………passim

*Saia v. New York*, 334 U.S. 558 (1948)……………………………………20

*State v. Newsom*, 27 N.C. 250 (1844)………………………………9,10,11

*Trump v. Hawaii*, 138 S. Ct. 2392 (2018)………………………………………4

*United States v. Emerson*, 270 F.3d 203, 230 n.29 (5th Cir. 2001)………6

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990)………………..26

*Watchtower Bible & Tract Soc'y of New York, Inc. v. Village of Stratton*,
536 U.S. 150 (2002)…..………………………………………………………20

*Wrenn v. District of Columbia*, 864 F.3d 650 (C.A.D.C. 2017) ………..6,7

## Constitutional Provisions

Fla. Const. art. I, § 21
(1838)…………………………………………………………………………10

Ark. Const. art. II, § 21 (1836) ……………………………………………10

## Other Authorities

Fola Akinnibi, *NYC's Subway Police Surge Fails to Dent Transit Crime*, Bloomberg (Nov. 4, 2022), https://tinyurl.com/SubwayCrime..............25

*Black Code*, Britannica, https://www.britannica.com/topic/black-code (last visited Feb. 24, 2023) ..........................................................11

Br. of Amici Curiae Professors of Second Amendment Law at 27–30, *Bruen*, 142 S. Ct. 2111....................................................................5

Br. of Amici Curiae Professors of Second Amendment Law, at 25–26, *Bruen*, 142 S. Ct. 2111.................................................................. 5

Br. of Pet. New York State Rifle & Pistol Ass'n, Inc.  at 32-36, *Bruen,* 142 S. Ct. 2111 ...............................................................................6

Robert J. Cottrol & Raymond T. Diamond, *Never Intended to Be Applied to the White Population": Firearms Regulation and Racial Disparity - the Redeemed South's Legacy to a National Jurisprudence?*, 70 Chi. Kent L. Rev. 1307, 1334 (1995)................................................17,18

Jason Crosby, *Targeting Black Churches Isn't Stuff of Distant History*, Courier Journal (Nov. 1, 2018), https://tinyurl.com/CourierChurches.............................................25

*Digest of the Laws of the State of Ala.* 391–92 (1833).......................10

*Free Blacks*, Encyclopedia of Arkansas, https://encyclopediaofarkansas.net/entries/free-blacks-6397/ (last visited Feb. 24, 2023)..........................................................................8

*Fresh off primary win, Gov. Kathy Hochul dives right into guns--who can get them and where they can take them*, CBS New York (June 29, 2022), https://tinyurl.com/SomeNYStreets....................................24

Conor Friedersdorf, *Thugs and Terrorists Have Attacked Black Churches for Generations*, The Atlantic (June 18, 2015)...............................................................................................25

Stephen P. Halbrook, *Securing Civil Rights: Freedmen, the Fourteenth Amendment, and the Right to Bear Arms* 31 (2010).............12,13,14, 23

Stephen P. Halbrook, *The Right to Bear Arms: A Constitutional right of the People or a Privilege of the Ruling Class* 299 (2021)...........4,9,13,16

Frank Heinz, *'Good Guy With a Gun' Who Stopped Church Gunman Receives Texas' Highest Honor*, NBCDFW (Jan. 14, 2020), https://tinyurl.com/GoodGuyChurch...............................................25

Nicholas J. Johnson, et al., *Firearms Law and the Second Amendment* 106 (2012)....................................................................................6

Renee Lettow Lerner, *The Second Amendment and the Spirit of the People*, 43 Harv. J. L. & Pub. Pol. 319, 324 (2019)............................8

*New York State Concealed Carry Firearm Safety Training*, Public Safety & Education, https://psanded.com/courses/firearms/nyccw/ (last visited Feb. 26, 2023).................................................................21

*NYS 18hr Concealed Carry Firearms Safety Training*, NY Concealed Carry, https://nyconcealedcarry.com/nys-ccw-18-hour-course (last visited Feb. 26, 2023)....................................................................................21

*NYS Concealed Carry License Class Schedule: NYC Area Dates*, Firearms Training of Western New York, https://ftwny.com/nys-concealed-carry-license-class-schedule-nyc-area-dates/ (last visited Feb. 26, 2023).................... ................................................................21

N.Y. Governor's Press Office, *Governor Hochul Announces New Concealed Carry Laws Passed in Response to Reckless Supreme Court Decision Take Effect September 1, 2022*, New York State (Aug. 31, 2022)...........................................................................................22

Stefan B. Tahmassebi, *Gun Control and Racism*, 2 Geo. Mason U. Civ. Rts. L.J. 67, 74 (1991) ..........................................................passim

*The Curse of Ham: Disarmament Through Discrimination - the Necessity of Applying Strict Scrutiny to Second Amendment Issues in Order to Prevent Racial Discrimination by States and Localities Through Gun Control Laws*, 11 Liberty U.L. Rev. 271, 283 (2016) ......11

*The Freedmen*, Library of Congress, https://tinyurl.com/LoCFreedmen (last visited Feb. 24, 2023) ..............................................................8

*The State of Black New York* 9, New York Urban League, https://tinyurl.com/BlackNY (last visited Feb. 24, 2023)........................................................................................23

William Tonso, *Gun Control: White Man's Law*, Reason Magazine (1985)..................................................................................14

Transcript of Oral Argument at 103–104, *Bruen*, 142 S. Ct. 211 (No. 20-843), https://www.supremecourt.gov/oral_arguments/argument_transcripts/2021/20-843_f2q3.pdf..................................................................17

Marina Villeneuve, *New York governor: State to limit where guns can be carried*, Associated Press (June 29, 2022), https://apnews.com/article/us-supreme-court-new-york-gun-politics-legislature-kathy-hochu-7df2c33a805cc1d99b2dd430675d3d53……………………………………18

## Statutes

§ 7, *1833 Ga. Laws* 228………………………………………...…………10

1911 N.Y. Laws, ch. 195, §1……………………………………………16

1913 N.Y. Laws, ch. 608, § 1897………………………………………16

2022 N.Y. Sess. Laws ch. 371, § 400……………………………………19

Act of Jan. 6, 1639, § 10, *reprinted in* 1 *The Statutes at Large; Being a Collection of All the Laws of Virginia, From the First Session of the Legislature, in the Year 1619* 224–226 (William Waller Hening ed. 1823)………………………………………………………....9

Act of June 7, 1712, § 5, *reprinted in* 7 *Statutes at Large of South Carolina* 353 (D.J. McCord ed. 1840)…… ……………………………10

Acts 1741, ch. 24, *reprinted in* 1 *Statute Laws of the State of Tenn. of a Public & General Nature*, 314 (1831)………… ……………………..………10

Act of Aug. 4, 1790, ch. XIII, § 4, *reprinted in* 1 *Statutes of Ohio* 106….7

Act of July 2, 1791, ch. XXIII, § 2, *reprinted in* 1 *Statutes of Ohio* 114………………………………………………………………....6

Act of Dec. 17, 1792, ch. 41, §§ 8 and 9, *reprinted in* 1 *The Statutes at Large of Virginia* 122 (Samuel Shepherd ed. 1835)…………………....9

Act of Oct. 1, 1804, § 4, *reprinted in The Laws of the Territory of Louisiana* 13 (Joseph Charles ed. 1808)……………..…………………10

Act of Feb. 4, 1806, ch. 94, § 1, *reprinted in* 3 *The Statutes at Large of Virginia* 274 (Samuel Shepherd ed. 1836) ………………………………9

ch. 176, § 1, 8 *Laws of the State of Del.* 208 (1841)…………………10

ch. 86, § II (1806), *reprinted in* 3 *Laws of Md.* 297 (1811)…………….10

ch. 174, §§ 5 and 6 (1798), *reprinted in* 2 *Digest of the Statute Law of Ky.* 1150 (1822)………………………………………………………10

Law of July 25, 1788, ch. I, §§ 1 and 4, *reprinted in* 1 *The Statutes of Ohio and of the Northwestern Territory* 92 (Salmon P. Chase ed. 1833)………………………………………………………………5

Law of Nov. 23, 1788, ch. VIII, § 2, *reprinted in* 1 *Statutes of Ohio* 102……………………………………………………………………6

N.Y. Penal Law § 265.01-e…………………………………………24

Second Freedman's Bureau Act with the explicit intent of negating the Black Codes. Stegall, 14 Stat. 173 (1866)....................................12

## INTEREST OF *AMICI CURIAE*

*Amicus curiae* Project 21,[1] the national network of black political, civic, and business leaders, is an initiative of the National Center for Public Policy Research to promote the views of black Americans whose entrepreneurial spirit, dedication to family, and commitment to individual responsibility have not traditionally been echoed by the nation's civil-rights establishment. The National Center for Public Policy Research is a communications and research foundation supportive of the view that the principles of a free market, individual liberty, and personal responsibility provide the greatest hope for meeting the challenges facing America in the 21st century.

Project 21 has regularly participated as *amicus curiae* in cases before the U.S. Supreme Court involving criminal justice and social policy issues that particularly impact black Americans. This case raises vital questions about the pernicious effects firearms regulations have had on black Americans and presents the opportunity to vindicate the U.S. Constitution's guarantee of equal protection of the right to bear arms by eliminating restrictions with race-based histories and current disproportionate effects.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a), *amicus curiae* Project 21 certifies that it is an initiative of the National Center for Public Policy Research, which has no parent company, and that no publicly held company owns ten percent or more of its stock. All parties have consented to the filing of this brief. No counsel for a party authored this brief in whole or in part, and no person other than amici curiae, its members, or its counsel made any monetary contribution intended to fund the preparation or submission of this brief.

1

## SUMMARY OF ARGUMENT

The right to own and carry a firearm is a right of all law-abiding citizens. This Nation has a well-established history of allowing—and even requiring—firearm ownership. Current restrictions on the right to own and carry a firearm that rely on historical regulations that were enacted with racial animus, however, cannot stand.

For decades, black Americans and other racial minorities were the target of firearm regulations that prevented them from exercising their right to bear arms. Arguably, that continues today, perhaps not explicitly, but effectively. Under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111(2022), laws restricting the right to bear arms pass constitutional muster only if they are consistent with *legitimate* historical firearm regulations. Advocates of firearm regulations seek to justify the imposition of these regulations by relying on old laws that were born of racial animosity or distrust of minorities and other disfavored groups. These historical deprivations of constitutional rights were gravely wrong, and the court cannot consider them for justification of current regulations.

New York's new firearm carry laws are similar to the discriminatory laws of the past. Indeed, they are little more than a continuation of the laws New York passed at the turn of the 19th century to restrict firearm possession or usage by another disfavored minority group—immigrants. Like those past discriminatory laws, New York's new law facilitates arbitrary denial of constitutional rights simply because a state employee does not believe the applicant has the "essential character" to be trusted

with a weapon. That was the hallmark of many facially neutral—but in reality discriminatory—Jim Crow era laws. The Supreme Court has always been juberous of laws restricting the exercise of constitutional rights with arbitrary permissive schemes.

## ARGUMENT

## I. History can affirmatively prove the legitimacy or illegitimacy of a firearm regulation.

From *Heller* through *Bruen*, the Supreme Court has relied heavily on historical practice to interpret the Second Amendment. "Whether it came to defining the character of the right (individual or militia dependent), suggesting the outer limits of the right, or assessing the constitutionality of a particular regulation," history has been vital to Second Amendment analysis. *Bruen* at 2129. In keeping with this requirement, the Court has held "that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2126. "And because many people face a serious risk of lethal violence when they venture outside their homes, the Second Amendment was understood at the time of adoption to apply under those circumstances." *Id.* at 2157 (Alito, J., concurring). As such, in order for a regulation on the carrying of a firearm outside of the home to be upheld, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126.

Because carrying firearms outside of the home is presumptively protected, courts must give "unqualified deference" to citizens right to

bear arms. *Id.* at 2131. Despite the policy preferences of the legislature for passing firearm regulations, "the government may not simply posit that the regulation promotes an important interest," but must affirmatively prove that the regulation is consistent with the historical regulations. *Id.* at 2126.

But mere consistency with historical practice is not enough. The historical firearm regulations relied-on must also be legitimate ones. Historical regulations designed to oppress racial minorities or show distrust or animus towards "disfavored" groups cannot be the basis for infringing on the right to bear arms. Where race "has extremely intensified a decisive purpose to entirely disarm" a disfavored class, the precedent cannot be relied on. Stephen P. Halbrook, *The Right to Bear Arms: A Constitutional right of the People or a Privilege of the Ruling Class* 299 (2021) (quoting *State v. Nieto*, 101 Ohio St. 409, 424, 130 N.E. 663 (1920) (Wanamaker, J., dissenting)). *See also Trump v. Hawaii*, 138 S. Ct. 2392, 2448 (2018) (Breyer, J., dissenting) ("By blindly accepting the Government's misguided invitation to sanction a discriminatory policy motivated by animosity toward a disfavored group, * * * the Court redeploys the same dangerous logic underlying *Korematsu* and merely replaces one 'gravely wrong' decision with another.").

II.   "All [firearms owners] are equal, but some [ ] are more equal than others."  George Orwell, *Animal Farm*.

>  a. **Early American history demonstrates that Americans were expected to own and carry firearms.**

Historically, firearm possession—both in the home and in public—has been both permitted and encouraged. The Second Amendment protects "the individual right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). The history and tradition of that right confirm that it has been understood, since our Nation's founding, to include the carrying of common arms in public for self-defense. Indeed, "public carrying of firearms was widespread during the Colonial and Founding Eras." *Grace v. District of Columbia*, 187 F.Supp.3d 124, 136 (D.D.C. 2016). Many of our Nation's founders themselves openly carried firearms. *See id.* at 137; *see also* Br. of Amici Curiae Professors of Second Amendment Law at 27–30, *Bruen*, 142 S. Ct. 2111.

In the Northwest Territory and throughout the Nation, carrying firearms was not merely permitted—it was expected and sometimes even required. A law in the Northwest Territory designated all male inhabitants between the ages of sixteen and fifty as subject to performing military duty and emphasized that "assembling without arms in a newly settled country, may be attended with danger." Law of July 25, 1788, ch. I, §§ 1 and 4, *reprinted in* 1 *The Statutes of Ohio and of the Northwestern Territory* 92 (Salmon P. Chase ed. 1833) ("*Statutes of Ohio*"). Those men who failed to furnish themselves with arms and ammunition were subject

to fines. Law of Nov. 23, 1788, ch. VIII, § 2, *reprinted in* 1 *Statutes of Ohio* 102. Another statute required militia members—males between sixteen and fifty years old—to carry arms "at any place for public worship." Act of July 2, 1791, ch. XXIII, § 2, *reprinted in* 1 *Statutes of Ohio* 114.

At least ten States had contemporaneous constitutional provisions that used the phrase "bear arms" in a manner that included carrying arms for private purposes such as self-defense. *See United States v. Emerson*, 270 F.3d 203, 230 n.29 (5th Cir. 2001) (collecting provisions); *e.g.*, Pa. Const. art. I, § 21 (1790) ("The right of the citizens to bear arms in defense of themselves and the State shall not be questioned."); Ky. Const. art. 10, ¶ 23 (1792) ("[T]he right of the citizens to bear arms in defense of themselves and the State, shall not be questioned."); Ohio Const. art. VIII, § 20 (1802) ("[T]he people have a right to bear arms for the defense of themselves and the State."); Ind. Const. art.1, § 20 (1816) ("[T]he people have a right to bear arms for the defence of themselves and the State.").

And "about half the colonies had laws *requiring* arms-carrying in certain circumstances." Nicholas J. Johnson, et al., *Firearms Law and the Second Amendment* 106 (2012) (emphasis added). This included carrying to church, courts, public assemblies, and while traveling. Br. of Amici Curiae Professors of Second Amendment Law, at 25–26, *Bruen*, 142 S. Ct. 2111 (collecting examples). Likewise, the great weight of nineteenth century case law "assume[s] the importance of carrying as well as possessing." *Wrenn v. District of Columbia*, 864 F.3d 650, 658 (C.A.D.C. 2017); *see also* Pet. Br. at 32–36, *Bruen*, 142 S. Ct. 2111 (collecting cases and noting that courts overwhelmingly understood the

Second Amendment to protect a "right to carry arms for self-defense outside the confines of one's home").

"[O]ne doesn't have to be a historian to realize that a right to keep and bear arms for personal self-defense in the eighteenth century could not have rationally been limited to the home." *Moore v. Madigan*, 702 F.3d 933, 936 (7th Cir. 2012). And the historical record is clear that Second Amendment rights were not limited in this way. Bearing arms outside one's home was commonplace, and, in many circumstances, it was expected.

Confrontations "are not limited to the home." *Id.*; *accord Wrenn*, 864 F.3d at 657 (emphasizing that the Second Amendment's "core lawful purpose is self-defense and the need for that might arise beyond as well as within the home") (internal quotation marks and citation omitted). That is precisely why lawmakers in the Northwest Territory and elsewhere expected people to bear arms.

A 1790 law regulating the *discharge* of firearms made clear that it did not prevent "any person lawfully using fire-arms as offensive or defensive weapons" or defending "his or her person or property, or the person or property of any other." Act of Aug. 4, 1790, ch. XIII, § 4, *reprinted in* 1 *Statutes of Ohio* 106. This included defending against "highwaymen, robbers, thieves, or others unlawfully assailing him or her." *Id.* Thus, even when they were regulating firearms, officials in the Northwest Territory did so respectful of the expectation that men and women would carry arms outside their homes. They assumed that citizens would carry arms for a very specific purpose—the "core lawful purpose of self-defense." *McDonald v. City of Chicago, Ill.*, 561 U.S. 742,

768 (2010) (quoting *Heller*, 554 U.S. at 630).

But apparently not all people could be trusted with firearms—after all, if disfavored groups were allowed to possess or carry firearms, they might use them to protect themselves from those who would victimize them.

### b. Firearms regulations have been used to disarm and oppress minorities for generations.

As long as firearms restrictions have existed, they have been used to disarm and oppress "disfavored" groups. In 1689, the English Bill of Rights limited the right to arms to upper-class Protestants. Renee Lettow Lerner, *The Second Amendment and the Spirit of the People*, 43 Harv. J. L. & Pub. Pol. 319, 324 (2019). This allowed the English to disarm and oppress Catholics—a suspect and disfavored group—and other servants and laborers. *Id.* at 324–325. To protect citizens from such oppression, the United States ratified the Second Amendment. *Heller*, 554 U.S. at 593–595.

But in the American Colonies, black Americans' right to bear arms was determined by their social status. Slaves were forbidden to own or possess firearms—unless there were exceptional circumstances and local authorities granted a license. Later, some freedmen[2] were allowed to

---

[2] Freedmen is generally used to refer to former slaves who gained their freedom after the Emancipation Proclamation—or for most—after the Thirteenth Amendment. *The Freedmen*, Library of Congress, https://tinyurl.com/LoCFreedmen (last visited Feb. 24, 2023). In contrast, "free negroes" or "free blacks" were black Americans who were not enslaved prior to the Civil War. Sherri L. Burr, *The Free Blacks of*

possess firearms but only with a license approved by the state. In other states, even freedmen were denied the right to bear arms. Many times—though free—the courts denied the freedmen their rights as they did not consider them to be citizens. *State v. Newsom*, 27 N.C. 250, 207 (1844); *Cooper v. Savannah*, 4 Ga. 72 (1848).

The unfortunate history in Colonial America of denying firearm possession to disfavored minorities began in the 1600s. The first colonial law prohibiting black Americans from being "provided with arms and am[m]unition" was passed in Virginia in 1640. Act of Jan. 6, 1639, § 10, *reprinted in* 1 *The Statutes at Large; Being a Collection of All the Laws of Virginia, From the First Session of the Legislature, in the Year 1619* 224–226 (William Waller Hening ed. 1823). In 1792, Virginia made clear that "[n]o negro or mulatto whatsoever shall keep or carry any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive." Act of Dec. 17, 1792, ch. 41, §§ 8 and 9, *reprinted in* 1 *The Statutes at Large of Virginia* 122–123 (Samuel Shepherd ed. 1835). In 1806, Virginia amended the law to allow firearm ownership by freedmen; however, Virginia restricted ownership by requiring freedmen to obtain a permit issued by state authorities. Act of Feb. 4, 1806, ch. 94, § 1, *reprinted in* 3 *The Statutes at Large of Virginia* 274–275 (Samuel Shepherd ed. 1836). After Nat Turner's slave revolt in 1831, Virginia repealed the law—once again preventing freedmen from owning or possessing firearms. *The Right to Bear Arms: A Constitutional right of the People or a Privilege of*

---

*Virginia: A Personal Narrative, A Legal Construct*, 19 J. of Gender, Race & Justice 1, 3 (2016).

*the Ruling Class*, *supra*, at 299.

In Louisiana, "no slave or mulatto whatsoever, shall keep or carry any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive; but all and every gun, weapon and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person * * * ." Act of Oct. 1, 1804, § 4, *reprinted in The Laws of the Territory of Louisiana* 13–14 (Joseph Charles ed. 1808).

In South Carolina it was the same: "[N]o negro or slave shall carry *out of the limits* of his master's plantation any sort of gun or firearms, without his master, or some other white person by his order, is present with him, or without a certificate from his master, mistress or overseer, for the same." Act of June 7, 1712, § 5, *reprinted in 7 Statutes at Large of South Carolina* 353–354 (D.J. McCord ed. 1840) (emphasis added).

At least eight other states or territories—Alabama, Arkansas, Delaware, Florida, Georgia, Kentucky, Maryland, North Carolina, and Tennessee—had similar pre-civil war oppressive laws preventing "negro[s] mulato[s] or Indian[s]" from keeping or carrying guns unless given specific permission. *See, e.g.*, *Digest of the Laws of the State of Ala.* 391–92 (1833); Ark. Const. art. II, § 21 (1836) (only allowing free white men the right to bear arms); ch. 176, § 1, 8 *Laws of the State of Del.* 208 (1841); Fla. Const. art. I, § 21 (1838); § 7, *1833 Ga. Laws* 228; ch. 174, §§ 5 and 6 (1798), *reprinted in 2 Digest of the Statute Law of Ky.* 1150 (1822); ch. 86, § II (1806), *reprinted in 3 Laws of Md.* 297 (1811); *Newsom*, 27 N.C. at 207; and Acts 1741, ch. 24, *reprinted in 1 Statute Laws of the State of Tenn. of a Public & General Nature*, 314 (1831). Like the modern day justifications for firearm licensing, courts upheld the restrictions on

freedmen because the laws did "not deprive the free man of color of the right to carry arms about his person, but subjects it to the control of the County Court, giving them the power to say, in the exercise of a sound discretion, who, of this class of persons, shall have a right to the licence, or whether any shall." *Newsom*, 27 N.C. at 254.

>   c. **During Reconstruction (1865–1877), black Americans' right to bear arms continued to be denied through passage of the black codes.**

Even after the end of the Civil War and the passage of the Thirteenth Amendment in 1865, Southern States continued to treat freedmen as second-class citizens. J. Baxter Stegall, *The Curse of Ham: Disarmament Through Discrimination - the Necessity of Applying Strict Scrutiny to Second Amendment Issues in Order to Prevent Racial Discrimination by States and Localities Through Gun Control Laws*, 11 Liberty U.L. Rev. 271, 283 (2016). The States—and some localities— passed black codes,[3] which explicitly targeted freedmen by preventing them from owning or carrying firearms. *Id.* at 284–287; *McDonald*, 561 U.S. at 771–772. The black codes were not just words on paper. Because the black codes were reenactments of the slave codes, "the black man [ ]

---

[3] The black codes were laws "designed to replace the social controls of slavery that had been removed by the Emancipation Proclamation and the Thirteenth Amendment to the Constitution." *Black Code*, Britannica, https://www.britannica.com/topic/black-code (last visited Feb. 24, 2023). The black codes, though varying between states, "were all intended to secure a steady supply of cheap labour, and all continued to assume the inferiority of the freed slaves." *Id.*

never had the right either to keep or bear arms." *The Right to Bear Arms A Constitutional right of the People or a Privilege of the Ruling* Class, *supra*, at 264 (quoting Address delivered in New York City, May 10, 1865, 4 *The Frederick Douglas Papers* 84 (1991)). State officials used the black codes as justification for abusive conduct, including robbery, searching of freedmen's homes and person, and seizure of their firearms. Stegal, *supra*, at 284–287. The black codes allowed outlaws to "make brutal attacks and raids upon the freedmen, who are defenseless, for the civil law-officers disarm the colored man and hand him over to armed marauders." Stephen P. Halbrook, *Securing Civil Rights: Freedmen, the Fourteenth Amendment, and the Right to Bear Arms* 31 (2010).

After hearing from officials at the Freedmen's Bureaus of the abuse being committed in the Southern States, Congress passed the Second Freedman's Bureau Act with the explicit intent of negating the black codes. Stegall, *supra*, at 289. The Act stated that

> full and equal benefit of all laws and proceedings concerning personal liberty, personal security, and the acquisition, enjoyment, and disposition of estate, real and personal, *including the constitutional right to bear arms*, shall be secured to and enjoyed by all the citizens of such State or district without respect to race or color, or previous condition of slavery.

14 Stat. 173, 176 (1866) (emphasis added). At the same time, Congress passed the Civil Rights Act of 1866—guaranteeing "full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens." 14 Stat. 27 (1866). However, Southern States continued to deny black American's the right to bear arms by holding the

Civil Rights Act to be unconstitutional. *McDonald*, 561 U.S. at 775 n.24. One court did so "in the course of upholding the conviction of an African–American man for violating Mississippi's law against firearm possession by freedmen" without the required license. *Id.*; *Securing Civil Rights: Freedmen, the Fourteenth Amendment, and the Right to Bear Arms*, *supra*, at 269.

### d. During Jim Crow (1877–1964) States used facially neutral laws and blatant prohibitions to prevent black Americans and Native Americans from exercising their right to bear arms.

Immediately following the Civil War, "most Northern states did not restrict an individual's right or ability to carry a firearm in public, whether it be concealed or openly, as long as they carried the weapon peaceably." *Securing Civil Rights: Freedmen, the Fourteenth Amendment, and the Right to Bear Arms*, *supra*, at 273. In 1868 the United States ratified the Fourteenth Amendment, which "incorporated the first eight amendments against states, so a citizen 'had secured to him the right to keep and bear arms in his defense.'" David B. Kopel, *The Second Amendment in the Nineteenth Century*, 1998 B.Y.U. L. Rev. 1359, 1453 (1998) (quoting Cong. Globe, 42d Cong., 1st Sess. app. at 475 (1871)). "[T]he Fourteenth Amendment was intended to invalidate [ ] the Mississippi Black Code from 1865, which provided that no African American, no freeman, no freed slave could carry a firearm without some kind of permit from the authorities." Stephen P. Halbrook, *The Right to Bear Arms: For Me, But Not For Thee?*, 43 Harv, J. L. & Pub. Pol. 331, 333 (2019). But, the intention of extending Second Amendment protections to individuals as against the States was never completely

realized until 2010. *McDonald*, 561 U.S. at 762–790.

Southern states, however, continued their efforts to disarm black Americans. Small pistols selling for as little as 50 or 60 cents became available in the 1870's and 1880's. William Tonso, *Gun Control: White Man's Law*, Reason Magazine (1985). Because black Americans and poor whites could afford these cheap arms, several states passed what are today called "Saturday Night Special" laws banning these small, inexpensive handguns. *Id.* Instead of formal legislation, states like Mississippi and Florida "simply continued to enforce the pre-emancipation statutes forbidding Blacks to possess arms, in violation of the Fourteenth Amendment." Stefan B. Tahmassebi, *Gun Control and Racism*, , 74 (1991).

Further, during the Jim Crow era, "exorbitant business or transaction taxes were imposed in order to price handguns out of the reach of blacks and poor [w]hites." *Id.* at 74–75. These laws—while facially neutral—were passed "to ensure that African Americans could not carry firearms, effectively in the same way that poll taxes were instituted to deny them the right to vote." *Securing Civil Rights: Freedmen, the Fourteenth Amendment, and the Right to Bear Arms*, *supra*, at 287. For example, in 1893, Florida made it a crime

> for a person "to carry around with him, or to have in his manual possession" a "Winchester rifle or other repeating rifle" without a license, which "may" be granted after posting a $100 bond. That would be equivalent to $2,922 in 2021. The average monthly wage for [a black] farm labor[er] in Florida in 1890 was $19.35 [in 2021 dollars]. In 1901, the law was amended to add pistols to the list.

*Id.* at 289. The Florida Supreme Court noted that the law

> "was passed when there was a great influx of negro laborers in th[e] State," and it was "for the purpose of disarming the negro laborers. . . . The statute was never intended to be applied to the white population. . . . Moreover, it was estimated that "80% of the white men living in the rural sections of Florida have violated this statute," "not more than 5% of the men in Florida who own pistols and repeating rifles have ever applied" for a license, and that "there had never been . . . any effort to enforce the provisions of th[e] statute as to white people, because it has been generally conceded to be in contravention of the Constitution and non-enforceable if contested."

Tahmassebi, *supra*, at 74 (quoting *Watson v. Stone*, 184 Fla. 516, 524 (1941) (Buford, J., concurring*)*.

Similarly, Mississippi in 1906 enacted the first registration law for retailers, requiring retailers to maintain records of all pistol and pistol ammunition sales, and to make such available for inspection on demand. *Id.* at 75. In other Southern States, retailers would often report to local authorities whenever black Americans purchased firearms or ammunition. *Id.* "The sheriff would then arrest the purchaser and confiscate the firearm which would either be destroyed or turned over to the local Klan or a white militia." *Id.*

But even as the U.S. Government and the States pretended to remedy their past oppression of former slaves, States and the federal government increased their oppression against other disfavored minority groups, such as Native Americans. In 1873, the federal government enacted a law which "prohibited the sale of arms and munitions to 'hostile' Indians." *Id.* at 79 (citing 17 Stat. 457 (1873)). "Usually the

disarmament of Indians was quickly followed by the imposition of oppressive measures or even murder and wholesale massacres." *Id.* Shockingly, those restrictions were not abolished until 1979. *Id.*

### e. New York's race and minority-targeting Sullivan Law.

Though a Northern State, in 1911 New York enacted the Sullivan law, a firearms restriction targeting "undesirables," such as black Americans and foreign-born residents. It was "the first law in any state (other than the black codes) to require a permit for keeping a pistol or other concealable firearm *in the home.*" *The Right to Bear Arms: A Constitutional right of the People or a Privilege of the Ruling Class*, *supra*, at 303 (emphasis added); 1911 N.Y. Laws, ch. 195, § 1. The Sullivan law "expanded the State's criminal prohibition to the possession of all handguns—concealed or otherwise—without a government-issued license." *Bruen*, 142 S. Ct. at 2122.

Violation of the law—even in one's own residence—was a felony. And the licensing procedure was totally discretionary; the applicant had to prove to a licensing agent who had absolute discretion to determine if the applicant had "good moral character" and "proper cause." 1913 N.Y. Laws, ch. 608, § 1897. It was even harder for "aliens" and "noncitizens" to get a license—they needed a judicial order supported by "persons certifying the good moral character" of the person. *Id.* Scholars have concluded that "[t]he Sullivan law was designed to 'strike hardest at the foreign-born element.'" Tahmassebi, *supra*, at 77 (quoting James Anderson & Lee Kennett, *The Gun in America: The Origins of a National Dilemma* 177–178 (1975)). "[T]here are those who argue * * * that a

major reason for the enactment of the Sullivan Law was the belief that certain disfavored groups, members of labor unions, Blacks and Italians, were carrying guns and they were dangerous people and they wanted them disarmed." Transcript of Oral Argument at 103–104, *Bruen*, 142 S. Ct. 211 (No. 20-843), https://www.supremecourt.gov/oral_arguments/argument_transcripts/2021/20-843_f2q3.pdf.

So, the very people targeted by this law were required to disprove the apparent presumption that they did not have good moral character. It is no surprise that the first person convicted of violating the Sullivan law "was a member of one of the suspect classes, an Italian immigrant." Robert J. Cottrol & Raymond T. Diamond, *"Never Intended to Be Applied to the White Population": Firearms Regulation and Racial Disparity - the Redeemed South's Legacy to a National Jurisprudence?*, 70 Chi. Kent L. Rev. 1307, 1334 (1995).

In *Bruen*, the Court struck down the Sullivan law. 142 S. Ct. at 2122. In addressing the "may-issue" aspects of the Sullivan law, the Court looked askance at how the law required the "appraisal of facts, the exercise of judgment, and the formation of an opinion," to determine if an applicant would be given a license. *Id.* 2138, n.9 (citing *Cantwell v. Connecticut*, 310 U.S. 296, 305 (1940)). Indeed, the constitutional right to bear arms deserves as much protection from arbitrary restrictions as other fundamental rights. "A statute authorizing previous restraint upon the exercise of the guaranteed freedom," such as the Sullivan law, is "obnoxious to the Constitution * * *." *Cantwell* at 306.

### III. Meet the new Hochul Law, worse than the old Sullivan Law.

New York learned nothing from *Bruen*. Within days after the U.S. Supreme Court struck down the state's handgun licensing law, New York Governor Hochul announced that she and the State's legislative leaders "have agreed on the broad strokes of a gun control bill * * *." Marina Villeneuve, *New York governor: State to limit where guns can be carried*, Associated Press (June 29, 2022), https://apnews.com/article/us-supreme-court-new-york-gun-politics-legislature-kathy-hochul-7df2c33a805cc1d99b2dd430675d3d53. Governor Hochul's new law doubles down on the State's past discriminatory firearms laws. Of course, the law is framed to address the societal goal of public safety. But "[i]f safety concerns must be conceded, it should be recognized as well that local governments have sought to ban firearms from what is frequently considered one of today's untrustworthy and suspect classes, the urban poor." Cottrol & Diamond, *supra*, at 1334–335. And the urban poor are often minorities. *The State of Black New York*, *supra*, at 9. New York's new law turns a constitutionally guaranteed *right* for all into a *privilege* enjoyed only by a select few—not the urban poor. Under the Hochul Law, in order to obtain a concealed carry permit in New York, an applicant must prove his or her moral character by:

- providing at least four character references;
- submitting a list of former and current social media accounts for the last three years;
- disclosing the applicant's spouse or domestic partner and any other adults residing in the applicant's home;

- providing any additional information the licensing officers deem appropriate; and

- submitting to an in-person interview with the licensing officer or designee.

2022 N.Y. Sess. Laws ch. 371, § 400.

Like the old "may issue" regime, licensing officers seem to have complete discretion to determine if the applicant's character references are adequate, if the social media accounts disqualify the applicant, if the applicant's associates disqualify the applicant, what is asked in the interview, and what other information is requested. The licensing officer then—apparently unilaterally—determines if the applicant is "of good moral character." *Id.*

This Court should reject any regime which purports to "license" constitutionally protected activity but relies on discretionary authority to determine who may engage in that activity. If this case were not about firearms, there would be no doubt that New York could not treat constitutional rights this way. Surely New York could not require a resident to prove with references and pre-speech interviews that he or she had the proper "moral character" before being allowed to speak in public. Nor could a State require a license before an individual could travel outside of his or her home, subject always to a licensing agent's approval of the applicant's moral character. Yet that is what has happened to the right to self-defense in New York.

The courts have been rightly skeptical of allowing broad discretion to governmental officials to regulate individual constitutional rights. For

example, in *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750 (1988), the Court held unconstitutional a city ordinance giving a government official broad authority to grant or deny applications for permits for publishers to place their news racks on public property. The Court emphasized that a law or policy protecting the rights "for some but not for others" raises the specter of unconstitutional censorship and viewpoint discrimination. *Id.* at 763. Indeed, the Court found that the danger of unconstitutionality "*is at its zenith* when the determination of who may speak and who may not is left to the unbridled discretion of a government official." *Id.* (emphasis added).

*Plain Dealer Publishing Co.* is hardly an outlier. Over many decades the Court has repeatedly found broad governmental discretion to be constitutionally suspect. *See, e.g.*, *Watchtower Bible & Tract Soc'y of New York, Inc. v. Village of Stratton*, 536 U.S. 150, 162–164 (2002); *Cox v. State of Louisiana*, 379 U.S. 536, 558 (1965) ("allowing unfettered discretion in local officials" is an abridgement of First Amendment rights); *Saia v. New York*, 334 U.S. 558, 562 (1948) (holding an ordinance unconstitutional where it gave broad licensing discretion to a government official, and concluding such a regime "sanctions a device for suppression" of people's rights); *Cantwell*, 310 U.S. at 308 (ordinance requiring persons to obtain a license before soliciting door-to-door was invalid because the "executive and judicial branches [had] too wide a discretion in its application").

Nor are these principles cabined to selected rights or specific Amendments. The case law makes clear that broad discretion by government officials is constitutionally suspect when applied to the full

range of rights protected by the Bill of Rights. The Court has emphasized that the "central concern underlying the Fourth Amendment" is that law enforcement officers would otherwise have "unbridled discretion" to perform searches. *Arizona v. Gant*, 556 12 U.S. 332, 345 (2009); *see also Marshall v. Barlow's, Inc.*, 436 U.S. 307, 323 (1978) (holding a portion of the Occupational Safety and Health Act unconstitutional, where the statute gave "almost unbridled discretion [to] executive and administrative officers" to perform warrantless searches).

The same constitutional infirmity is apparent here. New York's discrimination against individuals in the enjoyment of their Second Amendment right to carry is a feature—not a glitch—of the challenged law. New York's law was designed to treat certain persons differently, depriving them of rights guaranteed to "the whole people."

While it will be challenging for any applicant to meet the statutes ill-defined requirements to exercise a constitutional right, the financial burden it imposes will fall especially hard on the poor and minorities. First, to obtain a permit, one must complete a live firearms safety course costing from $350 to almost $600 in New York. *See, e.g.*, *New York State Concealed Carry Firearm Safety Training*, Public Safety & Education, https://psanded.com/courses/firearms/nyccw/ (last visited Feb. 26, 2023); *NYS 18hr Concealed Carry Firearms Safety Training*, NY Concealed Carry, https://nyconcealedcarry.com/nys-ccw-18-hour-course (last visited Feb. 26, 2023); *NYS Concealed Carry License Class Schedule: NYC Area Dates*, Firearms Training of Western New York, https://ftwny.com/nys-concealed-carry-license-class-schedule-nyc-area-dates/ (last visited Feb. 26, 2023). Applicants must also take time off work to attend the classes.

If a class is not offered within walking distance, they must pay for transportation to get to the class. Before taking the class, applicants without a license must rent a firearm from a range to practice for the live-fire portion of the test.

Second, the law requires an in-person interview prior to receiving a firearms license. The in-person interview again requires the applicant to spend money to travel to the interview location and to possibly take time off from work.

Third, even if an applicant has the means and patience to navigate this maze successfully and persuade an unnamed, unelected—and likely unreceptive[4]—bureaucrat to issue a permit, that permit must be renewed or recertified every three to five years—even though the State is required to review permit holder's information on a monthly basis. That means every three to five years, low-income individuals must again pay and seek the government's permission to exercise their right to bear arms. And, if a permit holder does not renew or recertify their permit, their future application will be denied. This will cost the applicant additional time and money to go through the appeals process.

The cost in time and money could easily exceed one-thousand

---

[4] It is apparent from Governor Hochul's press conference that she and her administration are highly skeptical of allowing anyone to carry firearms. N.Y. Governor's Press Office, *Governor Hochul Announces New Concealed Carry Laws Passed in Response to Reckless Supreme Court Decision Take Effect September 1, 2022*, New York State (Aug. 31, 2022), https://www.governor.ny.gov/news/governor-hochul-announces-new-concealed-carry-laws-passed-response-reckless-supreme-court. Indeed, the entire process is manifestly designed to discourage anyone from even applying, let alone completing the entire application process.

dollars, a cost which would be a struggle for many low-income minorities. In New York, 66% of black adults experienced material hardship for at least one year because they could not afford basic necessities, and nearly one in four black adults in New York City live in poverty. *The State of Black New York* 9, New York Urban League, https://tinyurl.com/BlackNY (last visited Feb. 24, 2023). Hence, the law lands squarely on New York's low income black-Americans. Indeed, the Hochul law is eerily similar to an 1893 Florida Jim Crow law, enacted "for the purpose of disarming the negro laborers" by requiring those persons to post a $100 bond in order to possess a firearm. Tahmassebi, *supra*, at 74; *see also, Securing Civil Rights: Freedmen, the Fourteenth Amendment, and the Right to Bear Arms, supra*, at 289. And it carries echoes of the now-illegal poll taxes which were also designed to repress black-American voters. See *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 666 (1966); *Harman v. Forssenius*, 380 U.S. 528, 543 (1965).

That the politicians who passed the Hochul Law presumably would deny any racist intent is of little moment to those individuals—including disproportionately minority individuals—whose right to bear arms for self-defense is violated by the Hochul Law.

**IV.    The Hochul law deprives minorities and other disadvantaged people from protecting themselves in the locations where they need it the most.**

Finally, even if a permit is granted, the law drastically restricts the places where a firearm can be carried. The law prohibits even a licensed individual from carrying a firearm in "sensitive places," which is pretty much anywhere. These "sensitive places" include—to mention only a few,

- places of worship or religious observation;
- libraries, public playgrounds, public parks, and zoos;
- homeless shelters, family shelters, shelters for adults, and domestic violence shelters;
- any building or grounds, owned or leased, of any educational institutions;
- public transportation;
- theaters, stadiums, racetracks, museums, amusement parks, conference centers, banquet halls;
- any gathering of individuals to collectively express their constitutional rights to protest or assemble; and
- Times Square.

N.Y. Penal Law § 265.01-e. When asked in what public places a permit holder could carry a firearm, New York Governor Hochul replied, "probably some streets." Marcia Kramer & Dick Brennan, *Fresh off primary win, Gov. Kathy Hochul dives right into guns--who can get them and where they can take them*, CBS New York (June 29, 2022), https://tinyurl.com/SomeNYStreets.

Many of these "sensitive places" are precisely the places where people may be most concerned about protecting themselves from lawless armed criminals. For example, black American churches have historically been—and shockingly still are—targeted by those seeking to

harm black Americans. Conor Friedersdorf, *Thugs and Terrorists Have Attacked Black Churches for Generations*, The Atlantic (June 18, 2015), https://tinyurl.com/AtlanticChurches; Jason Crosby, *Targeting Black Churches Isn't Stuff of Distant History*, Courier Journal (Nov. 1, 2018), https://tinyurl.com/CourierChurches. And there is no question that a good guy with a firearm in a church can prevent a tragedy. Frank Heinz, *'Good Guy With a Gun' Who Stopped Church Gunman Receives Texas' Highest Honor*, NBCDFW (Jan. 14, 2020), https://tinyurl.com/GoodGuyChurch.

Indeed, those who attend church services have both First Amendment rights to the "free exercise of religion" and the right to bear arms for their protection during that worship. People who are most targeted at church have the greatest need to protect themselves by bearing arms. The Hochul law takes away that ability for self-protection.

Further, many minorities and other low-income inner-city residents rely on places like public playgrounds and city parks for recreational activities for their children. These places are sadly not immune from urban violence, but the Hochul law prohibits parent-permit holders from carrying firearms in these areas—even though they would have been fully vetted through the extensive—and discriminatory—permitting process.

The law bans the possession of a firearm on public transportation. For many urban poor living in New York City—often minorities—public transportation is the only option. Despite rampant crime on New York City public transportation, these individuals are unable to exercise their constitutional right to defend themselves. *See* Fola Akinnibi, *NYC's*

*Subway Police Surge Fails to Dent Transit Crime*, Bloomberg (Nov. 4, 2022), https://tinyurl.com/SubwayCrime. Those who rely on public transportation must choose between their constitutional right to protect themselves and dangerous travel—knowing that the police generally solve crimes, they are seldom present to stop a violent crime before it occurs. *Id.*

These are the scenarios that the *Bruen* decision anticipates—protecting oneself in a public setting where armed criminals who ignore the Hochul Law's prohibitions are likely to prowl.

The Bill of Rights exists to protect individual rights against government interference. It cannot be left to the discretion of a government official to determine who may enjoy those rights—who may defend herself and who may not. *See Plain Dealer Publishing Co.*, 486 U.S. at 763. The Constitution does not abide such selective application of fundamental rights. The Court was clear in *Heller* that when the Constitution protects the rights of "the people," it "unambiguously refers to all members of the political community, not an unspecified subset." 554 U.S. at 580; *see also United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990). The Second Amendment is not limited to the wealthy or well-connected, or those who demonstrate the "essential character" to bear arms, or to any other category that the State deems fit.

## CONCLUSION

In *Bruen*, the Court held "that a State may not enforce a law, like New York's Sullivan Law, that effectively prevents its law-abiding residents from carrying a gun * * *." 142 S. Ct. at 2157 (Alito, J., concurring). As with the history of firearms regulations, the Hochul Law restricts the fundamental right to keep and bear arms for the urban poor and facilitates discriminatory enforcement by State officials. For the reasons stated in the Appellees' brief and this *amicus* brief, this Court should affirm the decision of the United States District Court for the Western District of New York, enjoining the enforcement of New York's firearm law.

Respectfully submitted,

*David C. Tryon*
David C. Tryon
  *Counsel of Record for Amicus Curiae*
Robert Alt
Jay R. Carson
Alex M. Certo
The Buckeye Institute
88 East Broad Street
Suite 1300
Columbus, OH  43215
(614) 224-4422
d.tryon@buckeyeinstitute.org

## <u>CERTIFICATE OF COMPLIANCE</u>

Federal Rules of Appellate Procedure
Appendix 6

1. This document complies with the word limit of Fed. R. App. Rule 29(a)(2) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

   X        this document contains 6,914 words, or

   □        this brief uses a monospaced typeface and contains [state the number of] lines of text.

2. This document complies with the typeface requirements of Fed. R. App. R. 32(a)(5) and the type-style requirements of Fed. R. App. R. 32(a)(6) because:

   X        this document has been prepared in a proportionally spaced typeface using Microsoft Word for the most current version of Office 365 in 14-point type, Century, or

   □        this document has been prepared in a monospaced typeface using [state name and version of word-processing program] with [state number of
   characters per inch and name of type style].

*David C. Tryon*
David C. Tryon
  *Counsel of Record for Amicus Curiae*
Robert Alt
Jay R. Carson
Alex M. Certo
The Buckeye Institute
88 East Broad Street
Suite 1300
Columbus, OH  43215
(614) 224-4422

March 13, 2023            d.tryon@buckeyeinstitute.org

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing Amicus Brief was served on all counsel of record via the Court's electronic filing system this 13th day of March, 2023.

*David C. Tryon*
*Counsel of Record for Amicus Curiae*